# Exhibit 1
# Part 1

**The Parish of Plaquemines**
**v.**
**Rozel Operating Company,** *et al*


**PRELIMINARY EXPERT REPORT ON VIOLATIONS**


**April 30, 2018**



Rozel_PrelimRpt: 00001

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

   A.   Purpose ............................................................................................................. 1

   B.   Overview of Breton Sound Basin and Land Loss within Parish.......................... 1

   C.   Overview of Bayou Gentilly Case Area Land Loss .............................................. 5

   D.   Overview of Bayou Gentilly Case Area Well Fields/Defendants........................ 9

II.   DESCRIPTION OF OIL/GAS ACTIVITIES WITHIN CASE AREA ................................. 13

   A.   Development of the Well Fields/Canal Network ............................................. 13

      1.   Delacroix Island .................................................................................... 13

      2.   Bayou Gentilly ...................................................................................... 19

      3.   Crooked Bayou ..................................................................................... 19

      4.   Lake Petit.............................................................................................. 20

   B.   Production of the Well Fields, Including Produced Water Discharge ............... 20

      1.   Delacroix Island .................................................................................... 20

      2.   Bayou Gentilly ...................................................................................... 23

      3.   Crooked Bayou ..................................................................................... 24

      4.   Lake Petit.............................................................................................. 25

III.  INTRODUCTION TO LOUISIANA COASTAL PROGRAM ........................................ 26

   A.   The Louisiana State and Local Coastal Resources Management Act of 1978 ... 26

   B.   The Louisiana Oil and Gas Industry role in modifying SLCRMA......................... 27

   C.   Pre-1980 Louisiana Laws, Regulations and Orders.......................................... 29

      1.   Acts of the Legislature ......................................................................... 29

      2.   The Office of Conservation (OC) ........................................................... 31

      3.   The Stream Control Commission (SCC) Rules and Orders ..................... 32

IV.  VIOLATIONS OF THE SLCRMA BEING PROSECUTED IN THE BAYOU GENTILLY CASE ........... 34

   A.   Violations For Undertaking Coastal Use Without a Coastal Use Permit ........................ 34

   OPINION #1:   Violation for Continuation of Use Commenced before 1980 Where There Was a Significant Change in Nature, Size, Location, or Impact of the Use/Activity ............. 34

      1.   Continued Operation of the Canals Without Seeking a Permit for Modification ........ 36

         (a)   Impacts from Continued Operation of the Canals................................. 40

            (i)   Construction - Direct Loss .................................................... 40

i

(ii)    Indirect Loss from Altered Hydrology ..................................................... 41

↳    Formation ............................................................................... 41

↳    Total Suspended Solids ...................................................... 43

↳    Construction – Direct Loss ............................................... 44

↳    Maintenance and Use - Indirect Loss (Weakened Marsh) ................................ 45

↳    Marsh Edge Erosion ........................................................... 46

↳    'Impoundment and Impediment' - Hydrologic Alteration ............................... 47

2.    Violations for Continued Discharge of Produced Water ............................. 53

   (a)    Impacts of Continued Discharge of Produced Brine Water .................................. 54

3.    Violations for Withdrawal of Fluids ................................................ 56

   (a)    Impacts of Continued Withdrawal of Oil and Gas and Produced Water .............. 56

4.    Absence of Permitting for Impacts from Otherwise Exempt Activities ....................... 60

OPINION #2:  Violation by Continuation of a Use Not Lawfully Commenced before 1980 Without Additional Permitting or Certification .................................... 67

1.    Pre-1980 Activities that were in "Bad Faith" and therefore could not have been lawfully commenced when Coastal Program commenced in 1980 ...................................... 68

OPINION #3:  Violations for Commencement of Uses after 1980 Without a Coastal Use Permit or Coastal Impact Determination ................................................................... 84

1.    Plugging & Abandoning Wells/Removal of Equipment Without a CUP ...................... 84

2.    Dredging/Maintenance Dredging/Propwashing Without a CUP ............................... 111

B.    Violation of the Terms and Conditions of Issued Coastal Use Permits ......................... 115

OPINION #4:  Violation of General Condition #3 Based Upon Failure of the Applicant to Fully Disclose Cumulative Impacts ........................................................... 115

OPINION #5:  Violation of CUP Terms & Conditions ............................................ 116

C.    Supplemental Information - Storm Impacts on Weakened Marsh ................................ 117

Literature Cited .......................................................................................................... 134

Appendix A – Well Details

Appendix B – Operator History

Rozel_PrelimRpt: 00003

*Overall report by Jim Blackburn and the team working under his supervision and control at Sustainable Planning & Design.  Specific sections written by other experts are noted.  All experts reserve the right to rely on the work of other experts included in this report.*

## I.   INTRODUCTION

### A.   Purpose

This is an expert report in the case of *Parish of Plaquemines v. Rozel Operating Company*, et al (hereinafter the "Bayou Gentilly case"), offering opinions regarding the types of violations that form the basis of this litigation.  The Bayou Gentilly case involves damage claims, primarily marsh land loss and ecological services damages, filed by the Parish/plaintiff under the State and Local Coastal Resources Management Act (SLCRMA) arising from operations within the Delacroix Island, Bayou Gentilly, Crooked Bayou and Lake Petit oil and gas well fields by the named defendants.  These well fields are located within the Breton Sound hydrologic basin, in which storm water runoff flows from north to south towards the Gulf of Mexico, and storm surge and tidal water flows northward up from the Gulf of Mexico.

This report sets out the opinions of the author(s) about violations and is based upon the work of multiple experts.

### B.   Overview of Breton Sound Basin and Land Loss within Parish

*The following section prepared by John Day, PhD*

The Mississippi delta is made up of several interdistributary estuarine basins separated by current and abandoned river distributary channels (Blum and Roberts 2012). The Breton Sound estuary is located southeast of New Orleans, Louisiana, and is bounded to the north by the natural levee of Bayou la Loutre, to the west by the Mississippi River levee, and to the east by the Mississippi River Gulf Outlet (MRGO; Figure 1). The present-day Breton Sound estuary is an ~850 km$^2$ zone of fresh, brackish, and saline wetlands in the upper half of the basin, and primarily open waters in the lower half.

1



*FIGURE 1:  Map of the Breton Sound estuary (modified from Day et al. 2016c).*

Beginning in the 18th century and greatly accelerating throughout the 20th century, the Breton Sound estuary has been impacted by a variety of human activities such as levee construction and closure of distributaries, massive hydrological alternation, impoundments, and barrier island loss. Flood control levees built during the last two centuries, but mostly in the 20th century, have separated the Mississippi River from its deltaic plain (Kesel 1988, 1989; Mossa 1996; Roberts 1997; Day et al. 2000, 2007; 2014; Day and Erdman 2018; Twilley & Rivera-Monroy 2009). Other factors exacerbating wetland loss include altered hydrology due to the proliferation of dredged canals and deep-well fluid withdrawal associated with the oil and gas industry (Turner et al. 1994; Day et al. 2000; Morton et al. 2002; Chan and Zoback 2007). This has led to salt water intrusion, deterioration of the skeletal framework, and massive wetland loss. These stresses are mostly the result of management in which navigation and flood control, as well as tax revenues from the extraction of petroleum, have prevailed over the ecological sustainability of the estuary.

*(end JD insert)*

The loss of marsh land along the Louisiana coast has been the subject of numerous technical and popular press publications, with varying percentages of the blame for such loss being placed on the oil and gas activities in this area depending upon the author.  A key source of the extent of the land loss is the work undertaken by the United States Geological Survey (USGS),

2

the latest of which was published in 2017.  This work is based upon aerial photographic interpretation and is an excellent starting point for any analysis of land loss, along with additional land loss work compiled by the U.S. Army Corps of Engineers.  All of this land loss work has been reviewed and subsequently verified and/or amended by the plaintiff's technical team after reviewing aerial photographs.

Figure 2 shows the general land loss in Plaquemines Parish, based on the USGS land loss data for the period from 1932-2010.  Figure 3 shows this same USGS land loss map with all of the oil and gas well fields that have been developed in Plaquemines Parish.  Figure 4 shows the myriad of individual wells within those fields.



*FIGURE 2: Plaquemines Parish Land Loss*

3



*FIGURE 3: Plaquemines Parish Oil Fields and Land Loss*

Rozel_PrelimRpt: 00007



*FIGURE 4:  Plaquemines Parish and Breton Sound (and eastern Barataria) Wells and Land Loss*

### C.    Overview of Bayou Gentilly Case Area Land Loss

Figures 5 through 8 below illustrate the development of the Bayou Gentilly case area as an oil and gas field and the loss of marshland through that time.  Figure 5 illustrates the original, pre-oil and gas, condition of the Bayou Gentilly case area in 1932.  Bayou Gentilly was comprised of freshwater influenced, emergent intertidal marsh, interspersed with natural shallow water bodies (marsh "lakes") and bayous, including named Bayou Gentilly and Bayou Long and numerous other small marsh bayou features.  By 1979 the oil and gas canal network was almost entirely developed by dredging activity to provide access to all wells as shown in Figure 6.  By 1985, approximately 5,000 acres of marsh land had been lost as shown in Figure 7.  Twenty-five years later, by 2010, approximately 13,000 acres were lost, representing a loss of 62% of the original 21,000 acres in Bayou Gentilly, as shown in Figure 8.

Rozel_PrelimRpt: 00008



*FIGURE 5:  TOPO map showing Bayou Gentilly Original Condition 1930's – Approx. 21,000 original marsh acres*

Rozel_PrelimRpt: 00009



*FIGURE 6: Bayou Gentilly 1979 Conditions at the Start of the CUP Program in 1980. Note developed canal network. Roughly 16,500 acres of marsh remain within the case area.*

Rozel_PrelimRpt: 00010



*FIGURE 7:   USGS Bayou Gentilly Land Loss by 1985 – Approx. 5,000 acres lost, 16,000 acres remain.*

8



*FIGURE 8:  USGS Bayou Gentilly Land Loss by 2010 – 13,000 acres lost, 8,000 acres remain.*

### D.    Overview of Bayou Gentilly Case Area Well Fields/Defendants

The following is a summary of the oil and gas well fields in Plaquemines Parish within the area outlined in the Bayou Gentilly case.   The geographical area covered by this legal filing is generally referred to in this report as the Bayou Gentilly case area.

There are four oil and gas well fields involved in the Bayou Gentilly case area: Delacroix Island (discovered in 1941), Bayou Gentilly (discovered in 1956), Crooked Bayou (discovered in 1970) and Lake Petit (discovered in 1981).  These well fields are shown in Figure 9.

Rozel_PrelimRpt: 00012



*FIGURE 9:  Outline of the Bayou Gentilly case area with the four well fields indicated, including time of field discovery.  Land loss background is cumulative to 2010.*

Within these four well fields, various oil and gas activities were conducted, including the construction of exploration and production wells, and the construction, maintenance and use of canals to access these wells.  The oil and gas wells comprising the four oil fields in the Bayou Gentilly case area are shown in Figure 10 below.  Also shown in Figure 10 are the various channels and canals that have been constructed and/or expanded by human activity, with most being related to providing access to the oil and gas wells.

Rozel_PrelimRpt: 00013



*FIGURE 10:  Bayou Gentilly aerial showing wells and oil and gas canals.*

The predecessors of the defendants named in the Bayou Gentilly case that operated wells within each field are as follows:

| | |
|---|---|
| Delacroix Island: | Texaco, Inc. & Texaco E&P, Inc. (together, "Texaco") |
| | Apache Corporation ("Apache") |
| | |
| Bayou Gentilly: | ARCO Oil & Gas Company – Div. of Atlantic Richfield ("ARCO") |
| | LA Land & Exploration Co./Conoco ("LA Land/Conoco") |
| | |
| Crooked Bayou: | LLOG Exploration Company ("LLOG") |
| | |
| Lake Petit: | LA Land/Conoco |

A map showing the wells operated by various defendants is shown in Figure 11 below.

11

Rozel_PrelimRpt: 00014



*FIGURE 11: Map showing wells operated by various defendants in the Bayou Gentilly case.*

***Appendix A—Well Details*** includes a detailed summary of the wells located in the Bayou Gentilly case area, including, for each, its well name, its status, the date on which a drilling permit was issued, the date on which it was spud, the date on which it was first completed, and, where applicable, the date on which it was plugged and abandoned. ***Appendix B—Well Operator History*** includes a detailed summary of the operational history of each well located in the Bayou Gentilly case area, of the identity of each successive operator of record for each well, as well as the specific time periods applicable to each operator. The first operator listed on *Appendix B—Well Operator History* for each well is the company that drilled that well.

12

## II.   DESCRIPTION OF OIL/GAS ACTIVITIES WITHIN CASE AREA

*The following section prepared by Charles Norman, PE*

### A.   Development of the Well Fields/Canal Network

#### 1.   Delacroix Island

Texaco discovered the Delacroix Island Field in 1941 and completed the first well for early production in the 8,900 ft. sand in late 1941.  Oil, gas and condensate were produced.  This well was drilled from a drilling barge.  Development drilling included drilling on West-East and North-South grid spacing.

By the early 1950's, approximately 35 wells had been drilled in the field. Up to this time the wells had produced 5.5 million barrels of oil, 10 BCF gas, 3.5 million barrels of produced water. Texaco's method of development drilling and producing the field was designed for early production methods that consisted of converting the vegetated wetlands to an all-marine, open marsh area by dredging canals, dredging well locations, and using all marine equipment such as draglines for dredging, drilling barges, twin screw work boats, crew boats, work barges, wooden platforms for tank batteries, and marine equipment for well wireline work, workover and other well maintenance services.   In other words, the operations became totally ***overwater*** operations (by continually increasing the amount of open water) as opposed to preserving the marsh and utilizing other more land-based methods such as roads/levees to protect the marsh environment.  These types of marine equipment required deepening the marshes for draft (10+ feet) to operate.  Also, the 24/7 nature of operations of the equipment generated accelerated wave action that erodes levees and destroys marshes.

The individual wellheads were considered satellite wells that produced oil, gas, condensate and produced water through long flowlines to a centralized tank battery.  The three-phase flowlines were routed to a tank battery where oil, gas and water were separated.  The large number of wells were divided up so there were two different tank batteries.  The gas was compressed and sold.  Some gas was used for gas lift.  The three-phase flow of production over long distances was a very inefficient method of producing the field.  It resulted in high back pressure and premature abandonment of the field.  In other words, Texaco's strategy of developing the field by marine operations with long distances between wellheads and the tank battery was an inadequate and inefficient method that resulted in problems with fluid dynamics causing excessive equipment failures and pollution.

Two centralized wooden tank battery platforms were used in the field to gather production. Surrounding these facilities were large open unlined earthen production pits that handled produced water. Oil was skimmed from these pits and the produced water was discharged overboard.

Rozel_PrelimRpt: 00016

Texaco discharged all produced water from these pits and made no provisions for proper handling the produced water to protect the marsh and environment until 1993 when underground disposal began.  The open unlined earthen production pits were used for settling oil and solids followed by discharging overboard. Oil wastes were also dumped inside the production pits and sometimes burned. Marine equipment constantly moving in the canals continued to damage and destroy the vegetated marsh.  Texaco did not restore dredge canals and well locations where dry holes were made or when productive wells were plugged and abandoned.

Texaco also chose to design wells, production flowlines, etc. with minimum and inadequate tubular wall thicknesses for corrosion to prevent failures.  Well cementing records show inadequate amounts of cement were used in surface and production casing.  These measures show that Texaco had little or no regard for designing long life equipment, resulting in failures that caused leaks and spills that caused pollution.

By 1961, 40 wells were drilled in the field and the field had produced 11.1 million bbls of oil, 25.8 BCF of gas and at least 18 million bbls of produced water. Twenty-six wells were producing in 1961.  Development of the field continued using the same methods of dredging canals, keyways, laying flowlines, etc. with no emphasis on restoration.

In Louisiana, starting in the 1920's, there were laws in place prohibiting pollution and the discharge of produced water that would destroy wildlife and aquatic marsh life. These laws are referenced further in Section III of this report. By 1980, the SLCRMA was implemented for regulating oil and gas development operations and their impacts to areas including the Bayou Gentilly case area.  The nature of these regulations required Texaco to change its method of operations to include more detailed engineering of dredging, maintenance, installation of facilities such as flowlines, platforms, and pits to minimize land loss, but to also restore land to its original condition when the work was finished. These regulations notwithstanding, Texaco failed to change their methods of operations.  Some CUPs were obtained but not all that were required, and CUPs were not closed or finalized with land restoration.  Overall, Texaco's operations continued to weaken and damage the wetlands in the Bayou Gentilly case area. Overboard produced water disposal continued after initiation of SLCRMA and this damaged the wetlands.  The SLCRMA regulations were designed to protect the wetlands and restore them. The CUP requirements include a careful engineering look at the proposed project in terms of the disturbance and/or modifications to the marsh, and then obtaining a written permit with sufficient detail to demonstrate the design of the project, its effects on the marsh, the term of the project, the maintenance of the project, and finally the restoration of the disturbed and damaged marsh to its original conditions when the project was complete.

By 1987, fifty-four wells were drilled in the field that Texaco continued to operate.  Twenty-three Miocene Sands were productive and cumulative production by the end of 1987 was 22

14

million bbls of oil, 162 BCF of gas and more than 90 million barrels of produced water discharged overboard.  Production rates were 5 MMcfpd and 300 bopd indicating more of a gas field.  Line heaters were installed on platforms near the individual well heads.

Apache purchased the Delacroix Island Field from Texaco in 1995.  Apache also operated the field using the same methods as Texaco, i.e. using dredged canals to well locations, laying long flowlines. There were few improvements such as securing additional CUPs; however, the follow through with the terms and conditions and/or the finalization of land restoration was not done based on the CUPs.  Also, Apache failed to obtain all necessary coastal use permits.  Thus, Apache also failed to follow SLCRMA regulations and additional land loss occurred.

Today, the Delacroix Island Field is abandoned, yet most if not all the dredged canals and dredged well locations remain.  In other words, both Texaco and Apache operations for closing out the field have failed to include proper restoration of the land losses.  Both operators' methods of operations (conversion of the wetlands to enable overwater operations), as designed, caused destruction of the wetlands and caused permanent land loss.

*(end CN insert)*



*FIGURE 12:  Delacroix Island oil field with Texaco and subsequent Apache well ownership indicated.  (Pipelines are in blue.)*

Rozel_PrelimRpt: 00018

In Figure 12, the wells operated by Texaco are shown in pink and the wells operated by Apache are shown in turquoise (or turquoise and pink). Of these wells, 14 were plugged and abandoned prior to 1980. After 1980, 59 wells were recorded as plugged and abandoned (Apache 37, Texaco 22).

Access canals shown on Figure 13 were constructed over time by several companies. Public records on the construction of these access canals is somewhat limited, and the best source for understanding the canal system is aerial photographs. The responsibility for these various canals, most of which remain today, is ascertained by determining the oil and gas wells that are accessed by these canals, as well as from consultation of public documents.

In Figure 13, responsibility for these various canals is assigned based upon the ownership of the wells serviced by the canals as of the starting date of the Louisiana coastal program. This shows primary ownership in the Delacroix Island field canals as Texaco, with ARCO having responsibility for the Bayou Gentilly field. Figure 14 shows the change in responsibility after Apache purchased much of the Delacroix Island filed from Texaco, based on our current knowledge of this transaction. In this figure, Apache responsibility is shown in turquoise, Texaco responsibility is shown in pink. Also identified are canals/corridors created by pipelines (shown in green/blue dash) and a number of cuts that are not identified as to origin and/or responsibility (shown in white).

Rozel_PrelimRpt: 00019



*FIGURE 13: Assigned responsibility for various canals and corridors identified in and around the Delacroix Island oil field. Prior to Apache's takeover of much of the Delacroix Island field in 1995, all wells were Texaco, and Texaco was primarily responsible for initial canal construction to these wells and the overall oil field canal network in this field.*

Rozel_PrelimRpt: 00020



*FIGURE 14.1: Post 1995 Canal Ownership (including Apache after Texaco sale) in Bayou Gentilly (See also Figure 14.2)*

18



*FIGURE 14.2:  DETAIL - Post 1995 Canal Ownership, Apache after Texaco sale, in the Delacroix Island Well Field*

*The following section(s) prepared by Charles Norman, PE*

### 2.  Bayou Gentilly

Development of the Bayou Gentilly Field began in 1956.  The dredging of canals and well locations was similar to the Delacroix Island field, but not as extensive. This field produced approximately 6.9 million barrels of produced water from 1965-2012 that was also discharged overboard except for approximately 0.5 million barrels of produced water that was injected into a SWD well in the field between 2006 and 2009.  The overboard discharge of produced water and the dredging contributed to continual land loss.

There are two defendants in this field (ARCO and LA Land/Conoco), totaling seven wells, of which four were operative after 1980 (3 ARCO, 1 LA Land/Conoco).  A number of other, non-defendant oil and gas wells are also present.

### 3.  Crooked Bayou

Development of the Crooked Bayou Field began in 1970.  The dredging of canals and well locations was similar to the Bayou Gentilly field. This field produced approximately 0.8 million barrels of produced water, of which 0.4 million barrels were injected into a SWD well in the

Rozel_PrelimRpt: 00022

field between 2003 and 2008.  The dredging did cause continual land loss that was not restored after operations ceased.

There is only one defendant well, operated by LLOG LLC pre-1980, in the Crooked Bayou field.

### 4.  Lake Petit

Development of the Lake Petit Field began in 1981.  The dredging of canals and well locations was similar to the Bayou Gentilly field. This field produced approximately 50 thousand barrels of produced water that was discharged overboard.

Lake Petit contains only a handful of wells located in the confines of Lake Petit, between the Bayou Gentilly and Delacroix Island fields.  Most were dry holes, with just one defendant well operational after 1980 (LA Land/Conoco).  However, the field was connected via underwater dredged channels to the dredged oil and gas canal complex of the Delacroix Island and Bayou Gentilly fields.

### B.    Production of the Well Fields, Including Produced Water Discharge

### 1.  Delacroix Island

Production from the Delacroix Island Field began in 1941 and continued until 2012.  During this time, the field produced approximately 23 million barrels of oil, 180 BCF of gas, and at least 110 million barrels of produced water.  At least 100 million barrels of the produced water was not injected but was discharged overboard.  The legal status of these produced water overboard discharges are discussed in Parts III and IV of this report.

By the early 1950's, approximately 35 wells had been drilled in the field. Up to this time the wells had produced 5.5 million barrels of oil, 10 BCF gas, 3.5 million barrels of produced water. All of the produced water was discharged overboard from the production pits at two tank batteries.

By 1961, 40 well were drilled in the field and the field had produced 11.1 million bbls of oil and 25.8 BCF of gas and at least 18 million barrels of produced water. Twenty-six wells were producing in 1961.  All of the produced water was discharged overboard from the production pits at two tank batteries.

By 1987, fifty-four wells were drilled in the field that Texaco continued to operate.  Twenty-three Miocene Sands were productive and cumulative production by the end of 1987 was 22 million bbls of oil, 162 BCF of gas and more than 90 million barrels of produced water discharged overboard.

Rozel_PrelimRpt: 00023

From available records, it does not appear that Texaco had state or federal permits for any of these discharges.

Increasing produced water production and its damaging effects on the loss of land became a critical issue between 1941 and 1980, when the Coastal Use Permit program began. Texaco did not stop discharging overboard during the beginning of the Coastal Use Permit program under the SLCRMA. Considering that the purpose of the SLCRMA was to protect and restore the wetlands, Texaco neglected to address ways to stop damage to the wetlands until 1993 when they installed the first saltwater disposal well in the Delacroix Island Field.

Prior to 1993, all produced saltwater and waste from the Delacroix Island Field production tank batteries had been discharged into production pits located near the tank batteries and compressor station. In addition, some individual wells were flowed into the production pits for well cleanup from remedial operations, unloading of wells, and temporary flaring of gas from wells and/or the compressor station. The levies of production pits contained discharge pipe(s) that allowed produced water to flow out of the pits into the open water and marsh. The pits would retain the produced saltwater for some settling time and also allow for some skimming of oil and/or burning off the top. Eventually all produced saltwater and waste from the pits was discharged overboard.

Starting in 1993, most, but not all, of the produced saltwater was injected into the subsurface using a SWD (saltwater disposal) well. The pits remained and continued to be used to process produced saltwater for settling, well testing, flaring, compressor blow down, and unloading of wells. Some amount of overboard discharging continued. In fact, most of the pits remained over the life of the Delacroix Island Field. The subsurface saltwater disposal method, starting in 1993, was to recomplete a well, called a SWD well, with tubing and packer inside perforated casing to inject large volumes of produced saltwater into the well. The SWD well had to have complete mechanical integrity at all times, and the saltwater had to be conditioned prior to injection by removal of most solids, hydrocarbons and often times treated with chemicals to deal with corrosion, formation blockage, etc. In the Delacroix field, the SWD well was problematic (considerable downtime) and did not operate continuously thereby requiring overboard discharges. In other words the SWD well was not totally reliable.

*(end CN insert)*

Production totals and spatial locations for produced water for the several oilfields in the Bayou Gentilly case area are mapped in Figures 15 and 16, below. Figures also show the location of the injection wells utilized post 1993. Annualized production graphs, by defendant, from the Delacroix Island field is shown by in Figure 15.

21



*FIGURE 15:  Delacroix Island Field Water Production Annual – Texaco and Apache*



*FIGURE 16:  Annotated Map of Water production (brine) in the Delacroix Island field. (Noted injection figures are included in overall production.)  Relative production and injection volumes suggest approximately 100 million barrels of production brine were disposed into the Delacroix Island marsh.*

22

*The following section(s) prepared by Charles Norman, PE*

### 2. Bayou Gentilly

Development of the Bayou Gentilly Field began in 1956.  The dredging of canals and well locations was similar to the Delacroix Island field, but less extensive. This field produced approximately 6.9 million barrels of produced water that was also discharged overboard except for approximately 0.5 million barrels of produced water from 1965-2012 that were injected into a SWD well in the field between 2006 and 2009.  The overboard discharging of produced water and the excessive dredging caused continual land loss.  Production totals for produced water are shown in Figures 17 and 18 below.



*FIGURE 17:  Bayou Gentilly Oilfield Water Production – All Operators*

Rozel_PrelimRpt: 00026



*FIGURE 18:  Annotated Map of Water production (brine) in the Bayou Gentilly field 1965 –2009 approx.*

### 3.  Crooked Bayou

Development of the Crooked Bayou Field began in 1970.  The dredging of canals and well locations was similar to the Bayou Gentilly field. This field produced approximately 0.8 million barrels of produced water, of which approximately 0.4 million barrels were injected into a SWD well in the field between 2003 and 2008.  The excessive dredging did cause continual land loss that was not restored after operations ceased.



*FIGURE 19:  Annotated Map of Water production (brine) in the Crooked Bayou field 1970 – 2009 approx.*

24

### 4. Lake Petit

Development of the Lake Petit Field began in 1981.  The dredging of canals and well locations was similar to the Bayou Gentilly field. This field produced approximately 50 thousand barrels of produced water that was discharged overboard.



*FIGURE 20:   Annotated Map of Water production (brine) in the Lake Petit Field (approx.)*

*(end CN insert)*

Rozel_PrelimRpt: 00028

III.    **INTRODUCTION TO LOUISIANA COASTAL PROGRAM**

*The following section prepared by Paul Templet, PhD*

A.     **The Louisiana State and Local Coastal Resources Management Act of 1978**

In 1978 the Louisiana legislature passed Act 361, the State and Local Coastal Resources Management Act (SLCRMA), effective January 1, 1979 (RS 49:214.21).  The Law provides state and local governments a legal basis for the management of lands and waters within the Coastal Zone, a defined area of South Louisiana that includes a number of parishes.  To address the many problems identified in the Coastal Zone the State of Louisiana established an Office of Coastal Management (OCM) in the Department of Natural Resources, promulgated regulations pursuant to SLCRMA and established a permitting process for the Coastal Use Permit (CUP), among other things.  The regulations also allow local parish governments to establish a program to manage local uses with state approval.  Under the law and regulations Coastal Use Permits (a CUP is required by section 214.30 of the regulations) must be obtained for any use within the coastal zone (defined by 214.24) which has a direct and significant impact on coastal waters. A direct and significant impact is "…a direct and significant modification or alteration in the physical or biological characteristics of coastal waters which results from an action or series of actions caused by man."

Guidelines were developed by experts subsequent to Act 361 in 1978 and have been promulgated and are listed in LAC 43: Part I, Ch. 7, paragraph 701-719.  The guidelines are rules and regulations adopted pursuant to 214.27 of the SLCRMA.  Guidelines applicable to the permitting of Oil and Gas Company Exploration and Production (E&P) operations in the Louisiana coastal zone are: Section 701 guidelines applicable to all uses; 705, guidelines for linear facilities; 707, guidelines for dredged spoil deposition; 709, guidelines for shoreline modification; 711, guidelines for Surface Alterations; 713, guidelines for hydrologic and sediment transport modifications; 715, guidelines for Disposal of Wastes; 719, and guidelines for Oil, Gas, and Other Mineral Activities. The E&P guidelines also state that E&P sites shall be restored to original condition upon termination of operations, to the maximum extent practicable (719 (M)).  At a minimum, restoration will involve the removal of all structures, clearance of the site, and the removal of any contamination.  The site shall then be restored and/or properly mitigated, as appropriate, considering all relevant circumstances. (LAC 43, Part I, Ch. 724).

In 1972 the US congress passed the Coastal Zone Management Act (CZMA, P.L. 92-583), six years prior to the Louisiana Legislatures' Act 361, in response to intense development pressures in the US Coastal Zone and the importance of protecting coastal areas of the US.  The Act stated "There is a national interest in the effective management, beneficial use, protection and development of the coastal zone." (Sec. 302 (a)).  The CZMA provided broad guidelines and 6

26

basic requirements for states to develop management programs for their coastal zones. Within this context Louisiana began developing its program starting in 1975 and enacted SLCRMA (Act 361) in 1978. The program was submitted to the US CZMA authorities in 1979 for approval and approved in 1980 (US Dept. of Commerce/NOAA/CZMA/FEIS, 1980).

The Louisiana State and Local Coastal Resources Management Act (SLCRMA) is the primary authority for regulating oil and gas development impacts to coastal resources in the Louisiana Coastal Zone from 1980 up to the present but there were earlier laws and regulations that addressed some of the coastal impact issues. These will be presented later.

### B.       The Louisiana Oil and Gas Industry role in modifying SLCRMA

In 1976 the first bill creating a Coastal Management Program in Louisiana was submitted to the Legislature. As program manager (Director) I was involved in the concepts, drafting, language and structure of the bill. The bill incorporated a Coastal Zone boundary description, authorities needed to manage coastal resources and promulgate regulations, etc. The bill was to be heard in committee and I attended the hearing. Approximately 5 minutes before the bill was brought up for hearing I was approached by lobbyists for the two oil companies leading the charge against coastal management and told that they were going to kill our bill and substitute their bill under our title, which they did. Their bill defined the CZ boundary as 3 miles inland from the shoreline (to match the 3-mile seaward boundary) and created a study commission. The commission sporadically worked for a year and submitted a bill to the Legislature that passed. Subsequently the US Department of Commerce and NOAA/CZM rejected the Act because it did not meet Federal requirements and the Louisiana Coastal Program died. The following year, 1978, our previous 1976 bill, with some relatively minor changes, was resubmitted to the Louisiana Legislature. It passed with some modifications pushed by the oil and gas industry.

The guideline and rule development process then began with major efforts on our part to include the oil and gas industry in the process as described in Stone, et al (1979). After much effort and considerable staff time on our part, the oil and gas representatives walked away from the process and refused to meet. "If one of the parties believes that the guidelines are not necessary or that there are ways to achieve their goals through political means, then the process is doomed to failure" (Stone, et al, 1979, p. 27). We proceeded to developed the guidelines and regulations.

The Oil and Gas industry modified the guidelines to insert weakening words in the regulations. The phrase "to the maximum extent practicable" was inserted into the guidelines 44 times in 94 guidelines. The phrase was so problematic that the Louisiana Coastal Resources Program (LCRP) established a 3-part test (guideline 1.8) to determine how it was to be applied (FEIS, 1980, pp 47-8, 55) involving 1) a cost/benefit analysis, 2) testing for other alternatives to the proposed use, and 3) requiring that a). there must be significant public benefits from the use, b). the use

27

would serve important local, state, or national interests and c). the use is coastal water dependent (FEIS, 1980, p. 55).

Another weakening of the LCRP by the Oil and Gas Industry was to "Grandfather" their activities undertaken before 1980 so that a Coastal Use Permit was not required.  The added language was (FEIS, 1980, p. 84-5):

Any use or activity which, prior to the initiation of the coastal use permit program, has been lawfully commenced in good faith and for which all required permits have been obtained is consistent with the Coastal Management Program and no coastal use permit is required for it (see Appendix c1, Part II, H(1)b).  Moreover, such use or activity shall thereafter be consistent with the program even if renewals of previously issued permits become necessary or if new permits are required by other governmental bodies provided that there is no significant change in the nature, shape, size, location or impacts of the use or activity.  To be so exempted, a use or activity must have met the following requirements prior to the date of the coastal use permit program:

1) Actual construction or operation of the use or activity must have been begun, in good faith; and

2) All permits, licenses and clearances required by governmental bodies must have been obtained and the use or activity must be in compliance with them; and

3) No significant change in the nature, size, location or impacts of the use or activity take place."

(see FEIS, pp. 84-85)

However, the Coastal Zone of Louisiana exemplifies change, signified by the fact that it has the highest rate of wetlands loss in the U.S., so in the unlikely event 1 and 2 above are in compliance it is highly unlikely that 3 above is met. Over time it is highly likely that there has been significant impact change of any exempted use since it was initiated.  For example, subsidence, erosion, land loss, flooding, maintenance activities, boat wakes, sinking of spoil banks, widening of canals, loss of vegetation, spreading of pollution and waste plumes from discharges of oil and produced water, etc. are dynamic processes that change over time and are impacts attributable to oil and gas activities.  Cumulative impacts from the interaction of multiple activities and impacts also increase over time.

28

### C.      Pre-1980 Louisiana Laws, Regulations and Orders

#### 1.   Acts of the Legislature

In 1910 the Louisiana Legislature passed Act 183 to protect fish, rice planters and owners of canals used for irrigation purposes from pollution from produced water, oil and other substances (Barnhill, 2011, p.11).  It prohibited the release of produced water (salt water), oil, or other noxious substances into irrigation water sources between March 1 and September 1of each year.  It allowed such releases in the other months.

In 1924 the Louisiana Legislature passed Act 133, entitled Pollution of Streams and Canals Prohibited, that declared it unlawful for anyone to discharge oil, salt water or other substances into Louisiana streams in quantities sufficient to destroy the fish.  Impounded salt water could be released by permission of the Department of Conservation.  Act 133 essentially mirrored Act 183 of 1910 except that it was not limited to rice growing areas of the state but dealt with natural streams throughout Louisiana (Barnhill, 2011, p.13).  The Louisiana Legislature had previously formed the Louisiana Commission for the Conservation of Natural Resources (CCNR) in 1908 by Act 144 (Barnhill, 2011, p.12).  Subsequently, in 1912 the Louisiana Legislature passed Act 127 that established the Louisiana Conservation Commission (CC) as a department of the State with control over the natural resources of the State with authority to make regulations.  The Commissioner of Conservation headed up the Louisiana CC.  In 1916 the Legislature passed Act 66 creating the Louisiana Department of Conservation, which replaced the Louisiana CC.

In 1940 the Louisiana Legislature passed Act 157 to conserve the oil and gas resources of the State, to prevent waste and depletion, to define the powers and duties of the Commissioner of Conservation (CC), and to authorize the CC to regulate oil and gas E&P, storage, transportation, processing and marketing and to issue regulations and orders for carrying out the purposes of the Act.  Regulations were to be developed for a number of purposes including (a) "To require the drilling, casing and plugging of wells to be done in such a manner as to prevent the escape of oil or gas out of one stratum to another; (b) "to prevent the intrusion of water in oil or gas strata; to prevent the pollution of fresh water supplies by oil, gas or salt water…" and (c) "To prevent wells from being drilled, operated and produced in such a manner as to cause injury to neighboring leases or property."

In 1940 also, the Legislature created the Stream Control Commission (SCC) by Act 367 to have control of the streams and waterways and coastal waters of the state, waste disposal and pollution with the power to promulgate rules and regulations for the control of waste disposal into any of the waters of the state.  The Commission was granted the statewide authority  "… for the prevention of pollution thereof tending to destroy fish life, or to be injurious to the public health or the public welfare or other aquatic life or wild or domestic animals and fowls."

29

In 1952, Act 203 of the Louisiana Legislature prohibited the discharge of oil field waste into any natural stream or irrigation source in Louisiana that would render the water unfit or fish or irrigation, except during Oct. 1st and Dec. 31 of each year.  The act established an exception for streams with a normal salt content of 110 grains/gal. (1568 ppm), recognized as unfit for irrigation.  Also in 1952 the Legislature established and authorized the SCC (Sept. 1) to control waste disposal and the Act stated that "No person shall discharge or permit to be discharged into any of the waters of the state any waste or any pollution of any kind that will tend to destroy fish or other aquatic life…".

In 1970, Act 404 provided for a definition of water pollution, to prohibit water pollution and to provide penalties.  The definition of water pollution included the killing of fish or other aquatic life, or the modification of natural conditions in any way detrimental to the interests of the state.  Act 628 of 1970 authorized the SCC to make certifications required by the Federal Water Pollution Control Act (FWPCA).  Act 712 of 1975 amended Louisiana Revised Statutes of Section 1439 to similarly authorize the SCC to make certifications required under the FWPCA.

In 1972 (May 1) the SCC was reauthorized in Title 56 and again given control of waste disposal for the prevention of pollution tending to destroy fish life or to be injurious to the public heath and welfare or other aquatic life or domestic animals or fowls. The SCC was granted the authority to issue orders and regulations to control, regulate or restrain the discharge of any waste material or polluting substance discharged, or sought to be discharged, into any water of the state and could prohibit discharge against the public interest.

In 1975, by Act 712, the Legislature authorized the SCC to make certifications required under the Federal Water Pollution Control Act.

In 1979, Act 449 created the Environmental Control Commission (ECC) and an Office of Environmental Affairs (OEA) of the DNR with powers, duties, functions and responsibilities that replaced and ended the SCC. Chapter 11 was the Louisiana Environmental Affairs Act.  The Legislature found that "The maintenance of a healthful and safe environment for the people of Louisiana is a matter of critical state concern."  And that clean air and water resources, solid and hazardous waste control, and radiation control are state concerns.  Part IV of Act 449 was the Louisiana Water Control Act.  The Legislature found that the waters of the state are among the state's most important natural resources and that a system to control and regulate the discharge of waste materials and pollutants was necessary.  The Act stated that "No person shall conduct any activity which results in the discharge of any substance into the waters of the state without the appropriate permit or license required under the regulations of the commission adopted pursuant to this Part." Many of the authorities, duties, responsibilities and functions of the OEA & the ECC were subsequently assumed by the Louisiana Department of Environmental Quality in 1983 by which time the SLCRMA had been authorized and operational for 3 years.

30

### 2.   The Office of Conservation (OC)

Pursuant to Act 157, in 1941 the Department of Minerals (predecessor to the Office of Conservation) issued State-wide Order 29 (July 15th) governing the drilling for, and producing of oil and gas in Louisiana Order 29 began the regulation of E&P activities in a number of ways, among them Section VIII B. 2 which stated "In water, swamp or marsh areas, where the building of fire – walls is impossible or impractical, in the future, permanent tanks shall be placed on an impervious platform… to catch all the oil and waste which may cause either a fire-hazard or pollution."  Section VIII (E states), "All waste shall be burned or disposed of in such a manner as to avoid creating a fire hazard or polluting streams and fresh water strata."  In addition, Section XIII required that "When a lease produces salt water, the operator or company shall obtain written permission to dispose of the brine in a manner acceptable to the Department of Minerals and the Stream Control Commission of the State of Louisiana."

In 1942 the Office of Conservation (OC) promulgated Order 29A which continued the protections for water, swamp, marsh and fresh water strata and required that operators or companies report the production of salt water to the Department.  In addition, Order 29 states that "No salt water shall be allowed to run into the natural drainage channels of the area. Permits must be secured before disposing of salt water underground."

In 1943 (July 19th) the OC issued state wide Order 29-B that governed oil and gas E&P activities in Louisiana; it mirrored the language of Order 29 (of 1941) about using tanks and impervious platforms with sumps to catch all the oil and waste, which may cause either a fire-hazard or pollution.  It also stated in VIII C1 "Each permanent oil tank, or battery of tanks, must be surrounded by a dike or fire-wall of at least the capacity of the tank or battery of tanks, except in such cases where fire walls are impossible, such as in water areas."  And C2 states "In water, swamp or marsh areas, where the building of fire-walls is impossible or impracticable, in the future permanent tanks shall be placed on an impervious platform surrounded by a metal gutter to catch all the oil and other waste which may cause with a fire-hazard or pollution." Finally VIII (E) states again "All waste shall be burned or disposed of in such a manner as to avoid creating a fire hazard or polluting streams and fresh water strata."

In 1967 (Oct. 19) the OC amended its 29B rule and found that the pollution of fresh water supplies by oil, gas or salt water is not in the public interest and should be prevented and that rules should be promulgated to accomplish this purpose.  The amendment ordered that 1. "No waste oil or oilfield waste shall be disposed of into any stream, lake or other body of water or into any ditch or surface drainage leading to a stream, lake or other body of water.  Such waste shall be retained for proper disposal."  On produced water the rule stated that 2(a) "It may be disposed of in pits where such method and pits have been approved by the Commissioner."

Rozel_PrelimRpt: 00034