# Exhibit 1
# Part 2

In 1974 the OC again amended Order 29B governing the E&P operations of the Oil and Gas Industry. Section VIII retains its 1941 rule 29 prohibition against polluting streams and fresh water strata. Part F of the section required each operator to conduct his operations and maintain his equipment as to reduce to a minimum the danger of explosion or fire, and consequent waste.

In 1986 (Jan. 20) the OC again amended statewide order 29B. The order now required that produced water be disposed of into subsurface formations and that contamination of a groundwater aquifer of a USDW (underground source of drinking water) is strictly prohibited. Injection of NOW (nonhazardous oilfield waste) into an aquifer or USDW is strictly prohibited. The discharge of produced water is allowed only in conformance with state and federal discharge regulations. Closed NOW storage systems are encouraged. Pits must be in conformance with standards in Subparagraph 2.4.

### 3. The Stream Control Commission (SCC) Rules and Orders

In the same year the Legislature created the Office of Conservation (1940), it also created the Stream Control Commission (SCC) by Act 367 to have control of the streams and waterways and coastal waters of the state, waste disposal and pollution with the power to make rules and regulations for the control of waste disposal into any of the waters of the state. The SCC subsequently issued orders regulating pollution from many sources, including the oil and gas E&P industry. Rules governing the disposal of oil field waste were adopted by the SCC in April 1941 and were revised in April 1943. There were 8 rules promulgated and adopted by the SCC dealing with the disposal of oilfield waste, some of which included the handling or produced water (Barnhill, 2011). Rule 8 specifically stated: "Wherever possible, disposition of oil field brine shall be accomplished by discharge through disposal wells to underground horizons below the fresh water level…". The rule allowed exceptions if it was determined by the SCC that the receiving water body was "…sufficiently saline to preclude any actual or potential pollution hazard due to such discharge." The 1941 rule of the SCC prohibited oily fluids from flowing 2) "…on the ground, or be carried from the original lease in open ditches, or discharged or allowed to flow into any stream, lake or other body of water." For oilfield brines 7) stated, "no discharge into any water body was allowed if it would adversely affect potable water, public health, agriculture, livestock, fish, or any beneficial animal or plant." The SCC could allow discharges under dilution ratios if it was determined not to be a pollution hazard and in the public interest. Rule 8 ordered that brines be discharged into underground horizons via disposal wells wherever possible.

In 1943 (April 19th) the SCC promulgated rules (G.P. 600 Oil Field Pollution – General) that reflected earlier rules; rule 1 stated that oily wastes shall be gathered and destroyed in a manner to eliminate any pollution hazard. Rule 2 stated that no oily fluids shall be discharged or allowed to flow on the ground or be carried from the original lease in open ditches, or

discharged or allowed to flow into any stream, lake or other body of water. Rule 3 required that oil or oil fluids be gathered and destroyed. Rule 4 addressed spillage around storage tanks, gun barrels, tank batteries and similar equipment, Rule 5 said that oil gathering lines shall be regularly inspected and all leaks shall be immediately repaired. Rules 6 and 7 dealt with salt water and brines (produced water); all oil was to be removed down to 30 ppm and no brines to be discharged into any water body was allowed if it would adversely affect potable water, public health, agriculture, livestock, fish, or any beneficial animal or plant. The SCC could allow discharges under dilution ratios if it was determined not to be a pollution hazard and in the public interest. Rule 8 ordered that brines be discharged into disposal wells wherever possible.

In 1946, (Dec. 2) the Louisiana Stream Control Commission (SCC) by resolution banned discharge of oil, brine (produced water) and other wastes into the waters of 16 coastal parishes because the discharges were found to "…cause damage to oysters, shrimp and other fisheries." The discharge of Produced Water in the upland parishes had been banned earlier. The SCC resolution for the coastal parishes was challenged by The Texas Company (Texaco) and the case went to the US Supreme Court where the ban was upheld in 1947. Unfortunately, the discharges continued. The LDNR allowed the discharges until DEQ water quality criteria were promulgated in 1990 (essentially a ban once again) during the authors' term as Secretary of the LDEQ. The discharges remain essentially banned to this day.

In 1949 (Jan. 18) the SCC issued rules that again said (1) crude oil, sludges, emulsions of any kind shall be gathered and destroyed by burning or otherwise on the lease to eliminate any pollution hazard. 2) stated that no oily fluids shall be discharged or allowed to flow on the ground or be carried from the original lease in open ditches, or discharged to flow into any stream, lake or other body of water. Rules 6,7, & 8, among others, of 1941 & 1943 were reiterated.

In 1952 - 1953 (Jan. 27) the SCC issued rules that again stated that oily wastes shall be gathered and destroyed as to eliminate any pollution hazard (1). And that 2) no oily fluids shall be discharged onto the ground or allowed to reach or put into streams, lake or other body of water. Rule 3 said that wells, pumps shall be provided with a gathering ditch or equally effective device to prevent the escape of oily wastes. The ditch is to be graded to a gathering sump which shall be cleaned regularly by removal and destruction of oily wastes. Rule 6 covers salt water and requires removal of all oily waste, approval in writing by the SCC for the transfer of salt water from the lease to a central treating plant and oil content below 30 ppm before discharge to streams. Rules 7 and 8 cover oil field brines and reiterate the earlier prohibitions against discharges that damage fish and other wildlife and are injurious to aquatic life. Rule 8 requires injection of oil field brines into SWD wells wherever possible, as expressed in earlier rules.

In 1968 (effective July 1, 1968) the SCC ordered (A) that no oil field wastes, including salt water, shall be allowed to drain into waters of the state, except salt water may be disposed of in saline waters, tidally affected waters, brackish water or other waters unsuitable for human consumption or agricultural purposes. Part (B) states that "Nothing herein contained is intended to repeal, modify or otherwise affect existing regulations of this commission."

In 1979, Act 449 created the Environmental Control Commission (ECC) and an Office of Environmental Affairs (OEA) of the DNR with powers, duties, functions and responsibilities that replaced and ended the SCC.

*(end PT insert)*

## IV. VIOLATIONS OF THE SLCRMA BEING PROSECUTED IN THE BAYOU GENTILLY CASE

This expert opinion identifies violations which provide the basis for defendant liability in this litigation. This litigation is based upon Paragraph D of La R.S. 49:214.36 that allows plaintiffs to prosecute two types of violations of the Louisiana coastal management program. **These are (1) where a "use" was made without a necessary coastal use permit and (2) where a "use" was made in violation of the terms and conditions of a coastal use permit** (LA R.S. 49:214.36). In this litigation, the plaintiffs are claiming both types of violations occurred within the Bayou Gentilly case area.

### A. Violations For Undertaking Coastal Use Without a Coastal Use Permit

It is the opinion of the author that three types of situations occurred within the Bayou Gentilly case area that violated SLCRMA by commencing or operating uses without a necessary coastal use permit. These three types of activities arise in different contexts. First, there were certain uses that were legally commenced before 1980 but whose impacts changed post-1980, triggering the requirement for a permit that was never obtained. Second, there were certain uses that were illegally commenced at their beginning and therefore did not qualify for the exemption from coastal permitting or review. And third, there were certain uses that were commenced after 1980 that did not receive appropriate permits under SLCRMA. These will be discussed sequentially.

#### OPINION #1: Violation for Continuation of Use Commenced before 1980 Where There Was a Significant Change in Nature, Size, Location, or Impact of the Use/Activity

First, all coastal uses legally commenced before 1980, still in existence at the time the SLCRMA became effective in 1980, and that were to be continued after 1980, initially were not required to receive either a coastal use permit (CUP) or to be certified as meeting the requirements of the SLCRMA. These uses were exempt under the statute. However, if the impacts of those

activities changed after the effective date of the coastal program, the **change in impact negated the initial exempt status.** Such changes in impacts occurred in the Bayou Gentilly case area, but no CUPs permitting such modifications or alterations were issued allowing these changing impacts. In addition, no after the fact permits were ever issued for the altered impacts of previously permitted activities, thereby representing numerous violations of SLCRMA.

Coastal uses are defined in the statute as "an activity within the coastal zone which has a direct and significant impact on coastal waters" (LAC 43:I.700). A direct and significant impact is, **"a direct and significant modification or alteration in the physical or biological characteristics of coastal waters which results from an action or series of actions caused by man"** (LAC 43:I.700). Therefore, "a modification or alteration" constitutes a use where the activities conducted after to the implementation of the program cause significant change in detrimental impacts to the physical characteristics of the coast after the effective date of the statute (See FEIS, pp. 84-85).

As a part of the application for a coastal use permit, the applicant must provide, among other things, information about anticipated adverse consequences, including hydrologic modification and land loss, of the use applied for in the proposed permit. This information is necessary for the Office of Coastal Management (OCM) to draft permit conditions that will provide for the restoration and/or compensatory habitat mitigation of all impacts to coastal resources associated with the activity. During the permit review and/or commencement and construction period, as well as the duration of the use thereafter, the permittee has an obligation to advise the OCM of any unanticipated adverse impacts that occur in association with the activity, so that consideration of the unanticipated impacts is made by OCM, including, when appropriate, permit modifications, restoration of habitat damage, or compensatory mitigation for damages when restoration is not a viable option; all undertaken, as appropriate. Unanticipated adverse impacts resulting from the permitted coastal use not reported contemporaneously with, or as soon as practical after their discovery will be considered an unauthorized coastal use and enforcement is appropriate under La. R.S. 49:214.36.

Of particular concern in this regard are ongoing oil and gas extraction activities and existing canals, disposal areas, salt water disposal sites, and pits. All of these activities have occurred in active oil and gas fields and in the case of the Bayou Gentilly case area, each of these types of activities was ongoing prior to and after 1980. These activities include certain existing oil and gas extraction activities, canals and associated disposal levees, gathering lines, production platforms, salt water disposal sites, and pits. And each of these activities, in their own unique way, generated direct and significant impacts to coastal waters.

In this situation, the violation is the failure to obtain a permit for a modification of a coastal use due to the increase in impacts post-1980. Here, there are three types of violations that are found in the Bayou Gentilly case area. These include:

(1) the continued operation of canals with their associated spoil disposal features that contributed to and/or caused hydrologic changes due to impediment and impoundment areas, contributing to if not directly causing the loss of extensive marshland acreage throughout the four fields and within and beyond the boundaries of the Bayou Gentilly case area. All of these activities cumulatively led to significant wetland, habitat and marine productivity losses within and beyond the Bayou Gentilly case area;
(2) continued discharge of produced brine water that contributed to the continued incremental and cumulative decline of the wetlands, ecosystem service and marine nursery habitat within all four fields; and
(3) violations associated with the extraction of oil and gas that reduced downhole pressure across the Delacroix Island field that activated the fault adjacent to Bayou Long and contributed to the cumulative loss of wetlands in the Delacroix Island Field.

Each of these three violation areas are discussed sequentially along with the analysis of the impacts that give rise to the opinion that a violation occurred. Expert opinions regarding the changes that occurred in the natural environment that triggered the requirement are included within the discussion of violations.

**1. Continued Operation of the Canals Without Seeking a Permit for Modification**

The opinion that a modification of a coastal use occurred due to a change of wetland impacts is supported by numerous exhibits and expert opinions. First, the existence of these impacts is clearly shown by the change in the aerial extent of wetlands within the Bayou Gentilly case area. The best map of the status of coastal land loss within the Bayou Gentilly case area as of the time of the commencement of the coastal program is the USGS map based upon an interpretation of a 1985 aerial photograph (see Figure 21.2). This change in wetland acreage is shown in Figures 21.3 and 21.4, representing direct and significant impacts associated with the operation and maintenance of, among other things, the canal systems of these various oil fields. The wetland loss from 1985 to 2010 represents about 8,000 acres, or about 60% of the total land loss that occurred within the Bayou Gentilly case area.




*FIGURE 21.1: Land loss from 1932 to 1985 is approximately 5,000 acres.*




*Figure 21.2: Land Loss from 1932 to 2004, approximately 8,800 acres.*



*FIGURE 21.3: Land loss from 1932 to 2006, approximately 11,600 acres.*




*Figure 21.4: Land loss from 1932 to 2010, approximately 13,000 acres of the original 21,000 acres, or 62% of the total land in the Bayou Gentilly case area. Cumulative land loss from 1985 to 2010 represents about 8,000 acres, or just over 60% of the total land loss.*

(a) Impacts from Continued Operation of the Canals

The mechanism for the loss of marshland associated with the canals is explained below. For canals, there is a direct loss associated with the actual canal cuts and erosion of the channels, and there is indirect loss associated with the hydrologic modifications inherent in the interference of the canals and the spoil disposal berms in the overall health and long-term stability of the marsh.

(i) Construction - Direct Loss

The direct loss from channel construction and operation is visible on aerial photography. Bayou Gentilly canals are mapped in Figure 22 below. There are approximately 325,000 LF or 523 acres (70' w) of direct-cut dredged canals in Bayou Gentilly. As these canals have widened over time (150' average), the traceable canal acreage increases to approximately 1,100 acres by 2010.

Traced to defendants (See Figure 13), responsibility may be assigned to various canals within Bayou Gentilly. Approximately 430 direct-cut acres may be assigned to defendant canals; of this figure, 300 acres may be attributed to Texaco and Apache, combined, primarily in the Delacroix Island field. The remainder are attributable to shared canals or the other defendants in Bayou Gentilly.




*FIGURE 22: Oil and Gas Canals in the Bayou Gentilly case area, pre- and post-1980.*

(ii) Indirect Loss from Altered Hydrology

*The following section(s) prepared by John Day, PhD.*

↳ Formation

The Breton Sound estuary was formed 2,000 to 3,000 years ago by the overlapping St. Bernard (of which Bayou Terre aux Boeufs is a relic channel) and the modern Balize deltaic lobes (Scruton 1960; Roberts 1997). Since then, approximately half of the original wetlands have disappeared by the processes of shore-line erosion and coastal subsidence (Yuill et al. 2009) exacerbated by human activity (e.g., Day et al. 2000, 2009, 2014, 2018). Numerous natural crevasses and minor distributaries as well as seasonal overbank flooding of the Mississippi River sustained the remaining wetlands (Condrey et al. 2014; Saucier 1963; Welder 1959, Day et al. 2016b), with the upper perimeter of the Breton Sound estuary fringed by 1-3 km of cypress-tupelo forested wetlands during the early 20th century (i.e., see USGS St. Bernard map 1892).

Dr. John Day's team collected water samples on transects on 114 different days over a twelve-year period from 2000-2012 spanning from September 6 2000 to March 5 2012, collecting 1772 samples in total. Discrete water samples were taken by boat at 21 locations in the Breton Sound estuary (Figure 23) and analyzed for salinity, total suspended sediments (TSS), nutrients ($NO_x$-N, $NH_4$-N, TN, $PO_4$-P, TP, and $SiO_4$-Si) and chlorophyll a, a measurement of phytoplankton biomass. Sampling occurred surrounding and in the vicinity of the Bayou Gentilly Oil Field.




*FIGURE 23: Map of the Breton Sound estuary showing east (E) and west (W) and interior (I) sampling locations that Dr. Day's team carried out from 2000-2012.*

Lane et al. (1999) reported that salinity was significantly lowered in the estuary due to operation of the Caernarvon structure, with salinity in the upper half of the estuary generally lower than 5 PSU throughout the year. Lane et al. (2007) reported that salinity in the upper estuary was fresh throughout a study in 2000-2002 and increased up to 14 and 30 PSU with distance from the diversion along the Western and Eastern routes, respectfully. The greater freshening of the Western route was likely caused by Mississippi River water flowing into the region below where flood protection levees end. Discharge from the river diversion greatly affected salinity throughout the basin, with the large spring pulses often causing the entire estuary to become fresh for a short period of time (<1 month; Figure 24). There was also a temporal lag of about two weeks between discharge and salinity in the lower estuary.




*FIGURE 24: Salinity along the western (left) and eastern (right) routes of the Breton Sound estuary from 2000-2002 (modified from Lane et al. 2007). Distance is from the diversion structure.*

↳ Total Suspended Solids

Figure 25 shows total suspended solids in the Breton Sound estuary for 2000 to 2002. This graph demonstrates the two sources of TSS for upper Breton Sound where most wetlands occur. The main source of sediments to the northern part of the basin is from the Caernarvon diversion in winter and spring when the diversion structure is most often open. TSS concentrations when the structure is operating generally range from 50 to over 200 mg/l. TSS decline down basin as sediments settle from the water column and are deposited in wetlands when water flows over the marsh. TSS from the diversion generally settle out between 10 and 20 km from the diversion.

A second source of sediments comes from the south. These sediments are re-suspended from bottom sediments in the open waters of upper Breton Sound. The upper bay is regularly supplied with riverine sediments below where the levees stop via over bank flooding or through channels such as Mardi Gras Pass. The highest concentrations were in excess of 200 mg/l and decrease up basin. But TSS concentrations can be much higher during energetic events such as frontal passage and tropical storms but it is difficult or impossible to sample from small boats during such events. Perez et al. (2000) demonstrated this process during a study in Fourleage Bay, LA. They sampled from a moored house boat and reported concentrations during frontal passages were commonly 400 to 600 mg/l and reached nearly as high as 2000 mg/l. Because of the high sediment input, the marshes closest to the open waters of Breton Sound are very stable and most wetland loss is due to edge erosion caused by waves (Couvillion et al. 2011).

These two sources of sediments, one from the north and one from the south, result in high sediment availability in the upper and lower parts of the wetland-dominated part of upper Breton Sound but lower sediment availability in the middle portion of the wetland-dominated estuary where the Bayou Gentilly field is located.




*FIGURE 25: Total suspended solids (TSS) along the western (left) and eastern (right) routes in the Breton Sound estuary from 2000-2002 (modified from Lane et al. 2007). Distance is from the diversion structure. TSS varied from less than 10 mg/l to over 200 mg/l. These graphs show the two major sources of sediments to the upper Breton Sound where most wetlands occur. TSS are lower on the western side from 20 to 30 km because There are more wetlands below where sampling ended.*

↳ Construction – Direct Loss

Gagliano (1973) studied wetland loss in coastal Louisiana between 1936 and 1959 and concluded that direct loss from canal dredging account for 39% of wetland loss. If wetland loss from spoil bank construction was included in that estimate, Craig et al. (1979) concluded that total direct loss would be much greater (69% of wetland loss).

Oil and gas canals are typically dredged to a depth of 2.5 m, a width of 20 to 40 m, and a length of 100 to 1000 m or more (Turner et al. 1994). The construction of these canals causes direct loss of wetlands through soil removal during canal dredging and through burial when dredged spoil is placed on top of vegetation alongside canals. Over time, oil and gas canals widen as a result of spoil bank undercutting, erosion, and collapse and cause additional wetland loss (Davis 1972; Doiron and Whitehurst 1974). Turner et al. (1994a) estimated that the most likely cause of 30-50% of wetland losses from 1955 to 1978 in coastal Louisiana were canals and spoil banks.

Construction of canals, which are typically straight channels, increases tidal flows in coastal marshes. The increase in flows, coupled with wakes from boat traffic and wind-induces waves, cause rapid morphological changes in spoil banks as wakes and currents removal material, erode the base, undercut the bank and cause sloughing and collapse which leads to canal widening (Davis 1972; Doiron and Whitehurst 1974; Johnson and Gosselink 1982; Gagliano and Wicker 1989; Reed et al. 1995; Ko and Day 2004; Ko et al. 2004). Increases in canal width range between 2 and 14% per year, for a doubling time of 5–60 years (Craig et al. 1979). Johnson and Gosselink (1982) examined canal widening within the Barataria-Terrebonne Estuarine System and found that the Southwestern Louisiana canal, originally about 9 m (30 ft) wide in 1888, had widened to over 100 m (330 ft) at many locations by 1978. The amount and type of boat traffic greatly influences the rate of widening (Davis 1972). As a canal becomes wider and deeper, a

greater volume of water can flow through it, which increases erosion rates over time (Doiron and Whitehurst 1974). Swenson and Turner (1987) determined that as canal density increased, the density of natural channels decreased due to preferential capture of flow by straight deep canals. Johnson and Gosselink (1982) also hypothesized that canal widening rates were greatly increased once spoil banks were eroded away.

As stated previously, most oil and gas canals are deep and straight while natural waterways in a marsh are primarily shallow and sinuous tidal channels (Ko and Day 2004). Because of this difference, dredged canals tend to preferentially capture water flow from natural channels causing more efficient penetration of salt water into wetlands that were previously isolated from direct exchange with seawater (Sasser et al. 1987; Turner 1987; Wang 1988; Gagliano and Wicker 1989; Turner and Rao 1990; Reed et al. 1995; Bass and Turner 1997; Ko and Day 2004; Ko et al. 2004). Increases in salt water cause changes in vegetation composition and reduced productivity and/or death of fresh and brackish marsh species that eventually lead to open water.

Annual land loss in coastal Louisiana typically extends from 3 to 150 m on either side of pipeline canals, causing 25 to 125 acres of wetland loss for every mile of canal construction (Olea and Coleman 2014). Bass and Turner (1997) measured the relationship between salt marsh loss and dredged canals in three Louisiana estuaries and found that for every 1.0% increase in canal area there was a 1.85% increase in non-dredged open water in addition to the actual canal area being dredged.

↳ Maintenance and Use - Indirect Loss (Weakened Marsh)

Scaife et al. (1983) studied the impacts of oil and gas canals on coastal wetlands for southeastern Louisiana and southern Mississippi and concluded that the indirect effects of canals caused more land loss than the direct conversion of land to open water. They determined that from 1955 to 1978, direct land loss from canal dredging was less than 10% of the actual land loss caused by canal construction while other scientists have concluded that the indirect impacts of canal dredging may be double or more than that of the direct impacts (Deegan et al. 1984; Turner and Cahoon 1987).

Louisiana coastal wetlands are dependent upon sheet flow for inputs of fresh water, sediments, and nutrients and to maintain wetland health. Spoil banks placed alongside canals dredged for oil and gas exploration and production are typically much higher than the natural marsh surface and generally consist of highly organic marsh soil which is more susceptible to erosion than mineral soils (Doiron and Whitehurst 1974; Day et al. 2000; Ko and Day 2004; Reed and Wilson 2004). Because spoil banks are higher than surrounding wetlands, they reduce or eliminate surface water flow and cause impoundment or semi-impoundment of coastal marshes. Impoundment results in intrusion and entrapment of salt water, increased waterlogging,

decreased drainage, altered sediment flow and decreased accretion, lower vegetation productivity and/or death, and a reduction in the movement of migratory organisms compared to marshes without impoundment (Davis 1972; Swenson and Turner 1987; Turner and Cahoon 1987; Mendelssohn and McKee 1988; Day et al. 1989; Taylor et al. 1989; Cahoon and Groat 1990; Reed et al. 1992, 1995, 1997; Reed and Cahoon 1992; Rogers et al. 1992; Bouman and Day 1994; Cahoon 1994; Asano 1995; Gascuel-Odux et al. 1996; Ko and Day 2004; Reed and Wilson 2004; Mitsch and Gosselink 2007; Olea and Coleman 2014).

Impounded wetlands have fewer periods of flooding and reduced water exchange compared to unimpounded marsh areas. However, when water does enter impounded areas (e.g., during the passage of a cold front), the wetlands are flooded much longer than unimpounded wetlands because water is essentially trapped by the spoil banks (Swenson and Turner 1987; Bouman and Day 1994; Cahoon 1994; Day et al. 2000). Swenson and Turner (1987) found that semi-impounded marshes had fewer flooding events compared to marshes without hydrologic alterations (4.5 events vs. 12.9 events), but that the average duration of flooding was significantly longer (149.9 hrs. vs. 29.7 hrs.). In addition, Turner and Rao (1990) found that areas of open water caused by marsh vegetation death developed within 2 to 3 km of canals and spoil banks (Turner and Rao 1990).

↳ Marsh Edge Erosion

Coastal wetlands exist in dynamic equilibrium between horizontal and vertical dimensions, between forces that lead to wetland establishment and maintenance, and forces that lead to wetland deterioration. In the vertical dimension, one of the most important processes affecting coastal wetlands has been relative sea-level rise (RSLR), the combined effect of natural and induced subsidence (2-10 mm $yr^{-1}$ or more, Penland and Ramsey 1990) and eustatic sea-level rise (1-2 mm $yr^{-1}$; Gornitz 1982). If wetlands are to survive RSLR, they must be able to accrete at such a rate that surface elevation gain is sufficient to offset the rate of water level rise (Cahoon et al. 1995; Day et al. 1997). In the horizontal plane, high wave energy on exposed marsh shores can lead to shoreline retreat, enlargement of interior marsh ponds and lakes, and scour of the surface of the marsh (Stevenson et al. 1985; Boumans et al. 1997; Day et al. 1997, 1999). Erosion of the marsh edge around bays, and other open water areas, has been found to be a major mechanism of land loss of estuarine wetlands in the Mississippi River deltaic plain (Day et al. 2000; Barras et al. 2003; Penland et al. 1989), as well as other estuaries. For example, in Western Rehoboth Bay, Delaware, marsh erosion rates were as high as 43 cm $yr^{-1}$ (Schwimmer 2001), Pamlico Sound showed a mean erosion rate of up to 91 cm $yr^{-1}$ (Phillips 1986), and Day et al. (1997) reported up to a meter of erosion per year at Venice Lagoon, with high deposition of sediments and high vertical accretion on the marsh surface. Marsh edge erosion in coastal Louisiana has become more apparent over the last century by the enlargement of bays and interior lakes, as well as navigable waterways due to increased boat traffic and associated

wakes (Day et al. 2000; Barras et al. 2003). In the Breton Sound estuary, edge erosion dominates in the lower marshes due to both long fetch that allows strong waves and to marshes with high soil strength (e.g., Day et al. 2011). In more interior marshes, submergence and waterlogging have caused interior marsh loss due to lack of sufficient sediment input. An oil and gas field exacerbates this by reducing sediment input, increasing subsidence, and diminishing marsh health.

There are two major erosion processes associated with marsh shoreline retreat. The first is slow, but relatively continuous, as the shore is eroded by waves breaking against the shoreline, with more powerful waves causing greater shoreline erosion (Schwimmer 2001). The second is the breaking off of overhanging marsh caused by waves undercutting the marsh edge and occurs mainly during storms and other high wind events (Wray et al. 1995; Schwimmer 2001, Day et al. 1997, 1999). Eroded material may then be deposited on the marsh surface during such events where it can lead to high rates of vertical accretion (Day et al. 1997, 1999). Marsh edge retreat can also be a function of rising sea level (Finkelstein and Hardaway1988). In Blackwater estuary, on the south-east coast of England, Pethick (1993) observed an approximate balance between the volume eroded from the intertidal zone and that deposited in the sub-tidal channel, suggesting that the response of this estuary to sea-level rise is to redistribute the sediment from the marsh edge to within the estuarine channel to achieve a wider, shallower cross-sectional shape. This agrees with the 'The Bruun Rule' that, for a shoreline in equilibrium, a given rate of sea level rise will result in shoreline erosion sufficient to deposit sediment on the nearby marsh surface to a depth equal to the rate of sea level rise (Bruun 1962). Analysis of shoreline morphology and processes indicate that decreasing tidal ranges result in increasing long-term erosion rates (Rosen 1977), which may have significant implications for microtidal coastal Louisiana, where the mean tidal range is about 30 cm. Scour of channel banks and the extension of first-order drainage networks by tidal flows also remove particulate matter from marsh substrates (Johnson and Gosselink 1982).

*(end JD insert)*

*This following section prepared by Ron Sass, PhD*

↳ 'Impoundment and Impediment' - Hydrologic Alteration

The marshland of the Bayou Gentilly area of the Breton Sound is a very hydrologically sensitive ecosystem. Its health is dependent upon a steady flow of water, nutrients and sediment associated with the diurnal inflow and outflow of tidal waters from the gulf or, before the riverine levee system, the periodic flooding from the Mississippi River. These water movements were historically in the form of sheet flow that kept the relative sea level uniform and the salinity and nutrients within a range appropriate for the marsh plants. Such a uniformity of water level, salinity, nutrient level and sediment source is necessary for the vitality of the wetland grasses that populate the particular parts of the marshland. Any

alteration of these environmental factors can and does, over time, weaken the marsh and eventually will lead to marsh collapse and the eventual conversion from healthy marsh to open water.

The Bayou Gentilly case area has, since the arrival of the petroleum industry, lost a total of approximately 13,000 acres or 62% of the healthy marsh that was present in 1932 as measured from aerial maps and photographs published by the USGS.

A major contributing cause for the conversion of healthy marsh to open water is the massive presence of canals associated with the exploration and production of oil and gas. Much of this land loss is due to altered hydrology caused by mazes of spoil banks from the dredging of these canals. Spoil banks are initially as much as 2 to 4 meters higher than the average water level in the canals (Turner and Streever, 2002). They create a system of man-made leveed impoundments and partial impoundments that can dramatically impede the overall movements of water through the marsh. The spoil is also heavy enough to compact the soil beneath it (Nichols, 1959), thereby reducing belowground water flows (Swenson and Turner, 1987). One of the indirect impacts of this damming effect of spoil banks above- and belowground is waterlogging that can lead to toxic sulfide accumulations thus stopping vegetative growth and reducing the accumulation of soil organic matter (Bass & Turner, 1987). The same damming effect causes longer drying cycles, leading to soil oxidation and causing wetland collapse (Bass & Turner, 1987). Spoil banks can inhibit sedimentation rates (Cahoon and Turner, 1989). The canals themselves increase the salinity of the marshland by introducing salt water from the Gulf. The combined effects of canals and spoil banks leads to pond formation within the marsh. More and larger ponds form with increases in the local density of spoil banks (Turner and Rao, 1990).

The effect of the impoundment of the marshland by spoil banks is presented in a study by Swenson & Turner (1987). Flooding events are three times more frequent in the control site than in partially-impounded sites, but the average length of flooding in the partially-impounded site was five times that in an un-impounded control area. This observation is consistent with the movement of the water into and out of the partially-impounded area, which is significantly slower than in the open marsh. The same effects are apparent in the drying events where the partially-impounded areas show less drying events but of greater time length. In addition, the mean water level in the partially-impounded area is higher than in the control area and water volume exchange rates, both above and below ground, are about twice those in the control site. Work by Turner clearly shows that impoundments of wetlands by canals result in the more permanent loss of marshland to open water (Turner, Swenson and Lee, 1994). These authors conclude that the indirect loss of land results from (1) prolonged drying (even in partially-impounded wetlands areas) and (2) flooding events that prolong heightened water levels behind spoil banks. The lengthened dry periods promote soil oxidation and subsequent

shrinkage whereas prolonged flooding increases waterlogging in the soils promoting the anaerobic production of toxic sulfide. Both occurrences dramatically change soil chemistry and stress plants to the point where growth reduction and even die-off occurs. In addition, sedimentation rates behind soil banks will decrease because of the reduced frequency and depth of tidal inundation and the weight of the spoil banks will compress the soil beneath them, thus decreasing the movement of water below ground as well as above ground.

An example of impediment and impoundment impacts within the Bayou Gentilly case areas can be seen by the comparison of the aerial photograph from 1971 where the canals are clearly visible and the resulting impacted wetland as shown in a 2018 photograph. *See* Figures 28 and 29. Notice how the canals present in the 1971 photograph form a type of maze-like structure within the marsh and compare that 1971 photograph with the status of the marsh at this location in early 2018.




*FIGURE 26: This 1971 aerial photograph of the Delacroix Island oil field shows the interconnected canals, visible as a 'maze' of artificial straight land cuts on the image.*



*FIGURE 27: A 2018 Google Earth image of the same impacted area of the Delacroix Island field.*

In the Bayou Gentilly case area, I have analyzed the role of impediments and impoundments on wetland loss. In the Delacroix Island field and in the Bayou Gentilly field, I have identified areas where the effects of the impediments and impoundments created by the maze of canals and disposal levees can be seen. In Figure 28, the areas shown in brown represent the "maze" area where the primary impacts of the canals and the resulting impoundments and impediments can be seen. In Figure 29, the area shown in green represents the additional wetland area where hydrologic alterations have resulted from canals.




*FIGURE 28: Zones of hydrologic impoundment and impedance shown for the Bayou Gentilly case area with primary impoundment zone shown in yellow. Note well density, particularly in the Delacroix Island field.*




*FIGURE 29: Zones of hydrologic impoundment and impedance shown for the Bayou Gentilly case area with primary impoundment zone shown in yellow and total area impacted by altered hydrology shown in green. Hydrologic impacts extend beyond case area boundaries.*

In summary, although there may be other factors that cause the loss of coastal wetlands in Louisiana, wherever oil and gas fields exist in these shallow-water wetlands, there will be a maze of canals accessing each and every drilling site, both productive and dry, that will collectively lead to marsh collapse over the entire area covered by the maze and even kilometers beyond.

The destruction of wetlands within the Gentilly case area represents a significant loss of coastal resources and services. According to measurements obtained from USGS aerial photographic images taken over time up to 1985, over 5,000 acres of wetlands were continuously lost over the five-decade period prior to that time. The loss of each additional acre of wetlands after that time has added and will continue to add to a significantly deleterious cumulative impact on this important ecosystem.

*(end RS insert)*

Texaco and Apache continued to use Texaco's pre-1980 canal system shown in pink on Figure 34 after 1980 despite the increased impacts from such use after 1980, all without a CUP for such use. Texaco used the canals from 1980-1995 and Apache used them from 1995-2007.

Despite not having a CUP for the increase in impact resulting from its continued use of its pre-1980 canals after 1980, ARCO used its pre-1980 canals for access to the location of SN. 121138 from 1980-1983, to access to the location of SN. 123061 from 1980-1996, and to access the ARCO Tank Battery (see Figure 38.1 and Figure 38.2) from 1980 to 1990.

In summary, direct and significant impacts to wetlands occurred in the Bayou Gentilly case area from the continued use and abandonment in place of canals and dredge spoil disposal sites. Based upon the best aerial photographic interpretative data available, those changes are clearly visible after 1985. These impacts continued to occur throughout the remainder of the 1980s to date. As described in the expert reports of Dr. Day and Dr Sass, the incremental impact of each calculated period of loss is significant in itself and is certainly significant when added to past losses to assess cumulative impacts.

**2. Violations for Continued Discharge of Produced Water**

From the best data available, the brine and oily waste that was produced along with oil and gas was discharged into pits and then into the marsh and adjacent waterways. Again, opinions of various experts are inserted into this opinion regarding the type of violation. Despite not obtaining a CUP for the increased impacts of continuing to discharge wastes to the surface waters of the Delacroix Island Field after 1980, Texaco extracted in excess of 24 million bbls of produced water from 1980-1995 but reinjected only approximately 1.7 million bbls (1993-1995). No other means of disposal have been identified, therefore, Texaco discharged in excess of 22 million bbls from Tank Battery No. 1 and Tank Battery No. 2 from 1980-1995, plus all other E&P wastes that were released into the pits at those two locations.

Apache operated the Delacroix island field after it purchased it from Texaco in 1995 and continued to use the SWD Injection well installed by Texaco in 1993. However, one SWD is insufficient to handle production from an entire field, as there will be downtime (see Charles Norman discussion p. 20). Apache extracted approximately 8.6 million bbls of produced water from the Delacroix Island wells from 1995-2005 but injected only approximately 8 million bbls. No other means of disposal have been identified, therefore, Apache discharged approximately 0.5 million bbls from Tank Battery No. 1 and Tank Battery No. 2 from 1995-2005 without a CUP.

LA Land/Conoco extracted approximately 0.2 million bbls of produced water from 1999-2003 from its wells in the Bayou Gentilly field, but no means have been identified for disposal. Therefore, it is reasonable to consider that LA Land/Conoco discharged approximately 0.2

million bbls of water from its production barge located adjacent to SN 221533 from 1999-2003 without a CUP.

### (a) Impacts of Continued Discharge of Produced Brine Water

*The following section prepared by John Day, PhD*

During oil and gas extraction, large quantities of water are produced and disposed of either by discharging to surface water or pumped back underground via injection wells. This produced water can create long-term detrimental environmental impacts because it contains high levels of dissolved solids with a salinity range between 12 and 300 ppt, semi-volatile hydrocarbons, radioactive materials such as radium, strontium, and barium, and metals concentrations higher than those of receiving waters (Rabalais et al. 1991; Roach et al. 1993; DeLaune et al. 1999; Cozzarelli et al. 2016).

The fate of produced water and its effect on coastal wetlands is dependent upon many variables, including the amount and source of the discharge and the hydrology, salinity, vegetation, and other conditions of the area (Rabalais et al. 1991). Negative impacts of produced water on estuarine ecosystems are caused by high chloride concentrations that can kill marsh vegetation, impede nekton movement, and decrease abundance and richness of benthic infauna (Roach et al. 1993). In addition, hydrocarbons are incorporated into aquatic organisms and marsh sediments (Rabalais et al. 1991; Roach et al. 1993).

Hanor et al. (1986) measured physical and chemical properties of coastal Louisiana oil field brines, reporting salinities ranging between 50 ppt to 150 ppt, much higher than open sea salinities which average about 35 ppt. This higher salinity brine water, normally discharged into dredged canals, acts as a dense plume that may or may not be diluted, depending both upon where the water is discharged and the hydrology of the area (Harper 1986; Boesch and Rabalais 1989). If this brine water penetrates into wetlands impounded by spoil banks (e.g., pushed out of the canals and into the wetlands during a storm surge or high tide), it can cause vegetation death in fresh and brackish marshes. St. Pe (1990) measured characteristics of produced water at the Bully Camp oil fields in LaFourche Parish, Louisiana and found that the effluent from the Bully Camp production facility had a chloride content of 92,625 mg/L, a total dissolved solids concentration of 152,034 mg/L, and a salinity of 167 ppt. In addition, sediment chlorinate concentrations were impacted by the produced water effluent from the facility at a depth of at least 30 cm. Impacts of the produced water on surface water and sediment varied with distance from the discharge, with the greatest impacts observed nearest to the brine discharge (St. Pe 1990).

*(end JD insert)*

Produced waters were directly discharged into surface waters from approximately 1932 to 1993, resulting in the release of greater than 86 million barrels of highly saline water just from records available for the Gentilly study area. In addition to salt, these discharges directly released petroleum hydrocarbons, heavy metals and radionuclides to the surface waters of the study area where they were deposited in the sediments and the remnant waste pits associated with production. Under typical conditions, produced water will sink to the bottom of the water column, leading to a plume of highly saline water beneath the surface of the canals, marsh creeks and shallow bays where these discharges occur (St. Pe', 1990; Hodges et al., 2011). Produced waters were released without the benefit of modelling or the infrastructure of industry standard effluent mixing strategies (Fisher et al., 1979). that would help reduce their worst impacts. As a result, these produced water discharges will produce plumes of saline water beneath the water surface. These will move under the influence of gravity and tides, spreading the layer across the study area, away from the point of discharge.

As these waters move away from the discharge point, these highly saline layers can cause their own impacts in the channels and shallow bays, including the development of hypoxia (Hodges et al., 2011; Washburn et al., 1999). Most significantly, stratified produced water plumes can cause impacts as they move away from the point of discharge and subsequently are moved into the marsh. Storm events such as strong cold fronts in winter and tropical weather in summer and fall can mix and deposit these waters into the marsh by the associated surge and high tides. As this happens over time, repetitive inputs of elevated salt, hydrocarbon, metal and radionuclide pollution occurs, impacting the marsh over time. Salt is conserved in these systems and concentrates as water evaporates. Ultimately, these produced water inputs represent a direct impact on the marsh health by oil and gas production in the study area.

As a result of these discharges, salt and other associated produced water pollutants contribute to land loss through toxic stress to *Spartina* and associated keystone species. Like hydrologic alterations caused by canal dredging and the construction of spoil banks, these actions impact land loss by adding cumulative stress on the marsh, ultimately leading to enhanced rates of erosion. Two specific mechanisms of impact, salinization (Baldwin and Mendelssohn, 1998) of the marsh soil from ions present in produced water brines and sulfide toxicity (Shin et al.; 2000, Lee et al., 1990) caused by input of elevated sulfate concentrations, both would contribute to stress on the vegetation. The presence of other pollutants such as petroleum hydrocarbons, metals and radionuclides could contribute to vegetation stress as well. In addition to directly leading to plant toxicity, as these pollutants accumulate, the marsh becomes much more sensitive to disturbances from storm surge, drought or disease. Ultimately, these contributed to the high rates of land loss that have occurred in the study area.

In summary, the loss of wetlands within the Gentilly case area represented a significant impact on coastal resources. Given that over 5,000 acres of wetlands had been lost according to the 1985 USGS aerial photograph interpretation, the loss of each additional acre of wetlands represented a cumulative significant impact.

*(end JP Insert)*

As can be seen from the opinions of Dr. Day and Dr. Pardue, the discharge of produced brine contributed to the loss of wetlands within the Bayou Gentilly case area. These discharges directly contributed to the loss of wetlands and were significant when considered in the context of the direct and significant impacts associated with the canal and spoil disposal impacts.

### 3. Violations for Withdrawal of Fluids

As discussed below, the continued withdrawal of oil and gas and produced water from the subsurface of the Delacroix Island Field led to an alteration and subsurface pressure at depth that triggered the activation of the Delacroix Island geologic fault. This active fault then further contributed to the loss of wetlands on the downthrown side of the fault and contributed to the significant change that occurred within the Delacroix Island field.

#### (a) Impacts of Continued Withdrawal of Oil and Gas and Produced Water

*The following Section prepared by Charles Norman PE*

In the Delacroix Island Field there are 23 different Miocene reservoirs (from 6550 ft to 10200 ft) concentrated under most of the same surface area that produced from the field with pressure depletion and water drive mechanisms. From 1941 to 2012, 23 million barrels of oil, 180 BCF of gas, and over 110 million barrels of produced water were removed from these reservoirs thereby creating large volumes of voidage of reservoir pore space. Subsidence has occurred at the subsurface levels in these reservoirs, and from an engineering point of view, the overburden pressure on these reservoirs has compacted the reservoirs to re-pressurize them over time; however, the ground surface has moved vertical downward to weaken the surface soils and land. Soils are thixotropic and once disturbed, their engineering properties dramatically change and are subject to compaction and subsidence.

The large volume of reservoir voidages create concerns to the well integrity of the producing wells. In other words, a producing well has cement between the outside of the casing and the open hole that was drilled. After a well is completed and produced, any subsidence of the reservoirs around this cemented casing causes slippage and failure of the cement bonds between the casing and the open hole. This leads to relative movement and leakage between the casing and the open hole. This results in the wellhead elevation changing overtime or the equivalent of a rise in the water level above the reservoirs. It also creates a pathway for fluid migration (oil, gas and saltwater) between different levels of reservoirs.

Texaco and Apache withdrew millions of barrels of production and did not analyze for voidage replacement. In particular, produced water from 1941 to 1993 was discharged overboard instead of putting the produced water back into the reservoirs to minimize voidage and subsidence. The oil and gas industry knew that voidage analysis and replacement was necessary to avoid subsidence. However, Texaco and Apache, the operators in the Delacroix Island Field failed in their duty to analyze for voidage replacement.

*(end CN insert)*

*The following Section prepared by HC Clark PhD*

The Delacroix Island fault, an active fault immediately north of the Delacroix Island field, is related to the field structural geology and the fault segment activation is involved with oil, gas and water production from the field. The fault is parallel to Long Bayou and displacement of the presently active segment is shown as a prominent scarp on sequential aerial photographs and topographic maps. The location of the growth fault is indicated on Figure 30.




*FIGURE 30: Location of the Delacroix Island fault in mid-Breton basin*

Land loss in a "D" shaped dislocation on the downthrown side of the fault is related to the fault activation and is more than 800 acres. The causal relationship between the oil and gas field and the present active fault segment confirmed by its displacement, proximity and that the fault activation happened after development of the field. The difference between the downthrown side of the fault where there is substantial land loss and upthrown side of the fault with much less severe land loss is clearly visible (Figure 31).




*FIGURE 31: The Delacroix Island growth fault shown by the dotted black line occurs at the break point between severe land loss and much less land loss.*

The Delacroix Island field structure is a rollover anticline on the downthrown side of the fault, producing from Miocene sands. The reservoirs are bounded by faults, stratigraphy related to the anticline and oil / water contacts. The dominant faulting at depth, when projected upward, matches the surface expression of the fault. The projection is confirmed by a 3D seismic survey of the Breton basin area—where successive time slices trace the path of this fault and others in the survey upward through younger horizons, culminating in projections of these faults to the surface. The Delacroix Island fault is mapped on the Black Bay sheet, by the Louisiana Geological Survey (Figure 35 above). In summary, the Delacroix Island fault exists and may be traced from the field structure to the surface—result and source are connected.

The Delacroix Island fault is a down-to-the-coast listric normal growth fault; and has been active in the past as shown by the trace of Long Bayou. Historic maps and photos show that before the development of the field, there was land on both sides of the bayou, was not active. The Delacroix Island fault present activation began after development of the Delacroix Island field. That is, the field began with the discovery well in 1941 and the production curve(s) illustrate a peak in the 1970's. Aerial photographs show that the fault activation took place after the early 1970's.

Fault activation by relative pressure change across the fault, both positive and negative, has been the subject of a number of studies. The Delacroix Island fault activation mechanism fits with these studies where negative pressures move a fault beyond the threshold required for fault activation. That is, where oil, gas and water production have resulted in depleted bottomhole pressures at the reservoir, faulting follows and in a number of cases, makes its way to the surface. Bottomhole pressures in a number of Delacroix Island reservoir sands show a depletion signature resulting in a marked pressure differential across the fault.

In summary, the Delacroix Island fault exists and it has caused extensive land loss. The fault is related to the Delacroix Island field structural geology and happened in time after development of the field and pressure depletion of reservoir sands. The fault was activated by differential pressure across the fault created by this depletion.

(end HC insert)

Texaco and Apache extracted approximately 23 million bbls of oil & condensate, 180 BCF of gas and 110 million bbls of produced water from the Delacroix Island Field from 1941-2005, from the well locations identified in Figures 32 - 34. Only approximately 10 million of the produced water was re-injected. Texaco and Apache continued after 1980 to produce the Delacroix Island field without undertaking the necessary voidage analysis or instituting any measures to prevent subsidence of the surface, and despite not obtaining a CUP for the increased impacts of their continued imprudent production practices after 1980.

As set out by Mr. Norman and Dr. Clark, the production within the Delacroix Island oil field led to the alteration of the subsurface pressure to such an extent that the Delacroix geologic fault was activated. This activation directly contributed to the loss of wetlands within the Delacroix Island oil field, and such loss was cumulatively significant.

### 4. Absence of Permitting for Impacts from Otherwise Exempt Activities

The violation complained of in Opinion #1 is that there were major changes in the impacts of the operation of the oil and gas fields within the Bayou Gentilly case area post-1980 without permits being obtained for those activities. The activities for which no coastal use permits were obtained include various canals and their associated disposal areas (and indirect hydrologic impacts), the expansion of canal widths, salt water discharges and oil, gas and produced water extraction. Figure 32 shows the wells that were active when the Coastal Program began in 1980. Figure 33 is a listing of those wells. Figure 34 shows the canals that were associated with the wells in existence in 1980. Figure 36 is a comprehensive list of issued CUPs, demonstrating that there were no CUPs issued for the wells and canals described in Figures 32 through 34.




*FIGURE 32: Active oil and gas wells owned by defendants in the Bayou Gentilly case area in 1980, with associated canals that caused a significant change in the nature, size, location or impact of the use of the coast.*