# Exhibit 1
# Part 3

| Well Serial No. | FIELD | Permit Date | P&A Date | Operator |
|---|---|---|---|---|
| 121138 | BAYOU GENTILLY | 1967 | 1983 | ARCO O & G CO-DIV ATL RICH CO |
| 122134 | BAYOU GENTILLY | 1967 | 1983 | ARCO O & G CO-DIV ATL RICH CO |
| 123061 | BAYOU GENTILLY | 1968 | 1994 | ARCO O & G CO-DIV ATL RICH CO |
| 25284 | DELACROIX ISLAND | 1940 | 1991 | TEXACO, INC. |
| 26018 | DELACROIX ISLAND | 1941 | 1997 | APACHE CORPORATION |
| 28160 | DELACROIX ISLAND | 1943 | 1990 | TEXACO, INC. |
| 28181 | DELACROIX ISLAND | 1943 | 2006 | APACHE CORPORATION |
| 28656 | DELACROIX ISLAND | 1943 | 1998 | APACHE CORPORATION |
| 28853 | DELACROIX ISLAND | 1943 | 1983 | TEXACO, INC. |
| 29070 | DELACROIX ISLAND | 1944 | 2000 | APACHE CORPORATION |
| 31357 | DELACROIX ISLAND | 1946 | 1998 | APACHE CORPORATION |
| 32566 | DELACROIX ISLAND | 1946 | 2003 | APACHE CORPORATION |
| 32996 | DELACROIX ISLAND | 1947 | 1996 | APACHE CORPORATION |
| 33711 | DELACROIX ISLAND | 1947 | 1997 | APACHE CORPORATION |
| 34474 | DELACROIX ISLAND | 1947 | 1991 | TEXACO, INC. |
| 35993 | DELACROIX ISLAND | 1948 | 1998 | APACHE CORPORATION |
| 36943 | DELACROIX ISLAND | 1948 | 1991 | TEXACO, INC. |
| 39700 | DELACROIX ISLAND | 1949 | 1998 | APACHE CORPORATION |
| 41103 | DELACROIX ISLAND | 1950 | 1998 | APACHE CORPORATION |
| 41508 | DELACROIX ISLAND | 1950 | 1991 | TEXACO, INC. |
| 41816 | DELACROIX ISLAND | 1950 | 1999 | APACHE CORPORATION |
| 42059 | DELACROIX ISLAND | 1950 | 1991 | TEXACO, INC. |
| 42320 | DELACROIX ISLAND | 1950 | 1991 | TEXACO, INC. |
| 42423 | DELACROIX ISLAND | 1950 | 1991 | TEXACO, INC. |
| 42532 | DELACROIX ISLAND | 1951 | 1991 | TEXACO, INC. |
| 43755 | DELACROIX ISLAND | 1951 | 1991 | TEXACO, INC. |
| 49161 | DELACROIX ISLAND | 1953 | 1997 | APACHE CORPORATION |
| 56332 | DELACROIX ISLAND | 1955 | 2001 | APACHE CORPORATION |
| 65802 | DELACROIX ISLAND | 1957 | 1991 | TEXACO, INC. |
| 65862 | DELACROIX ISLAND | 1957 | 1998 | APACHE CORPORATION |
| 69806 | DELACROIX ISLAND | 1958 | 2001 | APACHE CORPORATION |
| 70438 | DELACROIX ISLAND | 1958 | 2001 | APACHE CORPORATION |
| 71755 | DELACROIX ISLAND | 1958 | 1991 | TEXACO, INC. |
| 73479 | DELACROIX ISLAND | 1959 | 1991 | TEXACO, INC. |
| 74442 | DELACROIX ISLAND | 1959 | 1991 | TEXACO, INC. |
| 76738 | DELACROIX ISLAND | 1959 | 1991 | TEXACO, INC. |
| 76739 | DELACROIX ISLAND | 1959 | 1997 | APACHE CORPORATION |
| 77406 | DELACROIX ISLAND | 1959 | 1991 | TEXACO, INC. |
| 79142 | DELACROIX ISLAND | 1960 | 1984 | TEXACO, INC. |
| 83253 | DELACROIX ISLAND | 1961 | 2006 | APACHE CORPORATION |
| 112871 | DELACROIX ISLAND | 1965 | 1997 | APACHE CORPORATION |
| 128313 | DELACROIX ISLAND | 1969 | 2006 | APACHE CORPORATION |
| 129896 | DELACROIX ISLAND | 1969 | 2006 | APACHE CORPORATION |
| 130441 | DELACROIX ISLAND | 1969 | 2006 | APACHE CORPORATION |
| 131206 | DELACROIX ISLAND | 1969 | 2006 | APACHE CORPORATION |
| 131207 | DELACROIX ISLAND | 1969 | 1998 | APACHE CORPORATION |
| 132239 | DELACROIX ISLAND | 1970 | 2006 | APACHE CORPORATION |
| 132392 | DELACROIX ISLAND | 1970 | 1998 | APACHE CORPORATION |
| 133228 | DELACROIX ISLAND | 1970 | 2003 | APACHE CORPORATION |
| 133963 | DELACROIX ISLAND | 1970 | 1991 | TEXACO, INC. |
| 134146 | DELACROIX ISLAND | 1970 | 2003 | APACHE CORPORATION |
| 134424 | DELACROIX ISLAND | 1970 | 2000 | APACHE CORPORATION |
| 136611 | DELACROIX ISLAND | 1971 | 1991 | TEXACO, INC. |
| 159022 | DELACROIX ISLAND | 1978 | 2003 | APACHE CORPORATION |
| 161137 | DELACROIX ISLAND | 1978 | 2001 | APACHE CORPORATION |
| 166337 | DELACROIX ISLAND | 1979 | 2006 | APACHE CORPORATION |

*FIGURE 33: Defendant wells with pre-1980 permit dates.*




*FIGURE 34: Pre-1980 wells and associated canals keyed to defendants, Bayou Gentilly case area.*

| Code for Potentially Applicable Regulations | Coastal Use Activity Type | General Regulations | Coastal Use Activity-specific Regulations |
|---|---|---|---|
| 1 | Canal Dredging | **701**A; **701**G2,G5,G10,G12,G15,G16,G18,G19,G20 | **703**A/B/C/E; **705**A/B/C/E/F/I/J/K/L/N/O/P; **707**A/C/F; **711**F; **713**C,H; **719**B/D/E |
| 2 | Maintenance Dredging | **701**A; **701**G2,G5,G10,G12,G15,G16,G18,G19,G20 | **703**A/B/C/E; **705**A/B/C/E/F/I/J/K/L/N/O/P; **707**A/C/F; **711**F; **713**C,H; **719**B/D/E |
| 3 | Equipment | **701**A; **701**G2,G5,G10,G12,G15,G16,G18,G19,G20 | **711**F/L/M; **719**A/B/D/E/F/J/M/N |
| 4 | Flowline Installation | **701**A; **701**G2,G5,G10,G12,G15,G18,G19,G20 | **705**A/B/C/D/I/N/O; **711**F/L/M; **713**H; **719**B/D/J/M/N |
| 5 | Shell Pad Installation | **701**A; **701**G2,G5,G10,G12,G15,G18,G19,G20 | **707**A; **711**D/F/M; **713**C/H; **719**B/D/E/J/M |
| 6 | Site Clearance | **701**A; **701**G2,G5,G10,G12,G15,G18,G19,G20 | **705**D/J/N/O; **707**A; **711**F/L; **713**H; **719**D/G/M/N |

*FIGURE 35: CLASSIFICATION LEGEND: list of all potentially applicable CUP regulations as they relate to Coastal Use activity. (See also, Figure 41 below for Bayou Gentilly defendant CUPs.)*

Figure 36 comprises a comprehensive list of Coastal Use Permits (CUPs) in the Bayou Gentilly case area. As can be seen from this list, no coastal use permits or NDSIs were issued for the continued operation of any oil and gas well without taking any anti-subsidence measures, or for any canal use or modification or for the disposal of produced water. Each of these activities contributed to the continued loss of wetlands ecosystem services within the Bayou Gentilly case area, impacts that should have led to the permitting of the activities generating such uses. No such permits were issued as can be seen from the figures below.

| CUP Number | Applicant | Description | Code for Potentially Applicable Regulations |
|---|---|---|---|
| P19800210 | Texaco | Canal slip and pipeline | 1;4 |
| P19820679 | Texaco, Inc. | Platform and Boat Dock | 3 |
| P19841653 | Texaco, Inc. | 4" pipeline | 4 |
| P19860196 | Texaco, Inc. | Production facility to serve Tank Battery Delacroix Field | 3 |
| P19860331 | Texaco, Inc. | 2.78" gas flowline to serve well N0. 50 Delacroix Field | 4 |
| P19860381 | Texaco, Inc. | 2.78" gas flowline to serve well N0. 4 Delacroix Tield | 4 |
| P19860726 | Texaco, Inc. | Pipeline Junction Platform to serve Delacroix Field | 3 |
| P19870225 | Texaco, Inc. | Periodic maintenance of 15.5 miles of canals or channels | 2 |
| P19880698 | Texaco, Inc. | 1690' of 2.78" gas lift line jetted and laid on surface of marsh serves well no. 47 to well no. 42 in Delacroix Field | 4 |
| P19880700 | Texaco | Pipeline jetted under surface and heater platform and walkway | 4 |
| P19890271 | Texaco, Inc. | Heater platform to serve well no. 33 in Delacroix Field | 3 |
| P19890948 | Texaco, Inc. | barge drilling structure to drill Well no. 60 on SL 335 Delacroix Field | 3 |
| P19890949 | Texaco, Inc. | Heater platform to serve well no. 60 in Delacroix Field with walkways, 4995' of 3" flowline and 1220' of 3" gas lift line | 3 |
| P19890963 | Texaco, Inc. | 8' by 26' Heater Platform and 80' walkway 2260' of 3" gas flowline from Well no. 59 in SL 335 Delacroix Field | 3 |
| P19890964 | Texaco, Inc. | drill barge to drill well no. 59 in SL335 Delacroix Field | 3 |
| P19890965 | Texaco, Inc. | Platform and 80' walkway; jet in 868' of 3" flowline well no. 61 Delacroix Field | 1;3;4 |
| P19890999 | Texaco, Inc. | Locate drilling barge in existing canal; construct 14' by 7' slot piling | 3 |
| P19891000 | Texaco, Inc. | 80' walkway and 26' by 8' Heater Platform for SL335 Well No.62 7473' of 3" gas flowline to existing Heater Platform | 3;4 |
| P19900580 | Texaco, Inc. | Install boat dock and Cassion | 3 |
| P19900949 | Texaco, Inc. | 835' of 3" gas lift line from well no. 59 to existing gas flowline | 4 |
| P19901118 | Texaco, Inc. | Boat dock to Tank Battery No. 1 | 3 |
| P19901170 | Texaco, Inc. | Gas lift line Well no. 18 | 4 |
| P19901276 | Texaco, Inc. | 26' by 7' Heater Platform and 80' walkway to service SL335 Well no. 42 | 3 |
| P19910620 | Texaco, Inc. | Dredge 140' by 300' slip for drill barge 5600 cu yds; if well is good construct 7' by 14' well cribbing, (2) 80' walkways 7' b7 26' heater platform;2300' 2.875" gas flowline and 2300' 3" gas lift line to existing Tank Battery No.1 | 1;3;4 |
| P19910621 | Texaco, Inc. | Drilling barge, 50' by 280' slip, 2000 cu. Yds. To serve SL335 well # 64 if well is successful construct 2' by 80' walkway, 7' by 26' Heater Platform, jet in a 2.785" flowline 2066' and 3" flowline 2066' to Tank Battery No. 2 | 1;3;4 |
| P19911245 | Texaco Exploration and Production | Piling Cluster and dock to serve Tank Battery NO. 2 Delacroix Field | 3 |
| P19920103 | Texaco, Inc. | Construct piling cluster and dock for Tank Battery No. 2 | 3 |
| P19921005 (Withdrawn) | Texaco, Inc. | to Jet two flowlines one 2.875" and one 3" 4100' to serve well no. 64 | 4 |
| P19930515 (Withdrawn) | Texaco, Inc. | Field wide maintenance over 5 years 500,000 cu yds dredge | 2 |
| P19940450 | Texaco, Inc. | Dredge 70 by 750' canal and 170 by 250' slip for barge SL335 Well no. 65 | 1 |
| P19970407 | Apache Louisiana Minerals, Inc. | Install 2 flowlines (1) 2105' for SL335 Well no. 50 to Tank Battery No. 1and (1) 3890' SL335 Well no. 33 to well no. 62 | 4 |
| P19970771 | Louisiana Land and Exploration | Drilling rig and appurtenant structures for Delacroix Corporation No. 1 Well | 3 |

| CUP Number | Applicant | Description | Code for Potentially Applicable Regulations |
|---|---|---|---|
| P19971028 | Louisiana Land and Exploration Company | Channel for installation of Delacroix Corp. No. 1 well 3793' canal with (2) wings 90' by 90' clean out existing canal 5252' and construct new access canal 4600' with 345' by 160' slip | 1 |
| P19971475 | Exploration Company | (2) 4" flowlines, shell pad and purtenant structures to serve Delacroix Corp Well NO. 1 | 4 |
| P19980338 | Apache Corporation | Flowlines to service SL335 Well No. 23 Alternate "A" 3192' to and existing Tank Battery; Alternate "A" 1795' to Well No. 5 | 4 |
| P19981615 | Apache Louisiana Minerals, Inc. | To plug and abandon certain wells in Delacroix Field and site clearance; 10 wells | 6 |
| P19981741 | Corporation | To install 4" flowline from Well No. 24 to Existing Tank Battery No. 2 | 4 |
| P20010488 (Withdrawn) | Apache | Application for site clearance of 5 wells in Delacroix Field | 6 |
| P20030906 | Apache Louisiana Minerals, Inc. | P and A; site clearance and verification wells 10,56,48 and 48D in Delacroix Field | 6 |
| P20031127 | LLOG Exploration Company | Drill barge; 2705' canal and 5555' canal; 345' by 160' slip; 90' by 90' wing; structures | 1;3 |
| P20061801 | Apache Corporation | Site Clearance applcation for Well #'s 1, 5, 024, 041, 042, 043, 047, 057, 060 and 062 for well in Delacroix Field | 6 |
| P20070196 | Apache Corporation | Site Clearance applcation for Well #'s 1, 5, 024, 041, 042, 043, 047, 057, 060 and 062 for well in Delacroix Field | 6 |
| P20071874 | Corporation | Site clearance to tank batteries in Delacroix Field; Sec 3 TS16S R14E; | 6 |

*FIGURE 36: List of all Bayou Gentilly defendant CUPs. The column on the right, Code for Potentially Applicable Regulations, refers to Figure 35 above.*

| CUP Number | Applicant | Description | Code for Potentially Applicable Regulations |
|---|---|---|---|
| P19800210 | Texaco | Canal slip and pipeline | 1;4 |
| P19870225 | Texaco, Inc. | Periodic maintenance of 15.5 miles of canals or channels | 2 |
| P19890965 | Texaco, Inc. | Platform and 80' walkway; jet in 868' of 3" flowline well no. 61 Delacroix Field | 1;3;4 |
| P19910620 | Texaco, Inc. | Dredge 140' by 300' slip for drill barge 5600 cu yds; if well is good construct 7' by 14' well cribbing, (2) 80' walkways 7' b7 26' heater platform;2300' 2.875" gas flowline and 2300' 3" gas lift line to existing Tank Battery No.1 | 1;3;4 |
| P19910621 | Texaco, Inc. | Drilling barge, 50' by 280' slip, 2000 cu. Yds. To serve SL335 well # 64 if well is successful construct 2' by 80' walkway, 7' by 26' Heater Platform, jet in a 2.785" flowline 2066' and 3" flowline 2066' to Tank Battery No. 2 | 1;3;4 |
| P19940450 | Texaco, Inc. | Dredge 70 by 750' canal and 170 by 250' slip for barge SL335 Well no. 65 | 1 |
| P19971028 | Louisiana Land and Exploration Company | Channel for installation of Delacroix Corp. No. 1 well 3793' canal with (2) wings 90' by 90' clean out existing canal 5252' and construct new access canal 4600' with 345' by 160' slip | 1 |
| P20031127 | LLOG Exploration Company | Drill barge; 2705' canal and 5555' canal; 345' by 160' slip; 90' by 90' wing; structures | 1;3 |

*FIGURE 37: List of all Canal Maintenance Dredging CUPs by defendant. The column on the right, Code for Potentially Applicable Regulations, refers to Figure 22 above. NOTE: This list does not account for the canal maintenance dredging activities by defendants that occurred within the Bayou Gentilly Case Area that did not receive a CUP permit.*

**OPINION #2: Violation by Continuation of a Use Not Lawfully Commenced before 1980 Without Additional Permitting or Certification**

Defendants identified in opinion #1 are in violation of SLCRMA by failing to obtain the necessary CUP, failing to restore the coast, and failed to obtain a CUP to do so. Certain uses that commenced before the effective date of the SLCRMA are not exempt from the Coastal Zone Management program and need to obtain a CUP because these activities were not legally commenced or commenced in good faith prior to the initiation of the SLCRMA. The SLCRMA guidelines create a blanket exemption for activities that were "lawfully commenced or established prior to the implementation of the coastal use permit process" (LAC 43:I.723). However, the discharge of produced water into the marsh and coastal waters prior to the creation of the program and without a permit after the creation of the program fails to meet the requirements for the lawfully commenced exception to the obligation to seek a coastal use permit. The Federal Environmental Impact Statement for Louisiana's Coastal Management Program states that, "Any use or activity which, prior to the initiation of the coastal use permit program, has been lawfully commenced in good faith and for which all required permits have been obtained is consistent with the Coastal Management Program and no coastal use permit is required for it". Under the FEIS language, the use must be lawfully commenced in good faith in order for the exemption to apply.

Prior to the creation of the current Office of Coastal Management within the Department of Natural Resources, multiple agencies shared regulatory oversight of oil and gas produced water (brine). Both the Office of Conservation and the Stream Control Commission promulgated a body of rules prohibiting pollution of bodies of water through discharge of produced water. Beginning in the 1940's, regulations were promulgated banning the drainage of salt water into natural drainage channels. These regulations were later modified to prevent pollution of streams and fresh waters. At times, the Office of Conservation required oil and gas companies to request and receive written authority in order to legally discharge produced water into the marsh. In parallel, the Stream Control Commission created rules that regulated the concentration of dischargeable produced water, and the agency limited permissible discharges to those which would not "adversely affect potable water, public health, agriculture, livestock, fish, or any beneficial animal or plant". These two parallel regulatory agencies placed limits and conditions upon the pollution of marsh with salt water discharge from oil and gas production until 1967, when the Office of Conservation made discharge of produced brine into brackish waters permissible. Thus, the author is of the opinion that all brine discharged prior to 1967 was illegal unless allowed by a permit or finding, and to date, the author has not found any permits or letters of permission or similar authorizations. After 1967, although produced brine was allowed to be discharged into brackish waters, no oil was allowed to be included in this discharge, a requirement that is virtually impossible to meet when utilizing the disposal

methods photographed in opinion #1. Additionally, after 1967, the produced water discharge could not be injurious to aquatic life, a virtual impossibility.

As can be seen from this discussion, the requirement for an exempt use requires that the activity had to be undertaken in good faith and according to expert report of Charles Norman, such good faith was simply lacking in the Delacroix Island field, thereby bringing the otherwise exempt disposal activities within the Delacroix Island field into the permitting program of the coastal program. At the least, certain pits and salt discharges occurring prior to 1980 were not legally commenced or commenced in good faith and therefore required a separate coastal use permit in order to continue operation post 1980.

The coastal program regulates salt water disposal, in that the regulations require that, "Waste shall be disposed of only at approved disposal sites" LAC 43:I.715. The regulations define waste as "any material for which no use or reuse is intended and which is to be discarded" LAC 43:I.700. Produced water discharged into the marsh clearly constitutes a waste necessitating proper disposal. The program requires that where waste disposal is approved, "The location and operation of waste storage, treatment, and disposal facilities shall be avoided in wetlands to the maximum extent practicable, and best practical techniques shall be used to minimize adverse impacts which may result from such use". The coastal program regulations define the best practical technique as "those methods or techniques which would result in the greatest possible minimization of the adverse impacts listed in §701.G" (LAC 43:I.700). The guidelines in §701.G require avoidance of potential cumulative adverse impacts. Therefore, produced water waste discharge that adversely impacted the coast constitutes a use regulated by the coastal program. Under this opinion, all produced water discharges are considered to be illegally commenced or not commenced in good faith. This would include produced water discharges from the Delacroix Island and Bayou Gentilly fields.

*This Section prepared by Charles Norman PE*

**1. Pre-1980 Activities that were in "Bad Faith" and therefore could not have been lawfully commenced when Coastal Program commenced in 1980**

Prior to 1980, Texaco's operations in the Delacroix Island Field and ARCO's operations in the Bayou Gentilly Field violated numerous Environmental laws and regulations. These bad faith activities include the following:

Pit design: Texaco's pits and ARCO's pits, shown on Figures 38.1 and 38.2, were open unlined earthen with natural soil berms and bottoms along with no liners to prevent seepage. They leaked and seeped waste, produced saltwater and hydrocarbons into the marsh. The pits violated the 1931 Louisiana State law, Stream Control Commission Regulations, 29 and 29-B regulations. Also, the use of leaking pits was against industry knowledge and prudent practices.

*The following Section prepared by Frank Willis PhD, PE*

I examined historic aerial photographs of the case area from 1947 to 2016 in search of pits. Figures 32.1 through 32.10 show evidence of pits and areas where contamination might have been deposited. Three pit areas were detected. Figures 32.9 and 32.10 provide preliminary photogrammetric evidence that appears to indicate that burning took place at the central facility pit and one pit at the southern facility.




*FIGURE 38.1: Four pit areas in the Bayou Gentilly Case Area overlaid on a 2010 GOSHEP image (Source: www.lsu.edu, 2010 GOHSEP image)*




*FIGURE 38.2: Four pit areas in the Bayou Gentilly Case Area overlaid on a 1971 orthophoto (Source: USGS Explorer, 1971)*




*FIGURE 39.1: The ARCO Melerine pit area overlaid on a 1971 USGS orthophoto (USGS, 1971)*







*FIGURE 39.2: A comparison of the ARCO Melerine pit area between 1971 and 2010. The top photo is the USGS 1971; the bottom photo is GOHSEP 2010 (USGS, 1971 and GOHSEP, 2010)*




*FIGURE 39.3: The ARCO Tank Battery pit area showing a main pit, an apparent pit and other areas of environmental concern overlaid on a 1971 USGS orthophoto (USGS, 1971)*







*FIGURE 39.4: A comparison of the ARCO Tank Battery pit area between 1971 and 2010. The top photo is the USGS 1971; the bottom photo is GOHSEP 2010 (USGS, 1971 and GOHSEP, 2010)*




*FIGURE 39.5: The Texaco Tank Battery No. 1 pit area showing pit overlaid on a 1971 USGS orthophoto (USGS, 1971)*




*FIGURE 39.6: A comparison of the Texaco Tank Battery No. 1 pit area in 1971 and 2010. The top photo is the USGS 1971; the bottom photo is GOHSEP 2010 (USGS, 1971 and GOHSEP, 2010).*




*FIGURE 39.7: The Texaco Tank Battery No. 2 pit area showing pit overlaid on a 1971 USGS orthophoto. Three pits are visible (USGS, 1971).*




*FIGURE 39.8: A comparison of the Texaco Tank Battery No. 2 pit area in 1971 and 2010. The top photo is the USGS 1971; the bottom photo is GOHSEP 2010 (USGS, 1971 and GOHSEP, 2010)*




*FIGURE 39.9: Apparent smoke plume indicating possible burning at largest pit at the Texaco Tank Battery No. 2 pit area (USGS, 1952).*



*FIGURE 40.1: Texaco's Delacroix Island Tank Battery No. 1 and associated pit, March 1990. (Source: Chevron)*



*FIGURE 40.2: Production Pit at Texaco's Delacroix Island Tank Battery No. 1, March 1990. (Source: Chevron)*



*FIGURE 40.3: Production Pit at Texaco's Delacroix Island Tank Battery No. 1, March 1990. (Source: Chevron) Note changing production water level from previous Figure 34.2.*



*FIGURE 40.4: Production Pit at Texaco's Delacroix Island Tank Battery No. 1, March 1990. (Source: Chevron) Note marsh horizon in rear ground.*

(end FW insert)

**Texaco Pits**

Texaco operated pits identified in Figures 38.1, 38.2, 39.5 – 39.9. As identified by Charles Norman in section 2, the pits were seeping and leaking which caused significant impact by killing the marsh and its vegetation. Texaco did not obtain a CUP to continue to use the pit when the pit was causing a significant change in nature, size and impacts of the coastal environment. Examples of land loss are found in Figures 7 - 8.

**ARCO Pits**

ARCO operated pits identified in Figures 39.1 – 39.4. As identified by Charles Norman in section 2, the pits were seeping and leaking which caused significant impact by killing the marsh and its vegetation. ARCO did not obtain a CUP to continue to use the pit when the pit was causing a significant change in nature, size and impacts of the coastal environment. Examples of land loss are found in Figures 7 - 8.

<u>Overboard discharges of produced saltwater</u>: Texaco's and ARCO's overboard discharges violate 1931 Louisiana State law, Stream Control Commission Regulations, 29 and 29 B regulations. Also, overboard discharges were contrary to industry knowledge and prudent practices and killed the marsh.

<u>Failure to dispose of saltwater subsurface</u>: Texaco's and ARCO's failure to dispose of saltwater subsurface violates 29 and 29B regulations. Also, industry knowledge and prudent practices identified saltwater disposal as the preferred and best practices method.

Prior to 1980, Texaco's operations in the Delacroix Island Field and ARCO's operations in Bayou Gentilly Field violated numerous prudent practices and well-known industry knowledge methods. These bad faith activities include the following:

<u>Use of Earthen Pits</u>: Industry was moving fast to replace pits with steel tanks in the late 1930's and early 1940's. Tanks were safer and eliminated the need for leaking earthen pits, like those used by Texaco and ARCO in the Bayou Gentilly Case Area. This would reduce environmental damage.

<u>Lack of SWD wells</u>: Industry and the LA DNR were moving fast to install SWD wells to replace pits. Prudent practices dictated the elimination of pits to prevent pollution and protect the environment. SWD wells were being installed by the industry going back into the 1920's.

<u>Improper methods of developing the field using all marine operations</u>: Industry knowledge and prudent practices for development fields in marsh areas was to use networks of roads with drainage openings to protect the marsh from erosion. Wells were directional drilled from land pads or platforms. In the Delacroix Field four or five tank batteries would be required. Thus,

most canals would be eliminated. Texaco ignored the proper methods to minimize dredging, erosion and land loss.

Shorten flowlines using field layout development: The directional drilling of wells from land pads or drilling platforms in the Delacroix Island Field by Texaco would reduce the flowline distance and thereby decrease friction losses and improve production rates and ultimate oil and gas recovery. Shorter flowlines would reduce the flowline pressures and flowlines failures including less leaks and spills causing environmental damage.

Excessive number of dredged canals causing land loss and much more open water: Texaco dredged an excessive number of canals and well locations. Industry knowledge and prudent practices would have limited the amount of dredging done in marshland and provided alternatives with less dredging. This would have reduced the land loss and provided more protection to the fishing industry against damage from spills and leaks.

Lack of any erosion control measures: Neither Texaco nor ARCO took measures to limit or control erosion of banks or land masses due to wave action from heavy marine traffic. This bad faith was contrary to industry knowledge and practices to limit and prevent erosion and land loss of marshes.

No gaps in spoil banks: Texaco and ARCO failed to provide gaps in the spoil banks for water to flow and reduce bank erosion from wave action.

Excessive Boat traffic causing accelerated erosion: By converting to an all marine operation, Texaco forced and caused an excessive amount of erosion from wave action during the continual use of boats, barges, work boats, etc.

Excessive flowline lengths causing more leaks and spills: Because of the excessive length and number of flowlines in the open waters in the Delacroix Island Field, more repairs were needed from Texaco's damaged and leaking flowlines. The excessive damage was caused by boats, barges, and other marine equipment hitting lines and more corrosion due to longer lines. In addition, the excessive length of the flowlines increased the back pressure on the wellheads, thereby increasing pressure on the flowlines and reduced recovery efficiency. The higher pressures on the flowlines caused more flowline failures that led to more leaks and spills.

*(end CN insert)*

Defendants identified in opinion #2 are in violation of SLCRMA, failed to restore the properties and failed to get a CUP to do so.

## OPINION #3: Violations for Commencement of Uses after 1980 Without a Coastal Use Permit or Coastal Impact Determination

According to the SLCRMA, all non-exempt coastal uses initiated after 1980 required either a coastal use permit or a determination of a No Direct and Significant Impact (NDSI) on the coast. There are two major classes of this violation. One clear example of a post-1980 activity requiring a permit is maintenance dredging. Another is plugging and abandoning wells without obtaining a CUP to remove the abandoned infrastructure, including removing well equipment, flowlines, plugging dead end canals, and conducting restoration activities. Each of these classes of violation will be discussed separately.

### 1. Plugging & Abandoning Wells/Removal of Equipment Without a CUP

There is an issue regarding the activities of Apache in plugging and abandoning the wells that they purchased from Texaco in the Delacroix Island field. These wells are shown as being plugged and abandoned by the end of 2006. However, no permits were obtained to dredge for access to the wells to be plugged and abandoned and no maintenance dredging permit had been issued for this field since the expiration of the Texaco maintenance dredging permit in 1992/1993 time period. It is logical that dredging of some type, most likely prop-washing, was undertaken to provide access for Apache. Similarly, for flowline removal, some type of dredging and jetting for flow line removal must have occurred. Records show that no such dredging or flowline removal permits were obtained except for *P20070196* which was issued to Apache to allow the removal of three flow lines. Below Table 1 includes all wells plugged and abandoned after 1980 without a concurrent coastal use permit being issued.

*Table 1. All Wells Plugged & Abandoned After 1980 Without Concurrent CUP*

| Serial | Well Name | Status | P&A Date | Defendant |
|---|---|---|---|---|
| 32996 | VUA;SL 335 DEU NO. 011 | P&A Gas & Condensate Producer | 2/5/1996 | Apache |
| 26018 | VUA;SL 335 DEU NO. 002 | P&A Gas & Condensate Producer | 3/15/1997 | Apache |
| 33711 | VUA;SL 335 DEU NO. 012 | P&A Gas & Condensate Producer | 3/15/1997 | Apache |
| 49161 | VUA;SL 335 DEU NO. 032 | P&A Oil Producer | 3/15/1997 | Apache |
| 76739 | SL 335 DEU NO. 002-D | P&A Producer | 3/15/1997 | Apache |
| 112871 | SL 335 DEU NO. 013D | P&A Producer | 3/15/1997 | Apache |
| 131207 | VUA;SL 335 DEU NO. 046 | P&A Gas & Condensate Producer | 7/23/1998 | Apache |
| 132392 | SL 335 DEU NO. 046D | P&A Producer | 7/23/1998 | Apache |
| 39700 | VUA;SL 335 DEU NO. 020 | P&A Gas & Condensate Producer | 7/24/1998 | Apache |
| 35993 | VUA;SL 335 DEU NO. 015 | P&A Gas & Condensate Producer | 7/25/1998 | Apache |
| 41103 | VUA;SL 335 DEU NO. 021 | P&A Gas & Condensate Producer | 7/25/1998 | Apache |
| 65862 | VUA;SL 335 DEU NO. 015D | P&A Oil Producer | 7/25/1998 | Apache |
| 28656 | VUA;SL 335 DEU NO. 006 | P&A Gas & Condensate Producer | 7/26/1998 | Apache |

| Serial | Well Name | Status | P&A Date | Defendant |
|---|---|---|---|---|
| 31357 | VUA;SL 335 DEU NO. 004 | P&A Oil Producer | 7/26/1998 | Apache |
| 41816 | VUA;SL 335 DEU NO. 023 | P&A Producer | 12/8/1999 | Apache |
| 211611 | VUA;SL 335 DEU NO. 059 | P&A Producer | 12/9/1999 | Apache |
| 29070 | VUA;SL 335 DEU NO. 009 | P&A Producer | 8/12/2000 | Apache |
| 134424 | VUA;SL 335 DEU NO. 050 | P&A Producer | 8/17/2000 | Apache |
| 69806 | VUA;SL 335 DEU NO. 036 | P&A Producer | 11/1/2001 | Apache |
| 70438 | SL 335 DEU NO. 036D | P&A Producer | 11/1/2001 | Apache |
| 56332 | VUA;SL 335 DEU NO. 033 | P&A Producer | 11/2/2001 | Apache |
| 161137 | VUA;SL 335 DEU NO. 054 | P&A Gas & Condensate Producer | 11/4/2001 | Apache |
| 133228 | VUA;SL 335 DEU NO. 048 | P&A Producer | 4/15/2003 | Apache |
| 134146 | SL 335 DEU NO. 048D | P&A Producer | 4/15/2003 | Apache |
| 32566 | VUA;SL 335 DEU NO. 010 | P&A Producer | 4/17/2003 | Apache |
| 159022 | VUA;SL 335 DEU NO. 056 | P&A Producer | 4/22/2003 | Apache |
| 166337 | VUA;SL 335 DEU NO. 057 | P&A Producer | 9/19/2006 | Apache |
| 83253 | VUA;SL 335 DEU NO. 041 | P&A Producer | 9/28/2006 | Apache |
| 211612 | VUA;SL 335 DEU NO. 060 | P&A Producer | 10/3/2006 | Apache |
| 132239 | VUA;SL 335 DEU NO. 047 | P&A Producer | 10/8/2006 | Apache |
| 211744 | VUA;SL 335 DEU NO. 062 | P&A Producer | 10/16/2006 | Apache |
| 211613 | SL 335 DEU SWD NO. 001 | P&A Producer | 10/23/2006 | Apache |
| 128313 | VUA;SL 335 DEU NO. 042 | P&A Producer | 10/26/2006 | Apache |
| 131206 | VUA;SL 335 DEU NO. 043 | P&A Producer | 11/7/2006 | Apache |
| 129896 | VUA;SL 335 DEU NO. 024 | P&A Producer | 11/12/2006 | Apache |
| 130441 | SL 335 DEU NO. 024D | P&A Producer | 11/12/2006 | Apache |
| 28181 | VUA;SL 335 DEU NO. 005 | P&A Producer | 11/14/2006 | Apache |
| 121138 | CIB OP 2 SUB;MELERINE NO. 001 | P&A Gas & Condensate Producer | 12/19/1983 | ARCO |
| 122134 | CIB OP 1 SUB;MELERINE NO. 001D | P&A Gas & Condensate Producer | 12/19/1983 | ARCO |
| 123061 | DELACROIX CORP NO. 001 | P&A Dry Hole | 5/17/1994 | ARCO |
| 221523 | DELACROIX CORP NO. 001 | P&A Dry Hole | 12/26/2001 | LL&E |
| 28853 | VUA; SL 335 DEU NO. 007 | P&A Oil Producer | 12/17/1983 | Texaco |
| 79142 | VUA; SL 335 DEU NO. 040 | P&A Oil Producer | 11/12/1984 | Texaco |
| 28160 | VUA;SL 335 DEU NO. 003 | P&A Gas & Condensate Producer | 5/17/1990 | Texaco |
| 136611 | VUA;SL 335 DEU NO. 051 | P&A Oil Producer | 4/26/1991 | Texaco |
| 25284 | VUA; SL 335 DEU NO. 001 | P&A Gas & Condensate Producer | 5/1/1991 | Texaco |
| 77406 | VUA; SL 335 DEU NO. 039 | P&A Gas & Condensate Producer | 5/10/1991 | Texaco |
| 42059 | VUA;SL 335 DEU NO. 025 | P&A Gas & Condensate Producer | 5/13/1991 | Texaco |
| 41508 | VUA; SL 335 DEU NO. 022 | P&A Gas & Condensate Producer | 5/14/1991 | Texaco |
| 34474 | VUA;SL 335 DEU NO. 014 | P&A Gas & Condensate Producer | 5/16/1991 | Texaco |
| 36943 | VUA;SL 335 DEU NO. 018 | P&A Gas & Condensate Producer | 5/17/1991 | Texaco |
| 133963 | VUA;SL 335 DEU NO. 049 | P&A Gas & Condensate Producer | 5/20/1991 | Texaco |

| Serial | Well Name | Status | P&A Date | Defendant |
|---|---|---|---|---|
| 42423 | VUA;SL 335 DEU NO. 027 | P&A Dry Gas Producer | 5/21/1991 | Texaco |
| 71755 | VUA;SL 335 DEU NO. 035 | P&A Gas & Condensate Producer | 5/24/1991 | Texaco |
| 73479 | VUA; SL 335 DEU NO. 037 | P&A Gas & Condensate Producer | 5/26/1991 | Texaco |
| 74442 | VUA; SL 335 DEU NO. 038 | P&A Oil Producer | 5/28/1991 | Texaco |
| 43755 | VUA;SL 335 DEU NO. 029 | P&A Gas & Condensate Producer | 6/1/1991 | Texaco |
| 215633 | VUA;SL 335 DEU NO. 064 | P&A Dry Hole | 7/7/1993 | Texaco |

Official records indicate that there was only one CUP issued for flowline removal. This was Permit #P20070196 issued to Apache for the removal of three flowlines. One of these flowlines is not shown as having received a permit to be installed. The other two were permitted (P19890948 and P1989099). None of the other flowlines laid by Texaco, Apache or LL&E which received CUPs for construction are shown as receiving permits for removal. This leads to the conclusion that these flowlines were either removed without a permit or not removed. Another indication from the records is that Texaco/Apache tank batteries #1 and #2 were in the process of being removed in December, 2007, when Apache's agent applied for a coastal permit for site clearance (diver verification) work. There is no record of a CUP being issued for the removal and restoration of Texaco/Apache tank batteries #1 and #2.

First, there are situations where oil and gas wells were plugged and abandoned but for which there is no record of a CUP allowing for site clearance and restoration. Under SLCRMA, it is insufficient to plug and abandon a well without removing the facilities altering the marsh hydrology. The coastal guidelines include pipelines within the definition of a linear facility, and the linear facility guidelines require that "areas dredged for linear facilities shall be backfilled or otherwise restored to the pre-existing conditions upon cessation of use for navigation purposes to the maximum extent practicable" (LAC 43:I.705). Under Louisiana's Natural Resources Administrative Code, an abandoned facility "located above the mudline and in less than 20 feet of water…constituting an obstruction shall be removed within 90 days after abandonment or as soon thereafter as practicable by the responsible person" (LAC 43:XI.311). Therefore, an obligation to remove facility obstructions exists not only from the general provisions of the coastal program, but a parallel obligation is created by Louisiana's Office of Conservation.

In order to perform site clearance, a user of the coast must access the site, which often requires canal dredging. Furthermore, removal of the facilities and equipment (including flowlines) also requires canal/channel dredging to access the facility depending upon circumstances. According to the Department of Natural Resources documents advising the public on when Coastal Use Permits are required,

**"any dredging necessary to access the site, including propwashing, requires a CUP application. Any excavation to expose existing flowlines for cutting, capping, and abandoning in place or for the removal of any existing structures requires a CUP application"** *--Louisiana Department of Natural Resources, OCM Policy and FAQS for Site Clearance Work, Office of Conservation*

Accordingly, most wells plugged and abandoned after 1980 required a coastal use permit for site work, in addition to timely permits for dredging to access the site to perform site clearance activities. The wells to which this violation applies are found in Table 1. In Figure 42, the Texaco wells without a CUP permit on file are set out, along with permitted flow line installation lacking CUP removal to date. In Figure 43, the location of pre-1980 ARCO wells that did not receive CUPs upon closure are set out. These conclusions are based upon the best information available to plaintiffs' experts and will be reconsidered upon the identification of new data and information.




*FIGURE 41: Map of well ownership status with post-1980 PA dates*




*FIGURE 42: Red diamonds show wells that Texaco P&A'd after 1980 without obtaining a CUP for P&A work or restoration.*




*FIGURE 43: ARCO - Pre-1980 wells and canals, Bayou Gentilly field. For their pre-1980 permitted wells, ARCO did not obtain any CUPs for their activities after 1980 before their wells were abandoned, including P&A CUPs upon the closure of their wells, or abandonment of the ARCO tank battery.*

*The following Section prepared by Frank Willis PhD, PE*

On April 16, 2018, I conducted preliminary reconnaissance of the Bayou Gentilly Case Area by air to observe pits, debris and structures. On April 18 and 19, I inspected the case area by boat and photographed various oilfield debris and structures. I used georeferenced aerial photographs, a Humminbird 1198C sidescan, and Schonstedt GA-52 magnetometer.

Figures 44.1 through 44.22 consist of geotagged photographs and sidescan data overlaid on 2010 GOHSEP orthophotos. The images are presented only where I found items of concern. In addition to environmental concerns, some of the objects shown in the photographs are potentially hazardous to navigation. The photographs do not represent a full sampling or statistical sampling of the entire case area. The photographs and my preliminary reconnaissance are intended only to provide evidence that a presently unquantified amount of oilfield debris and structures exist within the Bayou Gentilly Case Area.






*FIGURE 44.1: Piling. Note the PVC marker that is used to indicate the obstruction during higher tide.*






*FIGURE 44.2: Piling and pipe, which may be an abandoned well.*