# Exhibit 1
# Part 4






*FIGURE 44.3: According to my captain, fishermen place markers like this (and PVC pipe markers) in areas where they hit objects with their boat motors. According to my boat captain, he loses at least one lower unit by hitting obstructions in the Bayou Gentilly case area annually.*




*FIGURE 44.4: The Texaco Tank Battery No. 1 pit.*






*FIGURE 44.5: Abandoned oilfield pipe*






*FIGURE 44.6: Wooden foundation of an unknown structure, now deteriorated*






*FIGURE 44.7: Abandoned oil field pipe*




*FIGURE 44.8: Abandoned oilfield pipe*




*FIGURE 44.9: Abandoned oilfield pipe. Note the pipe running from left to right underwater.*






*FIGURE 44.10: Pipe underwater.*






*FIGURE 44.11: Piping, valves and piling. The well was not verified at the time of this writing.*






*FIGURE 44.12: Abandoned oilfield pipe*






*FIGURE 44.13: Apparent plugged well, not verified at the time of this writing. Miscellaneous pipe fittings are visible.*






*FIGURE 44.14: Valve and pilings. Potential hazard to navigation.*






*FIGURE 44.15: Abandoned oilfield pipe verified by metal tapping.*






*FIGURE 44.16: Oil slick that appeared after the boat motor struck a steel or rigid object. A strong oil odor prevailed. Sidescan images and magnetometer revealed pipe on the bottom in this area. Many abandoned pipes are visible on the surface in this area.*




*FIGURE 44.17: Abandoned oilfield pipe*






*FIGURE 44.18: Abandoned oilfield pipe within 300 feet of the point where the oil slick in FIGURE 44.17 is shown.*






*FIGURE 44.19: Pilings. Potential threat to navigation.*




*FIGURE 44.20: Abandoned oilfield pipe near the location where the oil slick was observed*




*FIGURE 44.21: Side scan imagery of apparent oil field pipe on the bottom. Magnetometer indicated strong steel signal.*

*(end FW insert)*

### 2. Dredging/Maintenance Dredging/Propwashing Without a CUP

Second, there are situations where a coastal use permit for dredging was granted for a five-year term but upon expiration of the old permit, a new permit was never issued even though the necessity for such activity continued. The Coastal Management Guidelines define dredging as, **“the removal by excavation or any other means of native material, including soil, sand, mud, clay, and semisolid sediment, regardless of whether the material supports or is supporting vegetation, from any lands or water bottoms in the coastal zone of Louisiana”** (LAC 43:I.700). Continual access to the canal network required constant “removal by excavation”, which is why some operators within the case area sought out maintenance dredging permits for a five-year term. Therefore, a violation exists where an operator received a CUP for maintenance dredging of a particular network of canals but did not acquire a subsequent maintenance dredging permit upon expiration of the previous permit for that canal network, even though the field continued to operate. This leads to the conclusion that canal maintenance and dredging occurred without a permit, most likely by prop-washing. Areas where such violations are believed to occur are centered within the Delacroix Island field. A map showing areas where such violations are alleged to have occurred are shown in the following Figure 45. Alternatively, absence of a maintenance dredging permit upon expiration of the previous maintenance permit’s term is evidence of either a violation for continued dredging without a permit or abandonment of the canals for navigation purposes as shown in Figure 45. A canal is subject to the coastal program’s linear facility guidelines, including the requirement that canals be **“backfilled or otherwise restored to the pre-existing conditions upon cessation of use for navigation purposes to the maximum extent practicable”** (LAC 43:I.705). Therefore, once a canal is abandoned for navigation purposes, adverse impacts create an obligation to either restore or to provide mitigation, whichever is appropriate.




*FIGURE 45: 1987 CUP for Canal Maintenance held by Texaco, Inc. This permit for canal maintenance was valid for a 5-year period, 1987-1992. Thereafter it was apparently not renewed, and no restoration of these canals was ever performed.*




*FIGURE 46: **APACHE**- All Apache-related CUPs. It is noted that Apache does not hold any canal maintenance CUPs for its activities accessing their wells upon well acquisition after 1994.*

As shown in Figure 46, Apache never obtained CUPs for canal maintenance or canal closure after plugging and abandoning the wells they purchase from Texaco. The absence of CUPs is further developed in Figure 47.




*FIGURE 47: Areas of Maintenance Dredging with a CUP, and, by implication, also without a CUP. Pink lines indicate the 1987 (P19870225) Texaco field-wide canal maintenance dredge CUP; Texaco's canal maintenance dredging was permitted from 1987 to 1992, the 5-year lifetime of the CUP. Texaco submitted another field-wide canal maintenance dredging CUP application yet it was later withdrawn after field-wide maintenance dredging was discontinued and site-specific maintenance dredging under GP-10 was required. Apache never received canal maintenance dredge permits to access their active wells that they acquired from Texaco in 1994. Additionally, ARCO (Bayou Gentilly Field), La Land & Exploration (Lake Petit Field), and LLOG (Crooked Bayou Field) also lacked canal maintenance CUPs to access their active wells.*

Texaco maintenance dredged without a permit in locations shown on Figure 47 from 1980-1987, and from 1992-1995 without a permit. Texaco also dredged to access all wells shown in Table 1 above which were P&A'd by Texaco from 1980-1987, and from 1992-1995, all without a CUP.

Apache maintenance dredged in the pink area on Figure 50 from 1995 to 2007 without a CUP. They also dredged to access each well on Table 1 that they P&A'd, all without a single CUP. Same with the Tank Battery removals in 2007/2008.

ARCO maintenance dredged from 1980-1983 at the location of S.N. 121138, including in 1983 when they P&A'd it without a CUP. They also dredged from 1980 to 1996 at the location of S.N. 123061, including in 1996 when they P&A'd it.

LA Land/Conoco maintenance dredged at the location of SN 221533 from 2002-2004 without a CUP. Defendants identified in opinion #3 are in violation of SLCRMA, failed to restore in accordance with the guidelines and failed to obtain a CUP to do so.

### B. Violation of the Terms and Conditions of Issued Coastal Use Permits

### OPINION #4: Violation of General Condition #3 Based Upon Failure of the Applicant to Fully Disclose Cumulative Impacts

In order to obtain a coastal use permit, the applicant submits information to the Office of Coastal Management (OCM) within the Department of Natural Resources (DNR). Permits are issued after a determination of compliance with applicable rules and regulations based upon information submitted by the applicant. In many circumstances, applicants failed to submit complete information regarding cumulative impacts that were associated with various activities. In particular, operations involving dredging of either new canals or maintenance dredging of existing canals generated cumulative impacts associated with interference with the hydrology of the wetland ecosystem.

All coastal use permits (CUPs) have certain provisions. Among the general provisions on all permits is Section 7 which states that the permittee agrees to:

> ***"7. All terms of the permit shall be subject to all applicable federal and state laws and regulations."***

The applicable state laws and regulations include Section 701(A) of the Coastal Use Guidelines which states that: "…all applicable guidelines must be complied with" (LAC 43:I.701). Further, Section 701(c) states that "…the general guidelines apply in all situations." The key provision is Section 701(G) that states that:

> ***"[T]o this end, all uses and activities shall be planned, sited, designed, constructed, operated and maintained to avoid to the maximum extent practicable significant:***
>
> ***
>
> ***(10) adverse effects of cumulative impacts (LAC 43:I.701)."***

A number of permitted canal projects and maintenance projects contributed to these cumulative impacts. The permits that contributed to this cumulative impact include P19800210 (Texaco), P19870225 (Texasco), P19890965 (Texaco), P19910620 (Texaco), P19910621

(Texaco), P19940450 (Texaco), P19971028 (Louisiana Land and Exploration Company), and P20031127 (LLOG Exploration Company).

The guidelines define cumulative impacts as those "impacts increasing in significance due to the collective effects of a number of activities" (LAC 43:I.700). These cumulative impacts include direct wetland loss, alteration of the salinity regime due to discharge and distribution of produced water which also contained suspended solids, radioactivity, and toxic metals. These impacts were both direct and secondary in nature, given the time lapse and geographic distance between certain types of activities and the manifestation of that activity's cumulative impacts. Included among these secondary impacts are impacts to the distribution and abundance of wetland dependent species such as blue crab, white shrimp and brown shrimp. All of these impacts weakened the wetland complex and made this area much more susceptible to erosion and to the negative impacts of hurricanes. These various projects contributed to the cumulative loss of thousands of acres of wetlands including specifically the land itself and the ecological productivity and bounty of such lands.

These cumulative impacts, which were not disclosed by any of these applicants, are most important in the context of General Provision #3 whereby all permittees agree:

> **"3. [To] Adjust, alter or remove any structure or other physical evidence of the permitted use if, in the opinion of the Department of Natural Resources, it proves to be beyond the scope of the use as approved or is abandoned."**

Cumulative impacts occurred that were not disclosed when the permits identified in section above, were issued, and these impacts were not within the scope of these permits as issued. The cumulative impacts generated by these activities authorized by coastal use permits violated the terms of condition #3 because they were beyond the scope of impacts of the use, as permitted. Therefore, the permitted uses must be removed and the coast restored or mitigated.

### OPINION #5: Violation of CUP Terms & Conditions

As set out in opinion #4, the permittee agrees to various terms and conditions when they sign a permit. Among other requirements is General Condition 3 under which all permittees agree:

"3. [To] Adjust, alter or remove any structure of other physical evidence of the permitted use if, in the opinion of the Department of Natural Resources, it proves to be beyond the scope of the use as approved or is abandoned."

All permitted activities that were not fully removed upon abandonment are in violation of general condition #3. This includes the activities allowed by the permits identified in Figure 36 which have now been abandoned.

### C. Supplemental Information - Storm Impacts on Weakened Marsh

It is the policy of the coastal resources program to avoid the following adverse impact. To this end, all uses and activities shall be planned, sided, designed, constructed, operated and maintained to avoid to the maximum extent practicable increases in the potential for flood, hurricane and other storm damage, or increases in the likelihood that damage will occur from such hazards. ( CZM 701 G.20 of the guidelines )

Texaco, Arco, LA Land/Conoco and LLOG were required to minimize impacts from hurricanes and storm damage. Oil companies weakened the marsh by discharging millions of barrels of produced water and created impoundments and impediments to marsh hydrology. The hurricane(s) would not have had such a devastating impact if the oil companies had not violated the CZM program.

*The following Section prepared by Larry Dunbar PE*

The Louisiana coast had been covered by over 4 million acres of marshlands/wetlands that were created over the centuries by natural processes, such as freshwater flow, saltwater intrusion, storm events, sediment movement and ecological processes. These marshlands provided numerous benefits to the parish, the region, and the state, such as storm surge reduction, fish and wildlife habitation, and ecological systems.

Since around 1930, as oil and gas activities began along the Louisiana coast, a net loss of over a million acres of these marsh/wetland areas has occurred (USGS 2017). This amounts to about a 25% loss of the land area that existed around that time (USGS 2017.

The USGS has been analyzing, quantifying and documenting this land loss over the years using aerial photography and has recently updated their findings in a report dated 2017, titled "Land Area Change in Coastal Louisiana (1932-2016)". This USGS report provides information on this marsh/wetland loss, including maps, for each of nine watersheds or basins within the entire Louisiana coastal zone and for various blocks of time from 1932-2016. One of these hydrologic basins is the Breton Sound basin, located just east of the Mississippi River delta, and where the Bayou Gentilly case area is located. This study shows that for most of the hydrologic basins along the Louisiana coast, including the Breton Sound basin, the pattern of land loss is not uniform or constant, but is variable and can occur in significant amounts over a very short period of time (see Figure 48 for a plot of this land loss over time for the nine basins, including the Breton Sound basin).




*FIGURE 48: Plot of Land Loss over time for Nine Hydrologic Basins (ref. USGS 2017)*

While this USGS report indicates both natural and anthropogenic causes for this land loss, it clearly identifies oil and gas activities, such as infrastructure construction (canals, pipelines and other facilities) as contributors to this land loss. This USGS report notes that this infrastructure "contributes to wetland loss not only through direct removal of material but also by altering hydrologic flow. This altered hydrology can lead to indirect effects such as the propagation of wave energy and salinity into interior wetland areas."

The indirect effects on marsh vegetation contribute to the weakening of the marsh that make it more susceptible to damage or destruction during severe storm events, such as hurricanes. This has been quite evident in the Bayou Gentilly area as a result of the more recent hurricanes, Katrina (2005) and Gustav (2008).

Historically, hurricanes and tropical storms have been striking the Louisiana coast periodically, causing damage or destruction to the marshland. Figure 49 shows the major hurricanes that affected the Breton Sound Basin of the Louisiana coast from 1850 up to 1932, with their tracks and landfall locations.




*FIGURE 49: Major Hurricanes Affecting Breton Sound Basin 1850-1932 (ref. NOAA)*

However, these marsh areas have recovered and even flourished following such storms, until recently. The net loss of marshland, such as in the Breton Sound area, has been magnified during hurricane events over the last 80 years, but with little recovery occurring afterwards (see Figure 50 for the major hurricanes that have affected the Breton Sound basin since the 1930s and Figure 51 shows when those hurricanes occurred in relation to land loss).




*FIGURE 50: Hurricanes Affecting Breton Sound Basin Since 1932 (ref. NOAA)*




*FIGURE 51: Major Hurricanes Affecting Land Loss in the Breton Sound Basin since the 1940s (NOAA)*

For example, during Hurricane Katrina in 2005, significant marshland was lost in the Breton Sound basin, especially in the upper basin where more fresh/intermediate type marsh had been located (see Figure 52 for the land loss resulting from Katrina in the Breton Sound basin of the Deltaic Plain along the Louisiana Coast).




*FIGURE 52: Land Loss (shown in red) in Deltaic Plain Due to Katrina (USGS)*

The land loss depicted by the USGS in the Figure above helps to identify the extent of the marshland area along the coast that was impacted by Katrina ("Impact Area"). Over recent time, the indirect effects on this marshland from oil and gas activities made it more susceptible to being damaged or destroyed during this hurricane. This marshland loss area has not been able to fully recover or re-establish after Katrina, resulting in a permanent land loss for this area. The Delacroix Island well field located in the Bayou Gentilly case area is one of the areas that suffered significant marshland loss during Katrina (see Figure 53 for a comparison of the Delacroix Island Field marshland area before and after Katrina).




*FIGURE 53: Comparison of Marshland Area in Delacroix Island Field Before and After Katrina*

Hurricane Gustav also impacted the Breton Sound basin, including this Delacroix Island area, in 2008, further negatively impacting this marshland area and further causing marsh land loss, as shown in Figure 54.




*FIGURE 54: Comparison of Marshland Area in Delacroix Island Area Before and After Gustav*

*(end LD insert)*

*The following Section prepared by John Day, PhD*

A significant disturbance to the wetlands of the Breton Sound estuary in recent history was the passage of hurricane Katrina. On August 29, 2005, hurricane Katrina passed over southeastern Louisiana with winds in excess of 200 km/h, and a tidal surge southeast of New Orleans exceeding 15 ft. The hurricane crossed the lower Mississippi River near its mouth and traversed the Breton Sound estuary. Strong easterly winds north of the eye pushed a six-meter storm surge over the estuary, causing massive disturbance to the extensive wetlands in the upper basin (Day et al. 2007; Barras et al. 2008). On September 23-24, 2005, hurricane Rita passed south of Breton Sound and led to further disturbance. The hurricanes not only led to widespread disturbance of wetlands, but also altered hydrology by infilling many waterways, such as section along Manuel's Canal that prevented sampling along that route for several years and forced more diverted river water to flow via Lake Leary and Bayou Terra aux Boeufs. Following widespread disturbance of wetlands in the upper Breton Sound estuary by Hurricanes Katrina and Rita in 2005, the diversion structure was operated at high flow to encourage re-growth of wetlands degraded during the storms, with a goal to reversing this loss. However, after the passage of hurricanes Ike and Gustav in 2008, there was further wetlands loss (Barras et al. 2006; Figure 55). There was high wetland loss in the vicinity of the Bayou Gentilly field, undoubtedly influenced by earlier oil and gas activity.




*FIGURE 55: Land loss (in red) associated with Hurricane Katrina (modified from Barras 2006). Note high wetland loss in the vicinity of the Bayou Gentilly oil and gas field.*

Howes et al. (2010) speculated that low salinity wetlands proximal to rivers and distributaries exposed to periodic flooding have stratigraphy consisting of alternating sequences of peat interrupted by inorganic overbank flood deposits, and thus are subject to shallower rooting and susceptible to erosion during large magnitude storms. Howes et al. (2010) based this speculation on low soil strengths concentrated near the top of an inorganic clay layer approximately 30 cm below the marsh surface of the upper Breton Sound estuary and interpreted this as a possible crevasse splay or as storm related deposits and typical of upper basins in the Mississippi River delta. However, Day et al. (2016) positively identified this deposit as being formed during the 1927 levee breach at Caernarvon (Barry 1997). This deposit created a low shear strength zone that was instrumental in the wetland loss experienced during hurricane Katrina (Barras et al. 2008) and is a particular artificial feature due to the history of the estuary and is not typical of other interdistributary basins of the delta. Snedden et al. (2015) studied the impact of flooding on wetland health and productivity. They found that longer duration of flooding led to lower above and belowground wetland plant growth. Oil and gas activities increased the duration of flooding due to both lowered suspended sediment input and by increased subsidence rates. Stress due to high salinity brines would have further weakened or killed marsh vegetation.

Conner et al. (1989) reviewed impacts of hurricanes on coastal wetlands in the Gulf of Mexico and found that they generally do not produce long-term detrimental impacts to unmodified coastal systems and they often provide net benefits (e.g., redistribution of sediments into interior areas) that contribute to long-term wetland sustainability, habitat diversity, and vegetation productivity. Conversely, in coastal wetlands with anthropogenic modifications such as pipeline canals and oil field canals, hurricane impacts can be detrimental by disrupting and weakening the marsh sediments, changing surface elevations, providing preferred pathways for high-velocity flows, impeding post-storm floodwater drainage, and prolonged saltwater intrusion (Harris and Chabreck 1958; Morgan et al. 1958; Meeder 1987; Suhayda and Jacobsen 2008; Morton and Barras 2011). For example, impounded marshes in the Chenier plain region of coastal Louisiana remained flooded for over nine months following Hurricane Rita (Barras 2007). Swenson (1983) measured flooding frequency and duration at brackish marsh sites north of Golden Meadow, Louisiana from August 1982 through September 1983. The marsh that was semi-impounded due to placement of spoil from dredged oil and gas canals was flooded 141 hours more per month than the marsh that had unrestricted hydrology. Swenson and Turner (1987) concluded that partially impounded marshes had fewer flooding events per month (4.5 as opposed to 12.9 for a natural site without altered hydrology) that were much longer in duration (150 hours as opposed to 30 hours for the natural site). Changes in flooding frequency and duration can affect vegetation species composition and productivity.

*(end JD insert)*

## IV. ALTERNATIVE PRACTICES

There are numerous practical alternatives that were available to the defendants that could have substantially mitigated impacts post 1980. The follow paragraphs explain the types of actions that could have been undertaken.

**Alternative canal development scenarios**
**1. Directional Drilling**

At the inception of the oil and gas exploration activity dating back to 1941, the practice of directional drilling was available to the defendants who chose not to undertake such drilling practices. Directional drilling had been employed in California and other areas by various defendants yet was not pursued in the Bayou Gentilly case area. Had such practices been followed, the extent of impacts associated with oil and gas exploration and production activities could have been reduced substantially.

*The following Section prepared by Charles Norman, PE*

After discovering the Delacroix Field, Texaco decided to manage only the oil and gas activities and avoided managing the wetlands that included protecting the marshland from contamination and excessive land losses. This mistake was deliberate and showed bad faith on the part of Texaco. Industry knowledge and prudent practices including the work of API and the U.S. Bureau of Mines clearly showed in the 1940's that oil and gas operators had a duty to protect the land from pollution and land loss.

Texaco chose to use excessive canal dredging with high traffic marine equipment operations as the means of transportation to operate the Delacroix Island Field. They also chose the overboard discharging of large volumes of produced saltwater that contaminated the water, sediment, soil and groundwater. There were better alternatives to both the overboard discharging and the excessive use of dredged canals. Subsurface disposal of produced saltwater was recommended by the LA DNR, industry knowledge and prudent practices since the 1930's. Minimizing or eliminating dredged canals was being practiced in the early 1940's by the creation of roads with open drainage pathways. Directional drilling was developed in the late 1920's by Eastman and Sperry. Directional drilling could be done from a fixed platform or from a manmade island in the marsh. It had the advantage of drilling from a central location(s) and eliminating or reducing long surface flowlines that reduced production rates and increased leaks and spill.

Another major alternative to Texaco's practices was the use of steel tanks and/or barges for the handling of produced saltwater. Settling of oil and water as well as sediments in produced saltwater from separators is better handled using steel gun barrel tanks and/or concrete barges with inside compartments for separation. Steel tanks and steel and concrete barges in

conjunction with separators and heater treaters were available in the early 1940's and should have been used to replace open unlined earthen pits. Steel tanks would be installed on platforms or drilling/production pads and they would have reduced leaks, spills, and seepage into the open water, sediments, soils and groundwater. Concrete or steel barge tanks would be installed at the tank battery facilities.

Another important alternative was to commence SWD wells in the Delacroix Island Field at the onset of saltwater production. Two or more SWD wells were required for reliability purposes so that continuous subsurface disposal would be accomplished. The SWD wells in conjunction with steel tanks and/or concrete barges would have been a much more reliable method that would eliminate pollution and the need for excessive canals and high marine traffic. This alternative would have also complied with the environmental laws and regulations to protect the environment. The first SWD well was installed in 1993 which is an imprudent act since industry practice was to install subsurface saltwater injection wells at the beginning of production in 1941.

As noted above, a major alternative plan to canals is the use of directional drilled wells from centralized locations that are on platforms or manmade islands. Although additional casing and tubing are required for each well, long flowlines are eliminated and the wellhead is placed directly on the drill pad or platform. Thus, the need for dredged canals, dredged well locations, laying and burying flowlines, excessive marine operations is eliminated. Land loss due to flowline leaks and spills and marine operations are eliminated or greatly reduced. Subsurface disposal wells along with directional drilled wells from centralized locations would eliminate most if not all land loss and pollution. Following is some history into how this alternative is better and protects the environment.

After the Texaco discovery of the Delacroix Island Field in 1941, development of the field was determined by the production group within Texaco. There were three alternatives for development at the timeline of the discovery. These were as follows:

Early Production Facilities: This is the method Texaco chose and it was faulty and showed bad practices based on industry knowledge, complying with laws and regulations, and the method resulted in land loss, reduced economics, and pollution to the wetland soils, sediments and groundwater. It consists of individual satellite wells with long flowlines to two central production facilities for the entire field. The wells had high back pressure with three phase flow. The high back pressure caused high friction losses and resulted in lower recovery of reserves and higher maintenance costs. It required extensive dredging of canals, repairing of flowline leaks, and the extensive wave action and overboard discharging of produced saltwater further increased the land loss. Texaco did not analyze voidage replacement ratio. No plans were made to restore damaged land and no restoration was made for land loss. Accelerated cash flow, quicker payout, but lower recovery and net cash flow were the objectives. High land loss