**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **THE PARISH OF PLAQUEMINES** | * | **CIVIL ACTION: 2:18-CV-05189** |
| | * | |
| **VERSUS** | * | **JUDGE CARL J. BARBIER** |
| | * | |
| **ROZEL OPERATING COMPANY, ET AL.** | * | **MAGISTRATE MICHAEL NORTH** |

**************************************

---

## SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO REMAND

---

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

I. Relevant Background ........ 1

II. Defendants Have Waived Their Right to a Federal Forum ........ 4

III. Defendants Have Failed To Establish The Elements of Removal Under Section 1442 ..... 7

A. Applicable Legal Precepts ........ 7

B. The Limited Scope of *Chevron* ........ 7

C. Defendants Cannot Establish That They Were "Acting Under" a "Federal Officer" ........ 8

D. Defendants Cannot Establish that The Texas Company's Production of Crude Oil in the Delacroix Island Field "Relates to" Its Avgas Refining ........ 14

1. The Relevant "Acts" Are Confined to the Refining of Avgas, the Only Product Addressed by the Avgas Contracts ........ 14

2. Defendants' Removal Does Not Survive Application of the Chevron Test to the Facts of Record ........ 15

E. Defendants Cannot Establish a Colorable Federal Defense ........ 18

1. The Colorable Federal Defense Requirement is the Source of Article III Jurisdiction ........ 18

2. Textual Analysis Of Colorable Federal Defense Element ........ 19

3. The Jurisprudence Uniformly Supports The Foregoing Textual Analysis ..... 20

4. Defendants Have No Colorable Federal Defenses ........ 23

IV. CONCLUSION ........ 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga*, 155 F.4th 456 (5th Cir. 2025)..... 4

*Anderson Living Trust v. ConocoPhillips Company, LLC*, 349 F.R.D. 365 (D. N.M. 2025)........ 17

*Arizona v. Manypenny*, 451 U.S. 232 (1981) ........ 20

*Attorney General of State of New Jersey v. Dow Chemical Co.,* 2024 WL 1740087 (D.N.J. April 23, 2024), *aff'd*, 140 F.4 th 115 (3d Cir. 2025)........ 20

*Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010) ........ 22

*Blum v. AT&T Corp.*, 2025 WL 2792249 (W.D. La. Sept. 12, 2025) ........ 23

*Box v. PetroTel, Inc.,* 33 F. 4th 195 (5th Cir. 2025)........ 8

*Butler v. Coast Elec. Power Assoc.*, 926 F.3d 190 (5th 2019) ........ 25

*California v. Clay*, 709 Fed. Appx. 466 (9th Cir. Jan. 17, 2018) (unpublished disposition) .......... 5

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340 (5th Cir. 2024) ........ 7, 25

*Caterpillar Inc. v. Lewis*, 519 U.S. 61, 117 S.Ct. 467, 476, 136 L.Ed.2d 437 (1996) ........ 5

Chevron USA *Incorporated v. Plaquemines Parish, Louisiana*, 608 U.S. ----, 146 S.Ct. 1052 (April 17, 2026) ........ passim

*City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 1795 (2023). ........ 9, 22

*City of Oakland v. BP PLCI*, 2023 WL 8179286 (9th Cir. Nov. 27, 2023) (unpublished disposition)........ 14

*Clark v. United States*, 2018 WL 11312978 (E.D. Mo. Aug. 9, 2018) ........ 23

*County Bd. of Arlington County v. Express Scripts Pharmacy*, 996 F.3d 253 (4th Cir. 2021) ..... 22

*County Bd. Of Arlington County, Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243 (4th Cir. 2021) ........ 22

*CSWS LLC v. Village of Bedford Park*, 2008 WL 4148530 (N.D. Ill. Aug. 29, 2008) ........ 23

*Czerno v. General Elect. Co.*, 182 F.4th 15 (1st Cir. 2026) ........ 13

*Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310 (9th Cir. 1981)........ 20

*English v. General Elec. Co.*, 496 U.S. 72 (1990) .......... 25

*Federal Nat. Mortg. Ass'n v. Torborg*, 573 Fed. Appx. 606 (8th Cir. July 25, 2014) .......... 5

*Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) .......... 25

*Government of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174 (1st Cir. 2024) .......... 9, 22

*Hingst v. Providian Nat. Bank*, 124 F.Supp.2d 449 (S.D. Tex. 2000) .......... 6

*Holloway v. Parker*, 784 F.2d 1287 (5th Cir. 1986) .......... 25

*Humphries v. Elliott Co.*, 760 F.3d 414 (5th Cir. 2014) .......... 22

*In re National Prescription Opiate Litig.*, 327 F.Supp.3d 1064 (N.D. Ohio 2018) .......... 22

*Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2d Cir. 2008) .......... 21

*Jax Leasing v. Xiulu Ruan*, 359 F.Supp.3d 1129 (S.D. Ala. 2019) .......... 19

*Johnson v. Heublein Inc.*, 227 F.3d 236 (5th Cir. 2000) .......... 4

*Katsigiannis v. M.H. Parsons & Sons Lumber Co., Inc.*, 2025 WL 2778102 (D. N.H. Sept. 26, 2025) .......... 19

*Kelley v. Abram*, 2017 WL 586360 (D. Minn. Feb. 13, 2017) .......... 22

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) .......... 24

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc) .......... 7, 12, 22, 23

*Lirette v. N.L. Sperry Sun, Inc.*, 820 F.2d 116 (5th Cir. 1987) (en banc) .......... 7

*Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) .......... passim

*OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487 (5th Cir. 2020) .......... 6

*Plaquemines Parish v. Chevron USA, Inc.*, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (*unpublished disposition*), *cert. denied*, ___ U.S. ___, 143 S.Ct. 991, 215 L.Ed.2d 112 (2023) .. 1

*Quinoes v. City of Evanston*, 58 F.3d 275 (7th Cir.1995) .......... 23

*Rosenthal v. Coates*, 148 U.S. 142 (1893) .......... 5

*Sentry Ins. v. Morgan*, 101 F.4th 396 (5th Cir. 2024) .......... 7

*Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240 (5th Cir. 2000) .......... 24

*St Charles Surg. Hosp., LLC v. La. Health Service & Indem. Co.*, 990 F.3d 447 (5th Cir. 2021) 14

*St. Charles Surg. Hosp. v. Louisiana Health*, 935 F.3d 352 (5th Cir. 2019) .......... 25

*State by Tong v. Exxon Mobil Corporation,* 83 F.4th 122 (2d Cir. 2023) .......... 8

*Stutes v. Gulfport Energy Co.*, 2017 WL 4286846 (W.D. La. June 30, 2017) .......... 26

*United States v. Leventhal*, 2024 WL 38581760 (E.D. Wis. Aug. 19, 2024) .......... 22

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) .......... 24

*West Virginia ex rel. Hunt v. Caremark PCS Health, LLC*, 140 F.4th 188 (4th Cir. 2025) .......... 22

*Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) .......... 19, 20, 22

*Watson v. Philip Morris Cos.,* 551 U.S. 142 (2007) .......... 8, 9

*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) .......... 9, 12, 13

*Zeringue v. Crane Company*, 846 F.3d 785 (5th Cir. 2017) .......... 12, 13

**FEDERAL STATUTES**

1 U.S.C. § 1 .......... 19

16 U.S.C. § 1456 .......... 26

16 U.S.C. § 1456 *et seq* .......... 26

28 U.S.C. § 1442 .......... passim

28 U.S.C. § 1445(a) .......... 7

28 U.S.C. § 1446(d) .......... 2

28 U.S.C. § 1447(c) .......... 2, 25

**OTHER AUTHORITIES**

Carlson and Mayer, *Reverse Preemption*, 40 Ecology L.Q. 583 (2013) .......... 26

David M. Kennedy, *Freedom from Fear*, *The American People in Depression and War, 1929-1945* (New York: Oxford University Press, 1999) .......... 10

*The History of Why Oil Comes in a "Barrel,"* Petroleum Service Company, https://petroleum service company.com/blog/the-history-of-why-oil-comes-in-a-barrel/ (August 19, 2015) .......... 17

William Tidwell & Brendan O'Callaghan, *The Role of the Defense Supplies Corporation in the Wartime Aviation Gasoline Program*. Historical Reports on War Administration: Reconstruction Finance Corporation (1949) .......... 9, 10

**COMES NOW**, Plaintiff, the Parish of Plaquemines ("Parish"), and files this supplemental memorandum in support of the motion to remand, Doc. 74, filed by it and the State of Louisiana ("Plaintiffs").

## I. Relevant Background

In 2013, Plaintiffs filed this lawsuit in the 25TH Judicial District Court, State of Louisiana (the "State Court"). On May 23, 2018, Defendants Chevron USA Inc., Chevron USA Holdings, Inc., and The Texas Company ("Defendants") removed this case, for the second time, to this Court. The premise for this removal was that the lawsuit challenged their World War II oil and gas exploration and production ("E&P") activities, and that those activities had a sufficient federal nexus so as to justify removal under 28 U.S.C. § 1442(a)(1) ("Section 1442"). This case was one of dozens of such cases removed in 2018 to this Court (the "Coastal Cases").

Plaintiffs moved to remand this case to state court. However, that motion practice was stayed pending litigation of the *Riverwood* case, which was designated as the "lead" Coastal Case in this district. *Riverwood* was ultimately remanded to state court, a decision affirmed by the Fifth Circuit in *Plaquemines Parish v. Chevron USA, Inc.*, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (*unpublished disposition*), *cert. denied*, 143 S.Ct. 991 (2023) ("*Plaquemines II*").

Following *Plaquemines II*, Plaintiffs renewed their remand motion, which this Court granted. Doc. 83. Defendants attempted to exploit the suggestion in *Plaquemines II* that a company that both produced from the relevant field (here, the Delacroix Island Field in Plaquemines Parish), and refined that *same* production into avgas, might be able to remove under Section 1442. Doc. 83, at 5-8. This Court found, however, assuming (without deciding) that one or more Defendants was "acting under" a "federal officer," the E&P activities were too remote from refining activity to satisfy the "relating to" element of the test for removal under Section 1442. *Id.*, at 8-12.

This Court (over Plaintiffs' objection) stayed the remand order. However, on October 11, 2023, the Fifth Circuit granted Plaintiffs' motion to lift such a stay in another Coastal Case, *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362 (5th Cir. 2023) ("*Plaquemines III*"). In denying the appellants (including Defendants) a stay of the remand order, the Fifth Circuit specifically advised that appellants could renew their request for a stay if and when a trial of the remanded case in state court became likely.[1] In light of this decision, Plaintiffs filed a motion to lift the stay order in this case, which Defendants did not oppose. Doc. 92. The Court lifted the stay pending appeal in this case, and ordered that the District Court Clerk of Court mail a certified copy of the order of remand to the clerk of the State Court, on October 23, 2023. Doc. 93.

In accordance with 28 U.S.C. §§ 1446(d) and 1447(c), proceedings recommenced in the State Court. On March 12, 2024, the State Court set a jury trial to commence on March 10, 2025.[2] Despite the progress of the case in State Court, Defendants took no action in federal court to seek a stay or injunction of the State Court proceeding, or to expedite their appeal. Rather, they agreed to stay briefing in the appeal of this case while the appeal in another Coastal Case was heard. Furthermore, on November 14, 2024, after this other appeal was denied (*see Plaquemines Parish v. BP America Production Co*., 103 F.4th 324 (5th Cir. 2024) ("*Plaquemines IV*"), *vacated*, 146 S.Ct. 1052 (2026)), Defendants obtained a further stay of briefing in the appeal of this case.[3]

While the appeal remained in abeyance in federal court, in the State Court proceeding discovery concluded and Defendants filed multiple motions for summary judgment, which were adjudicated in judgments rendered on December 30, 2024[4] and February 12, 2025.[5] The case was

[1] *Plaquemines III*, 84 F.4th at 376.
[2] Exhibit 1 (Order Setting Jury Trial, March 12, 2024).
[3] Exhibit 2 (Unopposed Motion to Continue Stay of Appellate Briefing); Exhibit 3 (Order Granting Briefing Stay).
[4] Exhibit 4 (State Court Judgment, December 30, 2024).
[5] Exhibit 5 (State Court Judgment, February 12, 2025).

then tried before a State Court Jury from March 10, 2025 through April 4, 2025, with the Jury rendering a verdict in Plaintiffs' favor on April 4, 2025.[6] Following the verdict, Plaintiffs circulated a proposed form of final judgment.[7] Defendants disagreed with the proposed form of judgment because it provided for prejudgment interest, and filed a *Motion for Entry of Final Judgment*, praying that the State Court "enter the judgment" prepared by Defendants, on April 16, 2025.[8] The State Court set the matter for hearing, and scheduled the motion to be heard on July 10, 2025.[9]

However, on June 16, 2025, the Supreme Court granted Defendants' petition for a writ of certiorari in another Coastal Case (the *Total* case). The State court (with the parties' consent) stayed the State Court action pending the Supreme Court's decision. Defendants' motion for entry of a final judgment remains pending in State Court.

The Supreme Court rendered its decision on April 17, 2026.[10] Defendants filed a motion asking the Fifth Circuit to stay the remand order/enjoin the State Court proceeding and/or expedite a decision on the appeal.[11] In response, the Fifth Circuit issued an accelerated briefing schedule, and oral argument was had on August 5, 2026. On August 24, 2026, the Fifth Circuit issued the following per curiam in that appeal:

> In light of the Supreme Court's decision in *Chevron USA Inc. v. Plaquemines Parish,* 608 U.S. ---, 146 S. Ct. 1052 (2026), we VACATE the district court's order remanding this case to state court and REMAND to the district court for proceedings consistent with the Supreme Court's opinion. We express no view on the merits of this case and leave all issues to be addressed by the district court in the first instance.
>
> State court proceedings in this case are ENJOINED. This injunction shall last for 60 days unless extended or terminated by this court.

---

[6] *See* Exhibit 6 (Defendants' proposed jury instructions); Exhibit 7 (Defendants' objections to Plaintiffs' proposed jury instructions); Exhibit 8 (Jury Verdict).
[7] *See* Exhibit 9 (Defendants' Motion for Entry of Final Judgment, with exhibits).
[8] Exhibit 9 (Defendants' Motion for Entry of Final Judgment, with exhibits).
[9] Motion Exhibit 10 (State Court Order Setting Defendants' Motion for Entry of Final Judgment for Hearing).
[10] *Chevron USA Incorporated v. Plaquemines Parish, Louisiana*, 146 S.Ct. 1052 (2026) ("*Chevron*").
[11] Exhibit 11 (Appellants' Motion Regarding Further Proceedings).

## II. Defendants Have Waived Their Right to a Federal Forum

Plaintiffs submit that a defendant has the affirmative duty to take any and all measures available to it to avoid a state court adjudication of the merits of the case while the case, after it has been remanded, remains subject to federal appellate review. Defendants, by their efforts to obtain a merits determination in State Court and concomitant failure to seek federal relief (by way of stay/injunction or expedited appeal), waived their right to exploit a federal forum in this case.

> A defendant's intent to remain in state court must be "be clear and unequivocal," and "the right of removal is not lost by action in the state court short of proceeding to an adjudication on the merits." In practical terms, waiver occurs only when a defendant has "invoked the jurisdiction of the state court in resolving the issues presented by the original complaint." Anything less—mere procedural skirmishing—does not suffice.[12]

Here, Defendants did not merely engage in "procedural skirmishing." Instead, they elected to "experiment" with the case in State Court and thereafter "proceed to an adjudication on the merits." Defendants, despite the availability of a stay/injunction remedy (as per *Plaquemines III*) or acceleration of the appeal (as ultimately occurred, but only *after* Defendants gambled and lost in State Court), took these actions without seeking any intervention from the federal courts. In other words, Defendants, by participating (without seeking federal intervention) in the filing of dispositive motions and the submission of the merits of the case to a State Court jury, clearly "invoked the jurisdiction of the state court" to "resolve the issues presented by" Plaintiffs' petitions.[13] Moreover, Defendants have expressly and affirmatively sought entry of a final

[12] *Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga*, 155 F.4th 456, 460 (5th Cir. 2025) (quotation marks in original) (brackets and citations omitted).

[13] *See Johnson v. Heublein Inc.*, 227 F.3d 236, 244 (5th Cir. 2000) ("The Co-defendants waived their right to remove the case under the original complaint by (1) failing to file a notice of removal within thirty days of service of the initial complaint, and (2) filing both motions to dismiss and a motion for summary judgment in the state court proceeding prior to the filing of the amended complaint by the Co-plaintiffs, thus invoking the jurisdiction of the state court in resolving the issues presented by the original complaint.") (listing cases).

judgment by the State Court. Defendants have thus waived their right to, and are estopped from now claiming, any entitlement to a federal forum.

This result is consistent with long-standing judicial policy. In light of Defendants' conduct, "to sustain this removal would certainly violate the spirit of the removal acts, which do not contemplate that a party may experiment on his case in the state court, and, upon an adverse decision, then transfer it to the federal court."[14] This is because, once a case has been tried in the court of a sovereign with jurisdiction over the case (which is precisely what has occurred in the State Court proceeding, *see* 28 U.S.C. § 1447(c)), "considerations of finality, efficiency, and economy become overwhelming."[15] Consistent with these policies, several appellate courts have recognized that a merits determination in a remanded state court case, while the removal is on appeal, waives a federal forum and thus moots further federal proceedings.[16]

Several district courts have also reached similar conclusions in the post-removal/pre-remand context, finding that a removing defendant's participation in state court proceedings, *without asking the federal court to halt these state court proceedings*, impermissibly allows the removing defendants to "reap simultaneous benefits from both state and federal court," as they could "gain insight into the plaintiff's and co-defendants' claims, and watch other parties utilize their resources."[17] Because this conduct exhibits an "intent to have the case adjudicated in state

---

[14] *Rosenthal v. Coates*, 148 U.S. 142, 147 (1893).

[15] *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75, 117 S.Ct. 467, 476, 136 L.Ed.2d 437 (1996). In *Caterpillar* the Supreme Court held that such considerations warranted confirming a final judgment in a federal action, even though the plaintiffs successfully preserved an objection to a wrongful removal and demonstrated that the action should have been remanded and proceeded to judgment in state court.

[16] *California v. Clay*, 709 Fed. Appx. 466, 467 (9th Cir. Jan. 17, 2018) (in appeal of remand order in state criminal case removed under 28 U.S.C. § 1442, defendant's post-removal entry of a plea of nolo contendere to two misdemeanor charges evidenced a waiver of the right to a federal forum that mooted the appeal) (unpublished disposition); *Federal Nat. Mortg. Ass'n v. Torborg*, 573 Fed. Appx. 606, 607 (8th Cir. July 25, 2014) (in appeal of remand order in civil case removed under 28 U.S.C. § 1443, defendant-appellant's failure to obtain a stay of the remand order or expedited appeal, and the subsequent litigation of the state court proceeding to final judgment, rendered the federal proceeding moot).

[17] *Direct Mortgage Corp. v. Keirtec, Inc.*, 478 F.Supp.2d 1339, 1341 (D. Utah 2007); *accord Rozas v. Michigan Dep't of Health and Human Services*, 2024 WL 5136894, *7-8 (E.D. Mich. Dec. 17, 2024).

court" and otherwise "experiment with their cases in state court," it constituted a waiver of the right to a federal forum.[18]

To be clear, Plaintiffs are *not* asserting that Defendants were "voluntarily" in State Court, or that they intended to forgo their federal option; to the contrary, it is clear that Defendants fully intended to keep their federal cards in their back pocket, in case it became necessary to play them. Plaintiffs' contention is that waiver occurred when Defendants, faced with an approaching merits determination in the State Court, decided to rest on the extant stay of the federal appeal and forgo any federal intervention in the State Court proceeding. Thus, Defendants gambled on a merits win in State Court (a win they could clinch by dismissing their federal appeal), while preserving the fallback of a federal forum and the potential interdiction of any adverse State Court judgment.

"In essence, waiver is meant to prevent a defendant from using removal as an insurance policy against unfavorable treatment in state court."[19] And "an insurance policy" is precisely how Defendants treated this appeal, first by obtaining an indefinite stay (which virtually assured that a State Court trial would occur before the appeal would be decided), and then declining to seek federal intervention to delay or avoid that trial. In other words, Defendants rolled the dice, hoping that if they came up snake eyes in State Court, their federal "insurance policy" would be there to repair the damage. But if a defendant is rolling the dice in State Court, it makes no sense not to require that defendant to also roll the dice (by seeking a stay, expedited appeal, *etc.*) to preserve its federal forum. Again, it is the pursuit of merits rulings in State Court *combined with silence and inaction in federal court* that constitutes the waiver here.[20]

---

[18] *Rozas*, 2024 WL 5136894, *7 (citations omitted); *see Direct Mortgage*, 478 F.Supp.2d at 1341.

[19] *Hingst v. Providian Nat. Bank*, 124 F.Supp.2d 449, 452 (S.D. Tex. 2000) (citing *Rosenthal*, 148 U.S. at 147-48).

[20] *Compare OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487, 498 (5th Cir. 2020) ("This waiver rule prevents inefficiency and the gamesmanship that would result if a party could wait to see how the arbitration tribunal ruled before deciding whether to challenge its jurisdiction.") (citation omitted); *Lirette v. N.L. Sperry Sun, Inc.*, 820 F.2d 116, 117-18 (5th Cir. 1987) (en banc) (holding that 28 U.S.C. § 1445(a)'s ban on removal of FELA and Jones Act claims was waived by failure to object in district court and participation in federal proceedings).

## III. Defendants Have Failed To Establish The Elements of Removal Under Section 1442

### A. Applicable Legal Precepts

Even though there is no presumption disfavoring removal under Section 1442, "the defendant maintains the burden to establish the existence of jurisdiction."[21] Thus, Defendants have the burden of proving each of the following by a preponderance of the evidence:

> First, the removing defendant must be the United States, a federal agency, a federal officer, or a person "acting under" a federal officer, such as certain private parties hired to assist federal officers. Second, the suit must be "for or relating to any act under color of such office." Third, the removing defendant must assert "a colorable federal defense."[22]

### B. The Limited Scope of *Chevron*

The Fifth Circuit remanded this case to this Court for the specific purpose of re-evaluating its prior opinion in light of the *Chevron* decision. That such remand was necessary follows from the fact that this Court's prior ruling was premised entirely upon the "relating to" element of the Section 1442 inquiry, the same element addressed in *Chevron*. However, *Chevron* expressly avoids addressing the other elements; expressly avoids addressing any "related case" (including this one); and ultimately remands the case (with guidance) to allow the lower courts to make a final determination as to the propriety of federal officer removal.[23]

---

[21] *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 346 (5th Cir. 2024).

[22] *Chevron*, 146 S.Ct. at 1057; *see Sentry Ins. v. Morgan*, 101 F.4th 396, 398 (5th Cir. 2024) ("As the party invoking federal jurisdiction, Sentry has the burden of proving subject matter jurisdiction by a preponderance of the evidence.") (citation omitted).

[23] *See Chevron*, 146 S.Ct. at 1057-58 (reviewing elements of federal officer removal, and concluding that "[t]his case concerns the second requirement."), 1062, n. 5 ("We do not resolve whether the defendants in the related cases can satisfy the 'for or relating to' requirement. We also do not address the other requirements of federal officer removal."). *Chevron* does not purport to disturb the prior determinations of this Court and the Fifth Circuit that mere producer defendants in a "non-refinery" case cannot satisfy the first *Chevron* element, and thus do not qualify for federal officer removal. *Id.*, 146 S.Ct. at 1060, n. 2 ("The Fifth Circuit held that Chevron satisfied the first requirement of the removal statute because it "act[ed] under" a federal officer when it refined crude oil into avgas for the military pursuant to a federal contract. No party disputes that Chevron acted under a federal officer in that capacity. We assume, without deciding, that it did."). *Chevron* also does not purport to disturb the Fifth Circuit's *en banc* decision in *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc). Thus, *Chevron*, fairly read, addresses only the improper application of a single element of the federal officer removal inquiry by a single panel of the Fifth Circuit, and does not overrule any other precedent of this Court or the Fifth Circuit.

### C. Defendants Cannot Establish That They Were "Acting Under" a "Federal Officer"

Defendants' contention is that The Texas Company was both an oil producer and an oil refiner as to the Delacroix Island Field, and thus The Texas Company was "acting under" a "federal officer" when it refined avgas pursuant to a contract with the Defense Supplies Corporation ("DSC").[24] Neither this Court's prior opinion, nor the Supreme Court's decision in *Chevron*, addresses this element; rather, both opinions merely assume the existence of this element to enable further analysis of the "relating to" element.[25] Whether The Texas Company was "acting under" a "federal officer" when it refined avgas pursuant to a contract with the DSC is a mixed question of law and fact, and thus this determination must be made in light of the particular facts of record.[26]

The "acting under" inquiry "examines the *relationship* between the removing party and the relevant federal officer."[27] An "acting under" relationship exists if the federal officer (1) exercises "subjection, guidance, or control" over the removing party, ***and*** (2) that party is assisting or helping carry out a federal officer's duties, as opposed merely to complying with the law."[28] Both of these prongs must exist to establish the "acting under" element; entering into a commercial transaction to supply a product to that officer, without more, does not satisfy this element, even if copious amounts of the product are required to satisfy a pressing need.[29] Rather, contracts to supply

---

[24] Doc. 83, at 7-8.
[25] Doc. 83, at 8 n. 48; *Chevron*
[26] *International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 89 (1991) ("Similarly, whether Tulane will be able to remove the remanded case requires a determination whether it is a 'person acting under' the Director of NIH within the meaning of § 1442(a)(1). This mixed question of law and fact should not be resolved in the first instance by this Court, least of all without an appropriate record.").
[27] *Caris*, 108 F.4th at 347 (5th Cir. 2024) (quoting *St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 990 F.3d 447, 455 (5th Cir. 2021) (emphasis in original)).
[28] *Caris*, 108 F.4th at 347-48 (citing *Watson v. Philip Morris Cos.,* 551 U.S. 142, 151-52 (2007)).
[29] *Box v. PetroTel, Inc.*, 33 F.4th 195, 199-200 (5th Cir. 2022); *see Bd. of Cty. Comm'rs v. Suncor Energy (U.S.A.), Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022) ("The government can (and does) purchase some of the fuel produced by Exxon via its OCS leases, as it does from others in the marketplace. But the OCS leases do not require Exxon to tailor fuel production to detailed government specifications aimed at satisfying pressing federal needs.") (citations omitted); *State v. Exxon Mobil Corp.,* 83 F.4th 122, 144 (2d Cir. 2023) ("But the mere fact that Exxon Mobil helps the government to produce an item that it needs is not enough; it must also show that in providing fossil fuels to the military it acts under the close supervision, subjection, guidance, or control of federal officers.").

products to the Government satisfy the "acting under" element only when the contractor's "relationship with the government 'is an unusually close one involving detailed regulation, monitoring, or supervision.'"[30] Thus, "a private party acts under the government when the party is a contractor ***given detailed specifications and ongoing supervision*** to help fight a war."[31]

Defendants here rely upon several contracts between the DSC[32] and The Texas Company, for the refining of aviation fuel (avgas) at The Texas Company's Port Arthur facility (the "Avgas Contracts").[33] These contracts do ***not*** exhibit the necessary "subjection, guidance, or control" necessary to satisfy the "acting under" requirement.

At the beginning of World War II, private capital was generally unwilling to finance the expansion of refining facilities solely to service the limited one-year term supply contracts (the maximum term to which the military could commit) for military fuels like avgas.[34] The solution

---

[30] *Government of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 193 (1st Cir. 2024) (quoting *Watson,* 551 U.S. at 153)). *Watson* cited with approval the Fifth Circuit's decision in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) ("*Winters*"), which held that a government contractor satisfied the "acting under" requirement of Section 1442 because the contractor was acting on behalf of the government to produce Agent Orange, a carcinogenic herbicide used in Vietnam, and was acting under the close direction of the federal government which had provided "detailed specifications concerning the make-up, packaging, and delivery of Agent Orange," as well as "on-going supervision . . . over the formulation, packaging, and delivery of Agent Orange." 149 F.3d at 399–400

[31] *City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022) (emphasis supplied) (citations omitted), *cert. denied*, 143 S.Ct. 1795 (2023).

[32] At the threshold, Defendants have failed to identify any particular "federal officer" that The Texas Company was "acting under." The DSC, which was a congressionally-chartered subsidiary of the Reconstruction Finance Corporation ("RFC") created in 1940 and dissolved in 1946, is a "federal agency." *Southern Pac. Co. v. Recon. Finance Corp.*, 161 F.2d 56, 59-60 (9th Cir. 1947); *see Defense Supplies Corp. v. Lawrence Warehouse Co.*, 336 U.S. 631, 632-33 n. 1 (1949) (referring to DSC and RFC as "arms of the United States Government."). and the term "federal officer," as used in Section 1442, does not include federal agencies. *International Primate*, 500 U.S. at 79-80. To the extent the "federal officer" is the person(s) who signed the Avgas Contracts, this means that the Court must find the required "subjection, guidance, or control" within the four corners of the Avgas Contracts, as there is no evidence of any other interactions between DSC "officers" and The Texas Company.

[33] Doc. 76-2 (Exhibit 151); Doc. 76-13 (Exhibit 252).

[34] Record Exhibit 1; ROA.28924-28925 (declaration of Jay L. Brigham, Ph.D. ("Brigham Declaration"), ¶¶ 34-35); Record Exhibit 2; ROA.29445-56 (excerpt from William Tidwell & Brendan O'Callaghan, *The Role of the Defense Supplies Corporation in the Wartime Aviation Gasoline Program*. Historical Reports on War Administration: Reconstruction Finance Corporation (1949), attached as an exhibit to the Brigham Declaration). When the *Riverwood* record was introduced into the record of this case by stipulation (*see* Docs. 71-73, 75), the headers of these documents were unfortunately obscured by the filing process. Such documents are physically attached hereto and designated as "Record Exhibit ___." These exhibits are taken from the appellate record, which has its own page number format that remains legible, and thus citations to the appellate record ("ROA") are also presented for the Court's convenience.

to this problem was twofold: the RFC's incorporation of the DSC, whose purpose was to enter into multi-year supply contracts with refiners to purchase needed products (like avgas) for resale to the military; and complementary creation of a loan program to finance such plant expansions.[35] "In other words, the RFC offered (1) to make purchase commitments for longer periods than the Services could make, thereby justifying the investment of private capital in new facilities, and (2) to build or finance the construction of new facilities. It was the use of these two devices that enabled the great expansion of productive facilities during the war."[36]

The Government also provided refiners with a second option, namely, the construction of adjunct Government production facilities under funding and direction provided by the Defense Plant Corporation ("DPC").[37] However, most refiners, like The Texas Company in this case, opted for the DSC supply contract/RFC loan option, precisely because they wanted to avoid Government control or supervision of the construction or operation of their facilities.[38]

The Avgas Contracts at issue in *this* case are DSC, not DPC, contracts. And as the foregoing discussion suggests, those contracts contain none of the hallmarks of Government control or supervision typically present when a Government contractor "acts under" a federal officer. While the Avgas Contracts recite that the DSC is obligated to buy 5,900 barrels per day "in accordance

---

[35] *Id.*

[36] Record Exhibit 2; ROA.29448 (Tidwell & O'Callaghan, p. 12). As historian David Kennedy has observed, "[w]hen tax-advantaged private capital was not forthcoming, the [RFC] stood ready to provide government loans for needed plant expansion. As a further emolument, Roosevelt ordered the Justice Department to relax antitrust prosecutions." Record Exhibit 1; ROA.28918-28919 (Brigham Affidavit, ¶ 20); Record Exhibit 3; ROA.28979 (David M. Kennedy, *Freedom from Fear*, *The American People in Depression and War, 1929-1945*, p. 623 (New York: Oxford University Press, 1999) (attached as an exhibit to the original Brigham Declaration). This book won the Pulitzer Prize for history in 2000. Record Exhibit 1; ROA.28915.

[37] Record Exhibit 2; ROA.29445-56 (Tidwell & O'Callaghan).

[38] Record Exhibit 2; ROA.29450 (Tidwell & O'Callaghan, p. 14) ("Most of the large oil companies engaged in the aviation gasoline program preferred not to use the DPC mechanism. Having long-term purchase commitments from the Government and other incentives, the companies preferred to erect new facilities as private rather than public ventures. Further, the vast majority of new facilities built were additions to existing refineries, rather than complete new refineries. The companies did not like the idea of intermingling their own facilities with Government-owned installations.").

with the alternate specifications set forth in Exhibit A attached hereto," Exhibit A is only a one-page price list reflecting the price the DSC will pay for the listed grades of avgas, and contains no details regarding how The Texas Company should produce the listed grade of avgas.[39] This is unsurprising, given that "contemporary commentators and participants in the wartime programs are virtually unanimous that the relationship was cooperative, *and that the government left the production details largely to the industry*."[40]

Likewise, the Avgas Contracts lack any provision allowing DSC employees to monitor or participate in refinery operations; the only provision in the Avgas Contracts for "inspections" involve inspections of the quality and quantity of avgas delivered for sale, *i.e.*, inspections of the final product *after* all refining is complete.[41] This lack of any federal control or oversight extends to disputes that may arise under the Avgas Contracts, which are to be decided by private arbitrators unaffiliated with either The Texas Company or the DSC.[42]

These terms are what one would expect of a contract to sell avgas to the DSC, an intermediary between private industry and the military whose sole purpose was to provide an output purchase obligation of sufficient length to encourage the *voluntary* investment of *private* capital.[43] The same is true of the contractual provisions reflecting the RFC's loan commitment, which address the same sort of commercial loan transaction (at favorable terms) that federal

[39] Doc. 76-2, p. 351; *see* Doc. No. 76-2, pp. 335-51 (initial contract); Doc. 76-13, pp. 125-158 (amendments); *see also* 2 4; ROA.29863-73 (expert affidavit of Charles Norman). While the Avgas Contracts also provide for "other specification which by mutual agreement shall be attached as an addendum to Exhibit A," there is no evidence of any addendum which provided any requirements regarding the refining process, the equipment to be used, or the conduct of refining operations. *Id*.
[40] Record Exhibit 1; ROA.28916 (Brigham Declaration, ¶ 15) (emphasis supplied).
[41] Doc. 76-2, pp. 344-45, 351; Doc. 76-13, pp. 131-32, 148-49. The contracts do not require DSC inspectors, but rather only the issuance of a "certificate of inspection" by an "available" and "licensed inspector" whose inspection "conform[s] with usual industry practice." *Id*. In other words, the inspection regime called for by the Avgas Contracts was the same as every other commercial purchaser of refinery output.
[42] *Id*.
[43] As Defendants' own evidence recounts, "[t]he DSC was a government corporation organized in August 1940 as a subsidiary of the RFC to finance plant expansion and purchase 100-octane aviation gasoline." Doc. 76-1 (Gravel Affidavit, n. 7); *see* Doc. 76-2, pp. 21-31 (Final Report on the Reconstruction Finance Corporation).

agencies participate in on a daily basis.[44] More to the point, these are *not* the sort of contracts that the Fifth Circuit has found establish the "acting under" element.

In *Winters*, for example, the Fifth Circuit found that the defendants' evidence showed that the Government controlled the manufacturing and distribution process through its detailed contractual specifications:

> Each was required to produce and provide to the Department of Defense the herbicidal mixture known as "Agent Orange"—with the specifications for the defoliant (and its packaging) specifically dictated by the government. Although the defendants had produced 2,4–D and 2,4,5–T for commercial use before government involvement, their commercial formulations were never composed of a mixture of 100% pure 2,4–D/ 2,4,5–T, which the government required for the most part (98% for 2,4–D and 99% for 2,4,5–T) in its contracts with the defendants. Instead, the defendants had always included a substantial percentage of inert ingredients to dilute the two active ingredients and required further dilution before commercial application. In contrast, the government's specifications for Agent Orange included use of the two active chemicals in unprecedented quantities for the specific purpose of stripping certain areas of Vietnam of their vegetation. To quickly achieve this goal, the government dictated that Agent Orange contain only the active ingredients 2,4–D and 2,4,5–T and it applied the product in Vietnam without dilution.[45]

Likewise, in *Zeringue v. Crane Company*, the Fifth Circuit found a satisfactory showing of control and supervision was made by contract documents and affidavits showing that equipment manufactured for sale to the Navy was constructed in accordance with specifications so detailed that they regulated the raw materials used in the manufacturing process.[46] Furthermore, in both *Zeringue* and *Winters* the contracts provided for inspections, performed by Government inspectors, to ensure the detailed contractual specifications were being followed.[47] The Avgas Contracts are

---

[44] Pursuant to the initial Avgas Contract, RFC loaned The Texas Company $5 million to finance the initial expansion. Doc. No. 76-2, pp. 336, 342-43; *see Plaquemines IV*, 103 F.4th at 337. An additional expansion of The Texas Company's Port Arthur facility was financed by the RFC in March of 1942, and at that time the RFC loaned The Texas Company an additional $16.125 million. Doc No. 76-13, pp. 125-158. The Texas Company, for its part, presumably enjoyed the benefits of its expanded production facilities (which under the Avgas Contracts it alone owned and controlled) long after World War II ended and the DSC had ceased to exist. This was, of course, the benefit of accepting the DSC contract option, as opposed to the Government-controlled DPC option.

[45] *Winters*, 149 F.3d at 399.

[46] 846 F.3d 785, 792 (5th Cir. 2017), *overruled on other grounds by Latiolais*, 951 F.3d at 296.

[47] 846 F.3d at 788; 149 F.3d at 399, 401 n. 14.

nothing more than contracts to supply the military with a product needed for the war effort. Such contracts lack sufficient indicia of control and supervision to satisfy the "acting under" element.[48]

Plaintiffs anticipate that Defendants will attempt to rely upon the panel decision in *Plaquemines IV* to satisfy their evidentiary burden. However, that decision has been vacated, and lacks any precedential force. That decision also reviewed a different record and different factual findings.[49] In *this* case, the Fifth Circuit's remand order expressly indicates that it "express[es] no view on the merits of this case and leave[s] all issues to be addressed by [this Court] in the first instance." Accordingly, this Court, as the trier-of-fact, should make all factual determinations regarding what the Avgas Contracts say (and do not say) "in the first instance."

Moreover, the findings made in *Plaquemines IV* are inconsistent with the record in this case. While *Plaquemines IV* discussed with approval the *Winters* decision, it failed to consider whether the Avgas Contracts (as opposed to other contracts before that court) contain the detailed manufacturing specifications found essential in *Winters* and *Zeringue*.[50] They do not. This lacuna is dispositive, because, in the absence of "subjection, guidance, or control," a contract to supply a significant or even pressing military need cannot meet the "acting under" standard.

*Plaquemines IV* also rested in large part upon its view that "the terms of Defendants' federal contracts vested the government with control over the size and manufacturing capacity of their refineries."[51] This is an inaccurate characterization of the terms of the contracts at issue here. The Avgas Contracts express only that The Texas Company is "willing" to *voluntarily* expand its facilities to enable the manufacture of larger volumes of avgas *if* the RFC lends it the money to

---

[48] *Zeringue*, 846 F.3d at 792; *Winters*, 149 F.3d at 399; *accord, Czerno v. General Elect. Co.*, 182 F.4th 15, 23 (1st Cir. 2026) ("acting under" prong satisfied where "Several exhibits in the record demonstrate a high level of detail and specification in the government's demands from GE.").
[49] The panel in the vacated decision considered not only the Avgas Contracts at issue in this case, but also other avgas contracts involving other refiners and refineries not relevant to this case. *See* 103 F.4th at 337-38.
[50] 103 F.4th at 334-35.
[51] 103 F.4th at 335.

finance this expansion. Nothing in the plain text of the Avgas Contracts gives the DSC any "control" over the planning or execution of this expansion; rather, as with other DSC contracts, such "control" remained entirely in the hands of private industry.[52] In sum, the Avgas Contracts are nothing more than "arms-length business agreements" that do *not* exhibit the "subjection, guidance, or control" by a "federal officer" necessary to satisfy the "acting under" element.[53]

### D. Defendants Cannot Establish that The Texas Company's Production of Crude Oil in the Delacroix Island Field "Relates to" Its Avgas Refining.

#### 1. The Relevant "Acts" Are Confined to the Refining of Avgas, the Only Product Addressed by the Avgas Contracts.

Assuming *arguendo* that The Texas Company was "acting under" a "federal officer," the question remains what "acts" of The Texas Company qualify as "acts under color of such office." A company that "acts under" a "federal officer" pursuant to a contractual line of business does not "act under" the direction of that federal officer for ***all*** purposes.[54]

In *St. Charles Surgical Hosp.*, the Fifth Circuit considered a lawsuit challenging hundreds of insurance claims made against an insurer (Blue Cross/Blue Shield, or "BCBS"). Discovery responses indicated that a handful of the claims at issue might concern insurance claims by federal employees under a BCBS-administered program managed by the Office of Personnel Management ("OPM"). Federal officer removal jurisdiction in *St. Charles* thus hinged upon whether any relationship between the lawsuit and claims as to which BCBS was "acting under" OPM.[55] As the Fifth Circuit observed, "even if BCBS is determined to have been acting under OPM in this case,

---

[52] *See* Doc. 76-2, pp. 335-351 (initial contract); Doc. 76-13, pp. 125-158 (amendments).
[53] *City of Oakland v. BP PLCI*, 2023 WL 8179286 (9th Cir. Nov. 27, 2023) (considering DSC contracts for the refining of avgas during World War II and finding they fail to satisfy the "acting under" element) (unpublished disposition).
[54] *See St. Charles*, 990 F.3d at 455.
[55] *St. Charles Surgical Hosp.*, 990 F.3d at 455 ("If the district court concludes that St. Charles's waivers are valid, then there may be little room to contend that BCBS 'acted under' OPM in administering non-federal health insurance payments. And the same may be true if, irrespective of the waivers, the court concludes that St. Charles's complaint does not include any federally-governed claims, because the discovery disclosures to the contrary were inadvertent, or otherwise.").

it is possible that the alleged conduct underlying St. Charles's fraud and abuse-of-right claims was not connected or associated with (or related to) any federal directive *from OPM*."[56]

In this case, because Defendants premise their satisfaction of the "acting under" element solely upon the Avgas Contracts, which pertains only to the refining *of avgas* at The Texas Company's Port Arthur, Texas refinery. If the evidence shows only that crude oil produced in the Delacroix Island Field was refined at this refinery into *other* (military or civilian) products,[57] but not avgas, Defendants will have failed to prove that the production of this crude oil "relates to acts under color of" a DSC officer, *i.e.*, those Acts "directed" by the Avgas Contracts. In other words, evidence that merely establishes a relationship between this lawsuit and The Texas Company's general refining operations during World War II, but does not show a relationship between this lawsuit and the refining of avgas specifically, will not satisfy the "relating to" element.

**2. Defendants' Removal Does Not Survive Application of the *Chevron* Test to the Facts of Record.**

The relationship the court discerned in *Chevron* arose from the fact that "much of the crude oil" that The Texas Company produced from a specific field (the Delta Duck Club Field) "was ultimately used for its own avgas refining."[58] As the *Chevron* court stated it, this crude oil was "essential feedstock" for The Texas Company's contemporaneous refining operation, and thus anything that impacted the ability of The Texas Company to produce this "essential feedstock" (such as the operational standards inherent in Plaintiffs' coastal permit claims) also impacted the ability of The Texas Company to refine avgas.[59]

---

[56] *Id*. (emphasis supplied).

[57] Although the military's use of petroleum products greatly increased during World War II, more than 70% of petroleum products produced during the war were sold on the civilian market. Record Exhibit 1; ROA.28942 (Brigham Declaration, ¶ 84) (citing November 4, 1943 *Oil and Gas Journal*).

[58] *Chevron,* 146 S.Ct. 1052, 1061.

[59] *Chevron*, 146 S.Ct. at 1061 ("If Chevron had refrained from these actions and produced less crude oil as a result, its avgas refining for the military may have suffered.").

The record does not establish that "large quantities of crude oil produced in the Delacroix Island Field" were used "to fulfill" The Texas Company's "wartime avgas contracts with the federal government." To begin with, the only detailed information in this record regarding The Texas Company's Port Arthur operations consists of crude oil usage and refining cost and output data from the first three quarters of 1942, and a single-page "run sheet" showing average daily deliveries of crude oil during February of 1944.[60] The 1942 data reflects that the Port Arthur facility consumed 16,676 barrels from the Delacroix Island Field during the first quarter of 1942.[61] This might seem an impressive number, until one recognizes that the facility's refining operations consumed a total of 11,791,550 barrels of crude oil during the same period.[62] In other words, in the first quarter of 1942, Delacroix Island Field production accounted for only roughly 0.15% of the crude oil refined at The Texas Company's Port Arthur facility. These figures worsen as 1942 progresses, with crude oil produced in the Delacroix Island Field accounting for less than 0.03% of the crude oil consumed by The Texas Company's facility in the second quarter of 1942,[63] and only 0.09% of total consumption in the third quarter of 1942.[64]

This paltry performance may be explained by the fact that the Delacroix Island Field had only one oil-producing well during 1942, the only year for which Defendants produced refinery figures.[65] But nothing in the record supports an inference that the relative participation of the Delacroix Island Field in The Texas Company's refining operation dramatically improved in the following years. To the contrary, the February 1944 run sheet shows only 461 barrels per day being

---

[60] Doc. 76-11, pp. 79-118; Doc. No. .76-13, p. 95.
[61] Doc. 76-11, p. 85.
[62] Doc. 76-11, p. 86.
[63] 2,940 barrels produced in the Delacroix Island Field consumed at the Port Arthur refinery, out of a total of 9,560,566 barrels consumed. Doc. 76-11, pp. 98-99.
[64] 9,910 barrels produced in the Delacroix Island Field consumed at the Port Arthur refinery, out of a total of 10,639,287 barrels consumed. Doc. 76-11, pp. 112-13.
[65] Doc. 76-9, p. 67; Doc. 76-15, p. 139.

received from the Delacroix Island Field, out of a total of 61,140 barrels total, or 0.75%.[66] A slight improvement from 1942, but still merely a drop in the bucket. As *Chevron* indicates, the "relating to" element is not satisfied by a connection that is "tenuous, remote, or peripheral."[67]

If most of The Texas Company refinery's output had consisted of avgas, the question would be whether such a *de minimis* contribution to the refining effort had any meaningful impact on avgas production. However, the same evidence of refinery operations shows that, in the first quarter of 1942, the Port Arthur facility produced 520,425,738 gallons of various petroleum products, including gasolines, napthas, distillates, residual fuel oils, *etc*.[68] During this same time period the Port Arthur facility produced only 384,000 barrels,[69] or 16,128,000 gallons,[70] of avgas. In other words, in the first quarter of 1942, only 3% of the Port Arthur facility's refining output was avgas. In the second quarter of 1942, the percentage of avgas production out of total refinery production increased to 4.3%, or 445,000 barrels[71] (19,110,000 gallons) of avgas out of 440,982,822 gallons total production.[72] In the third quarter, this ratio dipped to 3.6%, or 429,000 barrels[73] (18,018,000 gallons) of avgas out of 497,618,016 gallons total production.[74]

Completely missing from this data is any indication that *any* of the crude oil produced in the Delacroix Island Field was used in the manufacture of avgas. Moreover, while the Delta Duck

[66] Doc. 76-13, p. 95.
[67] 146 S.Ct. at 1061.
[68] Doc. No. 76-11, p. 89.
[69] Doc. 76-2, p. 47. This total was calculated by adding the monthly avgas production figures, as reported by the Government, for the Port Arthur facility from January through March of 1942.
[70] The oil and gas industry standard for 1 barrel is 42 gallons. *Anderson Living Trust v. ConocoPhillips Co., LLC*, 349 F.R.D. 365, 397 n. 17 (D. N.M. 2025) (citing *The History of Why Oil Comes in a "Barrel,"* Petroleum Service Company, https://petroleum service company.com/blog/the-history-of-why-oil-comes-in-a-barrel/ (August 19, 2015)). The Avgas Contracts define one barrel of avgas as equaling 42 gallons. Doc. 76-2, p. 338; Doc 76-13, p. 140.
[71] Doc. 76-2, p. 47. This total was calculated by adding the monthly avgas production figures for the Port Arthur facility from April through June of 1942.
[72] Doc. 76-11, p. 102.
[73] Doc. 76-2, p. 47. This total was calculated by adding the monthly avgas production figures for the Port Arthur facility from July through September of 1942.
[74] Doc. 76-11, p. 116.

Club Field at issue in *Chevron*, the Delacroix Island Field was designated as a "critical field essential to the war program" because it produced "preferential type crudes used for making aviation gasoline," the Delacroix Island Field was ***not*** designated as such a "critical field."[75]

In sum, the evidence of record shows that: (1) Delacroix Island Field production accounted for less than 1% of the crude oil used by the Port Arthur refinery in ***all*** of its refining operations; (2) the refining of avgas was less than 5% of the refinery's output; and (3) while many Louisiana oil fields were designated as "critical fields essential to the war program" because these fields produced "preferential type crudes used for making aviation gasoline," the Delacroix Island Field was not such a field. There is no evidence that "large quantities of crude oil produced in the Delacroix Island Field" were used "to fulfill" the Avgas Contracts. Indeed, it cannot be reasonably inferred that *any* production from the Delacroix Island Field was "essential feedstock" for avgas refining, as opposed to "feedstock" for the many other petroleum products manufactured at the Port Arthur refinery. Consequently, Defendants cannot show that a lawsuit challenging production practices in the Delacroix Island Field "relates to acts under color of" any DSC officer.

## E. Defendants Cannot Establish a Colorable Federal Defense.

### 1. The Colorable Federal Defense Requirement Is The Source Of Article III Jurisdiction

Federal officer jurisdiction "must be predicated on the allegation of a colorable federal defense" that arises from the performance of a federal duty.[76] The assertion of such a colorable federal defense is "the very source of the court's constitutional jurisdiction over the claim."[77] Thus, "it is the raising of a federal question in the officer's removal petition that constitutes the federal

---

[75] Doc. 76-1, pp. 12-13; Doc. No. 76-11, pp. 45-64. Such a designation was a significant factor in the *Chevron* decision. *see Chevron*, 146 S.Ct. at 1061-62 ("The P.A.W. identified Delta Duck Club as a "Critical Fiel[d] Essential to the War Program" because it produced a "preferential" kind of crude oil for refining avgas.") (brackets and quotation marks in original) (citing appellate record).
[76] *Mesa v. California*, 489 U.S. 121, 129 (1989).
[77] *Williams v. Todd Shipyards*, 154 F.3d 416 (5th Cir.1998) (quoting *Mesa,* 489 U.S. at 136).

law under which the action against the federal officer arises for Art. III purposes."[78] Section 1442 "merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged."[79]

**2. Textual Analysis Of Colorable Federal Defense Element**

Under Section 1442, a private "person" must show that he or she is "acting under" a federal "officer," not the "United States" or an "agency thereof," as the parenthetical phrase "any person acting under *that officer*" makes specific reference only to the word "officer,"[80] not to the "United States" or an "agency thereof."[81] This "colorable federal defense" requirement is derived from the "act under color of *such office*" language of Section 1442.[82] The term "such officer" refers back to the specific "office" of the federal "officer" under whom the defendant is "acting" (here, the DSC). The phrase "under color of [federal] office" means "in the performance of [federal] duties."[83]

By tying the "acting under" element to acts taken "under color of such office," the statutory text limits the acts of private defendants subject to federal direction to acts falling within the scope

---

[78]*Id.* Section 1442 "cannot independently support [Article III] 'arising under' jurisdiction" because it is a "pure jurisdictional statute" that does "nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant." *Mesa*, 489 U.S. at 136.

[79] *Id.* (citations omitted).

[80] The Dictionary Act, 1 U.S.C. § 1, defines "officer" as "any person authorized by law to perform the duties of the office."

[81]*International Primate*, 500 U.S. at 79-84 (conducting rigorous textual examination of Section 1442 and concluding that version of statute in effect at that time provided a right of removal only to "federal officers" and those acting under such "federal officers," and not to "federal agencies"). While *International Primate* was later legislatively overruled by the amendment allowing the United States and federal agencies to utilize Section 1442 removal, this amendment did not revoke the pre-existing statutory requirement that a person "act under" a particular "federal officer" in order to qualify for removal under the statute. The 1996 amendment that granted federal agencies the right to remove under Section 1442 invokes the clause of Article III, section 2, which extends the "judicial power . . . to Controversies in which the United States shall be a party," and not the initial clause of that section (the clause applicable to "federal officers" and those "acting under" them), which extends the judicial power to cases "arising under" federal law. *City of Cookeville v. Upper Cumb. Elec. Member. Corp.*, 484 F.3d 380, 391 (6th Cir. 2007); *accord, Katsigiannis v. M.H. Parsons & Sons*, 2025 WL 2778102, * 2-3 (D. N.H. Sept. 26, 2025) (collecting cases).

[82]*Mesa*, 489 U.S. at 135. ("[W]e concluded that 'in the performance of his duties' meant no more than 'under color of office,' and *that Congress meant by both expressions to preserve the pre-existing requirement of a federal defense for removal.*") (emphasis added); *Willingham v. Morgan,* 395 U.S. 402, 406-07 (1969)(same); *Jax Leasing v. Xiulu Ruan*, 359 F.Supp.3d 1129, 1136 (S.D. Ala. 2019) ("requirement of a colorable federal defense flows from the 'act under color of such office' language").

[83]*Mesa*, 489 U.S. at 135 (brackets supplied) (full quote in Note 89, *supra*).

of the officer's official duties.[84] Consequently, any federal defense premised on an "act under color of such office" must arise from the performance of the duties of a federal office. Conversely, a private party's federal defenses to acts *not* conducted under color of federal office cannot support Article III "arising under" jurisdiction. Thus, any federal defense to private "charged conduct" that may "relate to" a suit against a person "acting under" a federal officer cannot satisfy the colorable federal defense element. While the 2011 amendment modified Section 1442 by extending federal officer jurisdiction to suits that challenge conduct only "related to any act under color of [a federal officer's] office," that amendment did not disturb the statutory language that is the basis for the colorable federal defense element, or otherwise purport to modify that element.

### 3. The Jurisprudence Uniformly Supports The Foregoing Textual Analysis

The Supreme Court has consistently held that a "colorable federal defense" must arise from the performance of official (federal) duties, *i.e.*, acts "under color of federal office:"

> [The Government] argues that the removal statute is an incident of federal supremacy, and that one of its purposes was to provide a federal forum for ***cases where federal officials must raise defenses arising from their official duties***. On this view, the test for removal should be broader, not narrower, than the test for official immunity. We agree. [85]
>
> Historically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to ***raise a defense arising out of his official duties***. The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice. It also enables the defendant to have the validity of his immunity defense adjudicated, in a federal forum. For these reasons, this Court has held that the right of removal is absolute ***for conduct performed under color of federal office***, and has insisted that the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).[86]

---

[84] *See* block quotes from *Willingham, Arizona, Mesa, and Isaacson*, *infra*, pages 35-36; *see also Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1313 (9th Cir. 1981) ("Act under color of such office" provision "restricts or clarifies the types of cases" removable under Section 1442.). In other words, the federal authority of a "person" who "act[s] under" a federal officer does not extend beyond "***that officer['s]***" authority under federal law.

[85] *Willingham*, 395 U.S. at 405 (emphasis supplied). This language was later approved in *Mesa,* 489 U.S. at 137.

[86] *Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981) (emphasis supplied) (internal quotation marks and citations omitted).

> Accordingly, we concluded that ***"in the performance of his duties" meant no more than "under color of office," and that Congress meant by both expressions to preserve the pre-existing requirement of a federal defense for removal***. Again, we see no reason to depart from this long-standing interpretation of Congress' intent in enacting the removal statute.
>
> * * * * *
>
> We are simply unwilling to credit the Government's ominous intimations of hostile state prosecutors and collaborationist state courts interfering with federal officers by charging them with traffic violations and other crimes for which they would have no federal defense in immunity or otherwise. That is certainly not the case in the prosecutions of Mesa and Ebrahim, nor was it the case in the removal of the state prosecutions of federal revenue agents that confronted us in our early decisions. In those cases where true state hostility may have existed, it was specifically directed against ***federal officers' efforts to carry out their federally mandated duties***.[87]

The question remains, however, whether the 2011 amendment to Section 1442, which did not change the "under color of such office" language that supports the colorable federal defense element, nonetheless somehow modified the contours of this distinct element. No rule of statutory interpretation suggests that it did. In both the pre-2011 and post-2011 versions of the statute, the "acting under" federal officer element is textually tied to "act[s] under color such office." In 2011, the statute was amended to cover suits both "for" and "relating to" an "act under color of such office," but the phrase "such office" remains as an *explicit* reference to the office of the officer the defendant is "acting under."

The present suit alleges only acts involving crude production (which *Plaquemines II* held does not involve the performance of *any* federal duties). In the wake of *Plaquemines II*, Defendants alleged that in acting as refiners, they were performing federal duties. If that is the case, then any

---

[87] *Mesa*, 489 U.S. at 135, 138-39 (emphasis supplied). And these principles have been consistently applied by the lower federal courts. *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138-39 (2d Cir. 2008) ("At its core, the defense prong requires that the defendant raise a claim that is defensive and based in federal law. ***More specifically, such defense must arise out of the party's official duties***. . . . The federal defense requirement is satisfied in all cases where federal officers can raise a colorable defense ***arising out of their duty to enforce federal law***.") (emphasis supplied) (internal quotation marks and citations omitted).

colorable federal defense *to the claims in this lawsuit* urged by Defendants thus must arise also from their refining activities. Yet, Defendants urge no such defenses.

No reported decision has held that the distinct colorable federal defense element was modified by the 2011 amendment. On the other hand, the First, Fourth, and Ninth Circuits have affirmed the continued viability of the pre-2011 Supreme Court jurisprudence.[88] While the Fifth Circuit has not directly applied the pre-2011 formulation as a rule of decision in a post-2011 case, it has adopted this formulation in at least one post-2011 case.[89] A contrary decision in this case that would jettison the requirement that the colorable federal defense element arise from the performance of a federal duty and would depart from the unbroken line of circuit jurisprudence.[90]

In *Latiolais,* the en banc Fifth Circuit observed that "[p]ermitting removal of all acts 'relating to' an act under color of federal office *that meet the other requirements of removal* did not radically change the Federal Officer Removal Statute."[91] Stated differently, *Latiolais* instructs

---

[88] *See West Virginia v. Caremark PCS*, 140 F.4th 188, 198 (4th Cir. 2025) ("A colorable federal defense is one that 'is defensive and based in federal law,' and that 'arise[s] out of a defendant's official duties.'"); *County Bd. v. Express Scripts*, 996 F.3d 253, 254 (4th Cir. 2021) ("'The Supreme Court has emphasized that such a defense must 'aris[e] out of [a defendant's] official duties.'") (quoting *Manypenny*, 451 U.S. at 241); *City & County of Honolulu*, 39 F.4th at 1110 ("Prong two requires Appellants to assert a colorable federal defense. The defense must arise out of defendant's official duties."); *Government of Puerto Rico*, 119 F.4th at 187 (observing that if a plaintiff "sues a defendant for the defendant's conduct on private property divorced from the work that it performed for a federal officer," the defendant "could not raise a colorable federal defense arising from its private conduct") (citations omitted). Post-2011 district court cases also continue to require that colorable federal defenses to arise out of the performance of federal duties. *See, e.g., U.S. v. Leventhal*, 2024 WL 38581760, *2 (E.D. Wis. Aug. 19, 2024) ("Nor are his claimed civil rights violations a 'colorable federal defense,' as such a defense must arise out of the defendant's duty to enforce federal law.") (internal brackets, quotation marks, and citations omitted); *Attorney General v. Dow Chem. Co.*, 2024 WL 1740087, *11 (D. N. J. April 23, 2024) ("[T]he defendant must establish that it arises out of defendant's official duties."), *aff'd*, 140 F.4th 115 (3d Cir. 2025); *In re Nat'l Prescr. Opiate Litig.*, 327 F.Supp.3d 1064, 1069 (N.D. Ohio 2018) ("The purpose of federal officer removal jurisdiction is to ensure that federal officers can raise colorable federal defenses arising out of their duty to enforce federal law and are given the impartiality of a federal forum.") (citations omitted); *Kelley v. Abram*, 2017 WL 586360, *1 (D. Minn. Feb. 13, 2017) ("To qualify for removal, however, [Abram] must also raise a 'colorable federal defense arising out of his duty to enforce federal law. In other words, there must be a causal nexus between the challenged conduct and the defendant's official authority.").

[89] *Humphries v. Elliott Co.*, 760 F.3d 414, 416-17 (5th Cir. 2014) ("The purpose of § 1442(a)(1) is to 'ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties.'") (quoting *Manypenny*, 451 U.S. at 241).

[90] Even Judge Oldham's dissent in the vacated case acknowledges that "there will be factual situations in which a federal officer or someone acting under a federal officer could be engaged in activities *related to* the federal authority, yet no federal defense will apply." *Plaquemines IV*, 103 F.4th at 355.

[91] *Latiolais,* 951 F.3d 286, 295.

that the 2011 amendment did not effect a change in the colorable federal defense requirement. This is unsurprising, given that the very purpose of Section 1442 is "to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties."[92] Accordingly, the Fifth Circuit in *Latiolais* rejected the plaintiff's "policy related complaints" that the literal application of the "relating to" standard "suffuses indeterminacy" in place of "workable standards" by noting that "the statute's requirement that a removing party assert a colorable federal defense remains a constitutional, viable, ***and significant limitation*** on removability."[93] Consistent with the foregoing statutory and jurisprudential authorities, this Court should find that, while a removing defendant is no longer required to show that it acted "under color of federal office" when engaged in the challenged conduct, it remains obligated to prove the existence of a colorable federal defense arising from official duties.

**4. Defendants Have No Colorable Federal Defenses**

**Due Process.** On appeal, Defendants asserted that Plaintiffs violated the Due Process Clause by attempting to apply the Louisiana State and Local Coastal Resources Management Act of 1978 (the "SLCRMA") retroactively, and thus impose liability upon them for conduct that occurred before the SLCRMA was enacted. This assertion fails at the threshold. A "colorable federal defense" must be "defensive."[94] "A discriminatory or unconstitutional state law is not a *defense* to liability under federal law. It is a *source* of liability under federal law."[95] Furthermore, "[t]he defense must be raised in the defendant's notice of removal," and here it is not.[96]

---

[92]*Manypenny*, 101 S.Ct. at 1664 (1981)(emphasis added); *Mesa*, 489 U.S. at 133.
[93] *Id.* at 296.(emphasis added).
[94] *Clark v. United States*, 2018 WL 11312978, *2 (E.D. Mo. Aug. 9, 2018) (quoting *Mesa*, 489 U.S. at 129–30).
[95] *CSWS LLC v. Village of Bedford Park*, 2008 WL 4148530, *2 (N.D. Ill. Aug. 29, 2008) (brackets omitted) (emphasis in original) (quoting *Quinoes v. City of Evanston*, 58 F.3d 275, 277 (7th Cir.1995)).
[96]*Blum v. AT&T Corp*, 2025 WL 2792249, *12 (W.D. La. Sept. 12, 2025) (citing *Latiolais*, 952 F.3d at 290); *see* Doc. 1.

Nor does this defense arise form the execution of federal duties. "Most defenses do not flow from official duties."[97] That is the case here. This "defense" does not involve the performance of any duties (federal or otherwise) during World War II. Rather, it rises out of the filing of a lawsuit in the 21ST century. Such a defense, which protects only private conduct and lacks any nexus with any discernible federal office, does not satisfy the colorable federal defense element.

Defendants' "due process" claim is also not colorable. As with all elements of removal under Section 1442, the plausibility of a proffered federal defense must be evaluated as of the time of removal, without regard to post-removal developments.[98] Defendants cannot identify any liberty or property interest of which they were deprived, at the time of removal, due to Plaintiffs' putative effort to enforce its regulations retroactively, as required to establish a violation of substantive due process.[99] Indeed, this remains the case today, because "[t]he conclusion that a particular rule operates 'retroactively' comes ***at the end of a process of judgment***," and there is not yet any judgment applying any law retroactively to divest Defendants of any liberty or property interest.[100]

In any case, "the constitutional impediments to retroactive civil legislation are now modest."[101] Retroactive application of a law only violates substantive due process when the law, which is presumed constitutional, is applied in an arbitrary or irrational manner.[102] Shifting some

---

[97] *City & County of Honolulu*, 39 F.4th at 1110.
[98] *Williams v. Lockheed Martin Corporation*, 90 F.3d 852, 862-63 (5th Cir. 2021).
[99] *Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240, 249-52 (5th Cir. 2000).
[100] *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994) (emphasis supplied). Nor will there ever be such a judgment. Plaintiffs do not seek a retroactive application of the statute and regulations. Under the statutes and regulations (*see* La. R.S. 49:214.21 *et seq*.; 43 La. Admin. Code Pt I, 700, *et seq.*) an operator who "legally commenced or established" an "individual specific use" before the start of the permitting program was not required to obtain a permit to continue that use after the start of the program if the use was not substantially changed after its commencement. However, uses illegally commenced before but continued after the start of the program required a permit, because such uses are "uses" as defined in the statute. Pre-program uses terminated before the start of the program are excluded from the program, and are thus not actionable, *even if such uses were illegal under applicable law*. The only actionable pre-program uses at issue here are illegally commenced or established pre-program uses continued after the program without a permit, or violations of permits issued for such uses.
[101] *Landgraf*, 511 U.S. at 272.
[102] *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15-16 (1976).

of the cost of restoring Louisiana's coastal zone to the parties who exploited that zone and substantially contributed to the extant pollution and land loss in that zone is not "arbitrary" or "irrational." As regards procedural due process, in *Holloway v. Parker* the Fifth Circuit, applying the *Parratt-Hudson* doctrine, held (in the context of an action by an oil company alleging a state judge and litigants conspired to deprive them of a fair trial) that federal due process guarantees were sufficiently served by the availability of post-deprivation remedies in the state court appellate system.[103] Defendants cannot come close to the showing required by *Holloway*.

**Preemption.** Defendants have also asserted the defense of conflict, citing conflicts with Louisiana law and wartime federal crude oil production regulations promulgated by the Petroleum Administration for War ("PAW"). Defendants cannot show that this defense is colorable.[104]

As per *Plaquemines II*, this defense also does not arise from the performance of any federal duties. Moreover, the "colorable federal defense" requirement is derived from the "act under color of *such office*" language of Section 1442. On the facts of this case, the relevant "federal officer" is an "officer" of the DSC, and thus "such office" is the DSC (a subsidiary of the RFC), not the PAW (a separate wartime agency). Consequently, a defense premised upon regulations of the PAW cannot serve as a "colorable federal defense" sufficient to invoke Article III "arising under" jurisdiction. This result is consistent with every post-2011 Section 1442 case in which the Fifth Circuit has found that a "colorable federal defense" of preemption exists; in all such cases, the federal laws effecting the preemption were the same federal laws executed by the "office" of the "federal officer" that the removing defendant "acted under."[105]

---

[103] 784 F.2d 1287 (5th Cir. 1986).

[104] As the Supreme Court has observed, "a court should not find pre-emption too readily in the absence of clear evidence of a conflict," *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000) (citation omitted), and "pre-emption is ordinarily not to be implied absent an actual conflict." *English v. General Elec. Co.*, 496 U.S. 72, 90 (1990) (internal quotation mark and citation omitted).

[105] *Caris*, 108 F.4th at 347; *St. Charles Surg. Hosp. v. Louisiana Health*, 935 F.3d 352, 357-58 (5th Cir. 2019); *Butler v. Coast Elec. Power Assoc.*, 926 F.3d 190, 198-200 (5th Cir. 2019).

Defendants also neglect that this action is brought pursuant to the SLCRMA, which was approved pursuant to Louisiana's Coastal Zone Management ("CZM") Laws. The Coastal Zone Management Act of 1972, 16 U.S.C. § 1456 *et seq*., expressly requires that federally regulated activities must be conducted in a manner consistent with the State's program, thus establishing a form of "reverse pre-emption" in favor of the State's CZM laws.[106] Defendants' pre-emption argument is not colorable because Defendants "cannot deny the significance of the Coastal Zone Management Act's grant of power and concurrent authority to the states."[107]

Lastly, the facts alleged in support of Defendants' pre-emption defense (which is based entirely on statements in the *Rozel* expert report that triggered this removal) are not supported in the record. Defendants have previously contended, for example, that Louisiana law required Defendants to build "overland roads" to their E&P facilities instead of dredging canals, or to use "steel tanks" instead of earthen pits. Not so. Plaintiffs have never disputed that some level of canal dredging was necessary. The *Rozel* report merely states that land loss and pollution should have been minimized by employing alternative measures such as directional drilling, subsurface injection, and "[a] *limited number* of roads [] built to central areas where land operations could be conducted," and that these alternative measures were largely disregarded in favor of the *overuse* of dredged canals.[108] Nowhere in the *Rozel* Report is there any suggestion that dredging should have been avoided altogether, or that roads should always have been used. As regards the "steel pits" assertion, Defendants have cited only 6 Fed. Reg. 5880. 5880 (Nov. 19, 1941). However, this

---

[106] 16 U.S.C. § 1456; *see Stutes v. Gulfport Energy Co.*, 2017 WL 4286846, * 13-14 (W.D. La. June 30, 2017); Carlson and Mayer, *Reverse Preemption*, 40 Ecology L.Q. 583 (2013).
[107] *Stutes*, 2017 WL 4286846, * 13 (citing Carlson and Mayer, *Reverse Preemption*, *supra*).
[108] Doc. 1-6, p. 2; Doc. 1-2, pp. 6, 9, 17. In fact, Defendants unwittingly provided evidence that proved this point by offering a 1944 Oil and Gas Journal article that notes that "operators in a number of instances have elected to excavate canal systems in areas in which the surface is comparatively dry most of the time and where land drilling rigs could have been used and roads provided without too much difficulty." Doc. 72-15, p. 20.

regulation on its face applies only to metal "containers" used for "petroleum or petroleum products" such as "drums, cans, and tubes," not steel tanks used for crude production.

Defendants have also mischaracterized Plaintiffs' arguments, stating that Plaintiffs are contending that Defendants "should have adopted 'alternative' practices in the early 1940[]s that would have 'reduced production rates.'" But the *Rozel* report says precisely the opposite, to wit: "[Directional drilling that should have been employed] had the advantage of drilling from a central location and eliminating or reducing long surface flowlines that reduce production rates and increased leaks and spill."[109] In other words, Plaintiffs' alternatives would have increased production rates, not reduced them! Moreover, Plaintiffs did not "take issue" with the "24/7 nature" of Defendants operations. The *Rozel* report merely observes: "[T]he 24/7 nature of operations of equipment generated accelerated wave action that erodes levees and destroys marshes."[110] The "24/7" nature of oil production is the nature of oil production generally, not just on the Louisiana coast. The report criticizes the excessive use of access canals that erodes levees and destroys marsh, not the fact that crude production was an around-the-clock enterprise.

Defendants have failed to demonstrate that preemption is a "colorable" federal defense.

## IV. Conclusion

For the reasons set forth herein, this Court should again grant Plaintiffs' motion to remand. Moreover, in light of the many delays that have already attended this case, Plaintiffs request that this Court make factual findings regarding, and fully adjudicate, their waiver argument and *all* elements of the federal officer removal test. Such a comprehensive adjudication of the issues presented will ensure that a decision in the inevitable future appeal of this Court's ruling conclusively resolves all threshold questions of federal jurisdiction presented by this case.

---

[109] Doc. 1-5 (p. 35).
[110] Doc. 1-2, p. 16.

*By Attorneys for Plaintiff, the Parish of Plaquemines:*

*/s/ Victor L. Marcello*
Donald T. Carmouche, #2226 (dcarmouche@tcmlawoffice.com)
Victor L. Marcello, #9252 (vmarcello@tcmlawoffice.com)
John H. Carmouche, #22294 (jcarmouche@tcmlawoffice.com)
Brian T. Carmouche, #30430 (bcarmouche@tcmlawoffice.com)
Todd J. Wimberley, #34862 (twimberley@tcmlawoffice.com)
D. Adele Owen, #21001 (aowen@tcmlawoffice.com
Leah C. Poole, #35092 (lpoole@tcmlawoffice.com)
A. Paul Leblanc, Jr., #23186 (pleblanc@tcmlawoffice.com)
TALBOT, CARMOUCHE & MARCELLO
17405 Perkins Road
Baton Rouge, LA 70810
Telephone: (225) 400-9991
Fax: (225) 448-2568

Bruce D. Burglass, Jr., #1411 (bburglass@burglass.com)
Andre' C. Gaudin, #20191 (agaudin@burglass.com)
Scott O. Gaspard, #23747 (sgaspard@burglass.com)
BURGLASS & TANKERSLEY, LLC
5213 Airline Drive
Metairie, LA 70001-5602
Telephone: (504) 836-0407
Fax: (504) 287-0447

W. Peter Connick, #14158 (pconnick@connicklaw.com)
CONNICK AND CONNICK
3431 N. Causeway Blvd., Ste. 408
Metairie, LA 70002
Telephone: (504) 838-8777
Fax: (504) 838-9903

Darren Sumich, #23321 (dsumich@cossichlaw.com)
David A. Parsiola, #21005 (dparsiola@cossichlaw.com)
Brandon J. Taylor, #27662 (btaylor@cossichlaw.com)
COSSICH, SUMICH, PARSIOLA & TAYLOR, L.L.C.
8397 Highway 23, Suite 100
Belle Chasse, LA 70037-2648
Telephone: (504) 394-9000
Fax: (504) 394-9110